UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X

BARCLAYS CAPITAL REAL ESTATE                    :
HOLDINGS INC.
                                                :       07 CIV 7644
          Petitioner,                                   ____ Civ. _____( )
                                                :
          - against -
                                                :
                                                        **PETITION TO COMPEL**
                                                :       **ARBITRATION**

REGIONS BANK                                    :

          Respondent.                           :

                                                :

-------------------------------------------------------------- X

Petitioner Barclays Capital Real Estate Holdings Inc. ("Barclays" or "Petitioner")

by its attorneys, Cleary Gottlieb Steen & Hamilton LLP, as and for its petition to compel

Regions Bank ("Regions" or "Respondent") to submit certain disputes to arbitration, avers upon

information and belief as follows:

> 1.       Barclays is a privately held corporation chartered in Delaware and

headquartered in New York.  Respondent Regions is a bank chartered under the laws of the State

of Alabama, with offices and principal places of business in the State of Alabama.[1]

> 2.       This Court has subject matter jurisdiction over this matter due to the

diversity of citizenship of the Parties, under 28 U.S.C. § 1332(a)(1).  It is a dispute between

citizens of different states and the amount in controversy is more than $75,000.

Respondent is subject to the personal jurisdiction of this Court.  Respondent expressly agreed to

"irrevocably submit to the jurisdiction of . . . the federal courts of the United States of America

---

[1]   Barclays and Regions shall be collectively referred to as the "Parties."  All initial capital terms not defined
herein are defined in the January 18, 2007 Stock Purchase Agreement ("SPA") between the Parties.

located in the state of New York solely in respect of the interpretation and enforcement of the provisions of this Agreement and of the documents referred to in this Agreement." See Declaration of Richard J. Gordon (the "Gordon Declaration") Ex. 1 at § 10.7 (a).

3.      On January 18, 2007, Barclays entered into the SPA with Regions, by which Barclays acquired all of the outstanding common stock of EFC Holdings Corporation ("EFC"). A copy of the SPA is attached as Exhibit 1 to the Gordon Declaration and made a part hereof by reference.

4.      Under the SPA, within 30 days of Closing, Barclays was to submit to Regions a Final Balance Sheet that would serve as the basis for calculating the final selling price of EFC. See Gordon Decl. Ex. 1 at Schedule 1.4(a). If Regions disagreed with Barclays' calculations, it had to provide notice of such disagreement within 30 days along with its own calculation of what it believed the Final Balance Sheet should be. See id. at Schedule 1.4(b). The Parties then had 15 business days to negotiate to resolve any disagreement over the Final Balance Sheet. Id.

5.      For any disagreement that the Parties could not resolve within the 15 business days, the SPA provided that "such disagreement shall be provided to an independent nationally recognized auditing firm selected by the Parties (the "Settlement Auditor") for resolution in a manner consistent with the provisions of [the SPA]." See Gordon Decl. Ex. 1 at Schedule 1.4(c).

6.      Barclays delivered the Final Balance Sheet to Regions on April 27, 2007. Regions disagreed with Barclays' Final Balance Sheet, and sent its own version of the Final Balance Sheet on May 25, 2007. The Parties attempted to resolve their disagreement as to the appropriate calculations in the Final Balance Sheet, but were unable to do so.

2

7.    In light of the impasse, on July 13, 2007, Barclays requested that the dispute be submitted to a Settlement Auditor as provided in the SPA.

8.    Regions has refused to move forward with the appointment of a Settlement Auditor.  Respondent has therefore failed and neglected, and continues to fail and neglect, to perform under the terms of the SPA.

9.    No previous request has been made for the relief requested herein.

10.    Wherefore, Petitioner moves for an order directing respondent to proceed to arbitration in accordance with the terms of the SPA, and for such other and further relief as may be just and proper, together with the costs of this application and 9% statutory pre-judgment interest.

Dated:  August **27**, 2007
          New York, New York

                                  Respectfully submitted,

                                  CLEARY GOTTLIEB STEEN & HAMILTON LLP
                                  By: _____
                                      Evan A. Davis
                                      Mitchell A. Lowenthal
                                      Jason P. Gottlieb
                                      Anna A. Makanju

                                  One Liberty Plaza
                                  New York, New York 10006
                                  (212) 225-2000

                                  Attorneys for Petitioners Barclays Capital Real
                                      Estate Holdings Inc.

GORDON DECLARATION

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X

BARCLAYS CAPITAL REAL ESTATE      :
HOLDINGS INC.

        :

     Petitioner,         :      \_\_\_\_ Civ. _____ (   )

             - against -         :

        :      **DECLARATION OF**

                  **RICHARD J. GORDON IN**

        :      **SUPPORT OF**
REGIONS BANK                **PETITIONER'S MOTION TO**

        :      **COMPEL ARBITRATION**
     Respondent.

              :

------------------------------------------------------------------ X

Pursuant to 28 U.S.C. § 1746, Richard J. Gordon declares as follows:

1.     I am a Senior Vice President and Chief Financial Officer of EquiFirst Corporation ("EquiFirst"), a wholly owned subsidiary of EFC Holdings Corporation ("EFC"). EFC was formerly owned by Regions Bank ("Regions" or "Seller") and, in the acquisition that is central to the Petitioner's motion, became wholly owned by Barclays Capital Real Estate Holdings Inc. ("Barclays" or "Buyer") when Barclays acquired all of the outstanding common stock of EFC (the "Acquisition").

2.     I have been the Senior Vice President and Chief Financial Officer of EquiFirst during the entire period relevant to this declaration, both before and after the Acquisition. I am personally knowledgeable about the matters set forth below and my statements about Region's positions on the matters in controversy are to the best of my understanding and belief based on oral and written communications between Regions and Barclays.

3.     A dispute has arisen between Barclays and Regions regarding the preparation of a Final Balance Sheet and the calculation of the Final Payoff Amount, which in turn will determine the consideration to be paid for EFC under the January 18, 2007 Stock Purchase Agreement by which Barclays acquired EFC (the "SPA," a true and correct copy of which is attached hereto as Exhibit 1).[1] Barclays contends that this dispute should be resolved by a Settlement Auditor under procedures specified in Schedule 1.4 of the SPA.  Regions contends that some or all of the matters which Barclays contends are to be resolved by the Settlement Auditor should be resolved through judicial proceedings under Article IX of the SPA. The purpose of this declaration, which is submitted in support of Barclays' Petition to Compel Arbitration, is to describe the matters at issue so that there may be a resolution of this aspect of the dispute.

## Overview of Dispute

4.     The SPA documents Barclays' purchase of EFC from Regions.  With the acquisition of EFC, Barclays also became the owner of EFC's wholly-owned subsidiary EquiFirst, a wholesale subprime mortgage lender.  The notional purchase price of EFC was $225,000,000, but Barclays was aware that EquiFirst was operating in a volatile and declining market, and therefore included within the SPA provisions to ensure that the sales price properly reflected EFC's value on the Closing Date.  To address this issue, the SPA required Regions to deliver an Estimated Balance Sheet to Barclays shortly before the Closing Date.  The Estimated Balance Sheet would be used to determine the Initial Payoff Amount – an amount that would be

---

[1]     Barclays and Regions shall be collectively referred to as the "Parties."  All initial capital terms not defined herein are defined in the SPA.  This declaration in support of the motion to compel submission of the issues identified below to the Settlement Auditor should not be read to waive any additional claims that Barclays or EquiFirst may have against Regions under the SPA.

included in the calculation of the sum Barclays would initially pay Regions. Based upon Regions' Estimated Balance Sheet, the Initial Payoff Amount was $175,795,064.

5.    Thereafter, as provided in Schedule 1.4 of the SPA, Barclays was required to prepare a Final Balance Sheet, and timely did so. The purpose of the Final Balance Sheet was to determine the Final Payoff Amount. This – plus $225 million – was the amount Barclays would have to pay for EFC. See Exhibit 1, § 1.3. To the extent the Final Payoff Amount differed from the Initial Payoff Amount, the Parties would make the appropriate adjustment – i.e., either an increase in the payment by Barclays, if the Final Payoff Amount were greater than the Initial Payoff Amount, or a return of payment by Regions, if the Final Payoff Amount were less than the Initial Payoff Amount. In either case, the difference is to be paid with simple interest at the rate of 3% from the Closing Date, which was March 30, 2007.

6.    The Final Balance Sheet prepared by Barclays demonstrated that the Final Payoff Amount ($107,129,870) was less than the Initial Payoff Amount ($175,795,064), so under the terms of the SPA the Seller, Regions, had to return funds to the Buyer, Barclays.

7.    The underlying dispute concerns disagreements among the Parties about the preparation of that Final Balance Sheet, something the Parties contemplated might happen, and something the Parties explicitly provided in the SPA would be resolved by a "Settlement Auditor." Regions, however, disagrees with the role of the Settlement Auditor and has refused to proceed with the Settlement Auditor selection process, necessitating this Motion to Compel.

8.    The SPA provides that the Final Balance Sheet "shall be prepared in accordance with GAAP, and, to the extent consistent with GAAP, on the basis of the same accounting principles and practices, and, regardless of whether consistent with GAAP, in the same format and utilizing the same line item classifications, as were used by Seller and the

3

Company (as the case may be) in preparing the Estimated Balance Sheet, the Balance Sheet [defined to be the audited balance sheet at December 31, 2005] and the example Estimated Balance Sheet set forth on Schedule 1.2 hereto." Exhibit 1, Schedule 1.4(a). In other words, the SPA is clear that if an accounting principle or practice used in preparing the Estimated Balance Sheet is not in accordance with GAAP, then the requirement of GAAP, rather than consistency with the Estimated Balance Sheet, controls in the preparation of the Final Balance Sheet.

9.    The Final Payoff Amount is defined in Section (e) of Schedule 1.4 to mean "the sum of (a) an amount equal to (x) the Total Assets as set forth on the Final Balance Sheet, less (y) the Assumed Liabilities as set forth on the Final Balance Sheet, less (z) the Equity [defined to mean $150,000,000], *provided*, that in the event that such amount is in excess of $500,000,000, such amount shall equal $500,000,000; and (b) the amount of the Pay-Off Liabilities [referring to an amount owing under a certain line of credit]." These amounts are to be determined in accordance with the rules for determining the Final Balance Sheet. Exhibit 1, Schedule 1.4.

10.    Schedule 1.4 of the SPA sets forth the procedure for the preparation of and the resolution of disputes about the Final Balance Sheet and the calculation of the Final Payoff Amount. It says that within 30 days after the Closing Date, the Buyer will prepare and deliver to Seller the Final Balance Sheet and the calculation of the Final Payoff Amount. Within 30 days of Regions' receipt of the Final Balance Sheet and the calculation of the Final Payoff Amount, Regions must provide Barclays with a written notice stating whether Regions agrees or disagrees with such calculation. If Regions disagrees, it must set forth its calculation of the Final Payoff Amount. If there is such a notice of disagreement, the Parties are to begin negotiations within 10 Business Days. If they are unable to resolve their disagreement within 15 Business Days after

4

such negotiations begin, then "such disagreement shall be submitted to an independent nationally recognized auditing firm selected by the Parties (the 'Settlement Auditor') for resolution consistent with the provisions of this agreement." The Settlement Auditor's "resolution of any such disagreement" shall be reflected in a written report, which shall be delivered promptly to and shall be final and binding on the Parties.

11.    On April 27, 2007 Barclays delivered to Regions a Final Balance Sheet and calculation of the Final Payoff Amount (a true and correct copy of which is attached as Exhibit 2). The Final Payoff Amount as calculated by Barclays was $107,129,870. On May 25, 2007 Regions delivered to Barclays a notice of disagreement together with its calculation of the Final Payoff Amount (a true and correct copy of which is attached as Exhibit 3). The Final Payoff Amount as calculated by Regions is $178,560,261. The difference between the two is $71,430,391. The Parties have exchanged correspondence and have otherwise negotiated regarding the resolution of their disagreement but have been unable to resolve their disagreement within the time period specified in Schedule 1.4. Regions has stated that it believes that some or all of the matters covered by the notice of disagreement should not be submitted to the Settlement Auditor for resolution, thereby making this Motion to Compel necessary.

## The Parties

12.    Buyer, Barclays, is a privately held corporation chartered in Delaware and headquartered in New York.

13.    Seller, Regions, is a bank chartered under the laws of the state of Alabama and headquartered in Birmingham, Alabama. Regions is owned by Regions Financial Corporation.

reflected conditions existing on the Closing Date, Barclays is of the view that GAAP required this information be taken into account in preparing the Final Balance Sheet. Regions is of the view that the information considered by Barclays in preparing the Final Balance Sheet included information that was not considered pursuant to the Company's past accounting practices. Regions contends that GAAP does not require adjustments to the Final Balance Sheet as a result of the information that became available through the date the Final Balance Sheet was delivered. Barclays responds that much of the information on actual repurchase frequencies and severities was available when the Estimated Balance Sheet was prepared, and that in any event GAAP prevails over consistency with past practice (assuming, without conceding, that past practices differed from the practices employed in preparing the Final Balance Sheet). Even though Regions prepared the Estimated Balance Sheet, it now contends that the methodology used in calculating the Repurchase Reserve in the Estimated Balance Sheet (the same methodology used by Barclays in creating the Final Balance Sheet) represented a departure from the Company's past accounting practice and should not have been employed.

18.    The amount in controversy as a result of this disagreement is approximately $82.6 million.[2] To the best of my understanding, Regions contends that this topic of disagreement must be judicially resolved as set forth in Article IX of the SPA because it involves, according to Regions, an assertion by Barclays of a breach by Regions of its agreements and representations. Barclays believes that under the terms of Schedule 1.4, this topic of disagreement, like all the other items of disagreement described herein, should be resolved by the Settlement Auditor because, among other things to be addressed by our Counsel,

---

[2]    The amounts at issue with respect to particular topics of disagreement are stated before account is taken of the tax benefit realized from the adjustments. Paragraph 37 sets forth the aggregate tax benefit adjustment for all items of disagreement.

14.    EquiFirst, a wholly-owned subsidiary of EFC, is a national lender headquartered in Charlotte, N.C., providing wholesale subprime mortgage loans through independent mortgage brokers across the United States.  See EquiFirst website page as of August 10, 2007, a true and correct copy of which is attached as Exhibit 4.

### Topics of Disagreement

**(1)    Repurchase Reserves**

15.    EquiFirst's business model involves the origination of mortgage loans through a nationwide network of independent mortgage brokers and the subsequent bundling and sale of such mortgage loans to external investors.  EquiFirst has maintained and is required by GAAP to maintain a reserve in the event that the entity to whom EquiFirst has sold a mortgage loan exercises its right under the transaction documents to require EquiFirst to repurchase the mortgage loan.

16.    To fix the amount of this reserve, EquiFirst must estimate the frequency with which it will be required to repurchase mortgage loans and the severity of the losses it will suffer on those mortgage loans after repurchase.  Frequency is expressed as a percentage of mortgage loans sold in a given month.  Severity is expressed as a percentage of expected loss on the original amount of mortgage loans sold.

17.    In preparing the Final Balance Sheet, Barclays used frequency and severity figures that were higher than those Regions believed should have been used.  In setting its frequency and severity levels for the Repurchase Reserve, Barclays used information that was available as of the Closing Date as well as information that became available between the Closing Date and April 27, when the Final Balance Sheet was delivered in accordance with the SPA.  Because this information concerned only time periods prior to the Closing Date and

6

the Settlement Auditor is specifically instructed by the SPA to apply GAAP in the event of an inconsistency between the accounting policies and practices previously used and GAAP.

**(2)    Mortgage Loans Valuation**

19.    This topic deals with the valuation of mortgage loans (and notes backed by those loans) that are "available for sale" but "impaired" (known as "<u>AFSI Mortgage Loans</u>"). AFSI Mortgage Loans are mortgage loans on which the Company estimates upon sale it may realize an amount less than the principal amounts otherwise due from the underlying borrowers according to the contractual terms governing the mortgage loan due to some type of defect or delinquency.

20.    As part of the Acquisition, in accordance with the SPA, the Parties agreed that Regions would sell most of these loans before the Closing Date.  Thus, under the SPA, Regions was to sell or commit for sale such AFSI Mortgage Loans until it held under $5 million of uncommitted loans.  <u>See</u> <u>Exhibit 1</u>, § 6.22(b).

21.    Regions entered into executory agreements for the sale of the majority of the AFSI Mortgage Loans to third parties.  Under these executory agreements, the purchasers had the right to exclude certain AFSI Mortgage Loans from the transaction if these mortgage loans did not successfully pass the purchasers' due diligence reviews.  This is common in the industry; the exercise of this right is generally referred to as a "Loan Kick."

22.    As of the Closing Date, Regions had entered into agreements for the sale of approximately $23 million worth of AFSI Mortgage Loans to third parties that those third parties subsequently rejected.

23.    The accounting issue in dispute is how, in accordance with GAAP requirements, to establish the carrying value of those Loan Kicks as of the Closing Date.

8

24.     On the Final Balance Sheet, Barclays accounted for the Loan Kicks using GAAP, which requires management to consider all available information prior to the issuance of financial statements in order to establish market values to be recorded, asset impairments or loss contingencies.  Because the $23 million of Loan Kicks for AFSI Mortgage Loans committed to be purchased as of the Closing Date had already been rejected by the time the Final Balance Sheet was prepared by Barclays, Barclays estimated the market value of these loans for purposes of preparing the Final Balance Sheet based on the underlying characteristics of the loans and based on its knowledge of the whole loan market for such loans in accordance with GAAP.

25.     Regions disagrees with this treatment on the Final Balance Sheet, and believes that the Loan Kicks should not be re-valued, instead using the sales prices for the trades in which these loans were originally committed as of March 30, 2007, as their value.

26.     The amount in controversy on the basis of this topic of disagreement is approximately $11.9 million.

**(3)     Deferred Tax Asset Valuation Allowance**

27.     In 2006 and the first quarter of 2007, EquiFirst had estimated taxable losses.  Because during this time period EquiFirst was owned by Regions, these taxable losses are to be included in Regions' 2006 and 2007 U.S. consolidated income tax returns.  Thus, these taxable losses should be available to Regions to offset taxable income from other members of the Regions Bank group (in effect reducing Regions' overall tax bill).

28.     However, Regions and EquiFirst did not file state tax returns on a consolidated basis in all U.S. states.  For those states in which EquiFirst files its own state tax return (over two dozen states), its tax losses are unavailable to offset other income from the Regions group.  EquiFirst should be able, however, to use those tax losses (as well as any future

9

tax deductions related to temporary book-tax differences), subject to individual state tax laws, to offset future income that EquiFirst may generate in those states.

29.    This future offset is normally treated as a deferred tax asset on the balance sheet.

30.    Under GAAP, deferred tax assets must be reduced by a certain amount (called a "valuation allowance") if it is more likely than not that some portion or all of the deferred tax assets will not be realized.

31.    Barclays contends that under this standard EquiFirst may not be able to realize the full benefit of this tax asset and as a result placed a valuation allowance against the deferred tax asset in preparing the Final Balance Sheet.

32.    Thus, Barclays prepared the Final Balance Sheet on the basis that under GAAP it was necessary to establish a valuation allowance – that is, it was necessary to account for a decrease in EquiFirst's deferred tax assets, a net decrease of its overall assets, and thus, a recognized expense.  In Barclays' view it was necessary to maintain a valuation allowance in order to properly account for taxes under GAAP.

33.    The Parties disagree on the need to maintain such a valuation allowance.

34.    The amount in controversy as result of this disagreement is approximately $7.5 million.

**(4)    Other Issues**

35.    It is my best understanding that Regions disputes the treatment of several other items on the Final Balance Sheet.  These items have relatively smaller dollar amounts than the three major items detailed above, but in each case the issue appears to be whether or not the

accounting on the Final Balance Sheet is as required by GAAP. In brief, these items are as follows:

- **"Held For Investment" Valuation Adjustment** (approximately $2.7 million). Certain loans that were previously categorized by Regions as either available for sale (AFS) or available for sale impaired (AFSI) contained certain deficiencies that made them difficult to sell under traditional terms of sale, so these loans were subsequently categorized as held for investment (HFI) by Regions. These loans are exclusive of those mortgage loans referred to in paragraphs 19-26 above. The issue is how these loans should have been accounted for when moved from AFS to HFI status; in particular, whether to value the loans using then-current market values or then-current carrying values. Barclays contends that GAAP requires these loans should have been transferred at current market values, not at carrying values.

- **Vacation Time Accrual and Year-end Bonus Accrual Adjustments** (approximately $1.8 million). When the Final Balance Sheet was prepared, Barclays had actual, detailed information about accrued vacation times for EquiFirst employees through the Closing Date, and used that information as required by GAAP. Similar to the Vacation Time Accrual, when the Final Balance Sheet was prepared, Barclays was able to estimate an appropriate year-end bonus pool to accrue.

- **Premium Recapture Reserves** (approximately $1.0 million). When EquiFirst sells loans at a premium to face value, an initial loan sale premium is recorded as revenue. However, if the loan is paid in full within 12 months (or in some cases within 90 days, dependent on the terms of the underlying mortgage loan purchase agreement), that loan sale premium is reimbursable to the purchaser. Barclays recorded a reserve for such repayments in the Final Balance Sheet. The issue is whether that reserve, in that amount, was required under GAAP.

- **"Real Estate Owned" ("REO") Valuation Adjustment** (approximately $0.7 million). When the Final Balance Sheet was prepared the actual properties held at March 30, 2007 were known and updated information regarding brokers' opinion of the values as of the real estate that EquiFirst owned was available. As required by GAAP, Barclays used that information to prepare the Final Balance Sheet. In preparing the Final Balance Sheet, Barclays also estimated the liability for the costs to sell such REO consistent with the methodology employed by Regions in preparing the December 31, 2006 audited financial statements and the Estimated Balance Sheet.

- **Accounts Payable** (approximately $0.6 million). In calculating the Accounts Payable balance in the Final Balance Sheet, Barclays accrued for all invoices related to expenses incurred prior to the Closing Date, as required by GAAP,

11

including invoices that were not yet received on March 30, but were received prior to the delivery of the Final Balance Sheet.

- **RAKIS Fixed Asset Write-off** (approximately $0.3 million). RAKIS is a software program that EquiFirst attempted to implement to produce and process loan documents. It never worked; it proved incompatible despite efforts to integrate it into EquiFirst's systems and therefore the software had no ongoing benefit. As a result and as required by GAAP, Barclays wrote off the cost of the software (treating the item as an "impaired fixed asset") in preparing the Final Balance Sheet.

36.     The amount in controversy as a result of these other miscellaneous disagreements is approximately $7.1 million.

### Conclusion

37.     The total amount in controversy as a result of the disagreements cited above is approximately $109.1 million or $71.4 million net of the tax benefit to be realized. For the reasons explained by Counsel in the accompanying Memorandum of Law, Barclays believes that each of the topics of disagreement described above is under the terms of the SPA to be resolved by the Settlement Auditor. Barclays is prepared to present the entire dispute described herein to the Settlement Auditor. It is respectfully requested that an order be made requiring Regions to proceed to the resolution of this dispute before the Settlement Auditor.

38.     I declare under penalty of perjury that the foregoing is true and correct.

Executed on: August 28, 2007

Richard J. Gordon

12

Exhibit 1

EXECUTION COPY

STOCK PURCHASE AGREEMENT

by and between

**REGIONS BANK**

and

**BARCLAYS CAPITAL REAL ESTATE HOLDINGS INC.**

for

all of the outstanding common stock of

**EFC HOLDINGS CORPORATION**

dated as of

January 18, 2007

NY12528 266865.1

TABLE OF CONTENTS

Page

ARTICLE I

SALE AND PURCHASE OF SHARES

SECTION 1.1    Sale and Purchase of Shares .................................................................... 1
SECTION 1.2    Purchase Price; Payoff Amount .............................................................. 1
SECTION 1.3    Payment of Purchase Price and Initial Payoff Amount............................ 2
SECTION 1.4    Post Closing Payoff Amount Adjustment ................................................ 2

ARTICLE II

THE CLOSING

ARTICLE III

REPRESENTATIONS AND WARRANTIES REGARDING THE PURCHASED COMPANIES

SECTION 3.1    Organization and Good Standing.............................................................. 3
SECTION 3.2    Capitalization. ......................................................................................... 3
SECTION 3.3    Company Subsidiaries ............................................................................ 4
SECTION 3.4    Governmental Filings and Consents ........................................................ 4
SECTION 3.5    No Violations .......................................................................................... 4
SECTION 3.6    Financial Statements; Books and Records................................................ 4
SECTION 3.7    Absence of Certain Changes and Events .................................................. 5
SECTION 3.8    Actions; Orders; etc ................................................................................ 6
SECTION 3.9    Taxes....................................................................................................... 6
SECTION 3.10   Employee Benefits; ERISA...................................................................... 9
SECTION 3.11   Labor and Employment Matters. ............................................................ 10
SECTION 3.12   Compliance with Laws; Governmental Authorizations; etc. .................... 11
SECTION 3.13   Title to Property ..................................................................................... 11
SECTION 3.14   Contracts; No Default. ............................................................................ 12
SECTION 3.15   Environmental Matters............................................................................ 13
SECTION 3.16   Insurance ................................................................................................ 14
SECTION 3.17   Brokers and Finders ............................................................................... 14
SECTION 3.18   No Undisclosed Liabilities; No Non-Business Activities ......................... 14
SECTION 3.19   Intellectual Property................................................................................ 14
SECTION 3.20   Bank Accounts ....................................................................................... 15
SECTION 3.21   Related Party Transactions ..................................................................... 15
SECTION 3.22   Mortgage Loans. .................................................................................... 16
SECTION 3.23   Sufficiency of Assets ............................................................................. 19

NY12528 266865 1

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF SELLER

SECTION 4.1    Representations and Warranties of Seller ................................................................... 19

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF BUYER

SECTION 5.1    Organization and Good Standing .................................................................... 20
SECTION 5.2    Corporate Authority ....................................................................................... 20
SECTION 5.3    Governmental Filings and Consents; No Violations .................................... 20
SECTION 5.4    Securities Act ................................................................................................. 21
SECTION 5.5    Brokers and Finders ...................................................................................... 21
SECTION 5.6    Financing ........................................................................................................ 21

## ARTICLE VI

## COVENANTS AND ADDITIONAL AGREEMENTS

SECTION 6.1    Conduct of Business ...................................................................................... 22
SECTION 6.2    Access ............................................................................................................. 24
SECTION 6.3    Required Approvals ....................................................................................... 24
SECTION 6.4    Reasonable Best Efforts ................................................................................ 25
SECTION 6.5    Governmental Approvals .............................................................................. 25
SECTION 6.6    Publicity .......................................................................................................... 26
SECTION 6.7    Confidentiality. .............................................................................................. 26
SECTION 6.8    Expenses ......................................................................................................... 27
SECTION 6.9    Further Assurances ........................................................................................ 27
SECTION 6.10   Notifications ................................................................................................... 28
SECTION 6.11   Non-Solicitation ............................................................................................. 28
SECTION 6.12   Non-Competition. .......................................................................................... 28
SECTION 6.13   Employees and Employee Benefit Plan Matters. .......................................... 29
SECTION 6.14   Related Party Transactions ........................................................................... 30
SECTION 6.15   Additional Financial Statements. .................................................................. 30
SECTION 6.16   Retention of Records ..................................................................................... 31
SECTION 6.17   Certain Tax Covenants .................................................................................. 31
SECTION 6.18   Indemnification of Directors and Officers of the Purchased Companies ..... 36
SECTION 6.19   Certain Litigation ........................................................................................... 37
SECTION 6.20   Release of Employees .................................................................................... 37
SECTION 6.21   Transition Services ......................................................................................... 37
SECTION 6.22   Certain Mortgage Loans. ............................................................................... 37

## ARTICLE VII

## CONDITIONS TO CLOSING

SECTION 7.1    Conditions to Obligations of Buyer ............................................................. 38

SECTION 7.2      Conditions to Obligations of Seller.............................................................. 39

ARTICLE VIII

TERMINATION

SECTION 8.1      Termination................................................................................................ 40
SECTION 8.2      Effect of Termination.................................................................................. 41

ARTICLE IX

INDEMNIFICATION; REMEDIES

SECTION 9.1      Survival....................................................................................................... 41
SECTION 9.2      Indemnification and Reimbursement by Seller........................................... 42
SECTION 9.3      Indemnification and Reimbursement by Buyer .......................................... 43
SECTION 9.4      Limitations on Indemnification................................................................... 43
SECTION 9.5      Subrogation Rights..................................................................................... 44
SECTION 9.6      Notice and Payment of Claims................................................................... 44
SECTION 9.7      Procedure for Indemnification - Third Party Claims. ................................ 44
SECTION 9.8      Tax Effect and Insurance ........................................................................... 46
SECTION 9.9      Indemnification Exclusive Remedy ........................................................... 46

ARTICLE X

MISCELLANEOUS

SECTION 10.1      Definitions. ............................................................................................... 46
SECTION 10.2      Assignments; Successors; No Third Party Rights...................................... 55
SECTION 10.3      Entire Agreement ...................................................................................... 55
SECTION 10.4      Amendment or Modification...................................................................... 55
SECTION 10.5      Notices ...................................................................................................... 55
SECTION 10.6      Governing Law .......................................................................................... 56
SECTION 10.7      Consent To Jurisdiction; Waiver Of Jury Trial......................................... 56
SECTION 10.8      Severability ............................................................................................... 57
SECTION 10.9      Waiver of Conditions................................................................................. 57
SECTION 10.10    Descriptive Headings; Construction .......................................................... 58
SECTION 10.11    Counterparts.............................................................................................. 58
SECTION 10.12    Disclosure Memorandum and Buyer Disclosure Memorandum................. 58
SECTION 10.13    Time is of the Essence ............................................................................... 58

Schedule 1.2
Schedule 1.4

Annex A

THIS STOCK PURCHASE AGREEMENT (including the annexes and schedules hereto, this "Agreement"), dated as of January 18, 2007, by and between REGIONS BANK, a bank chartered under the laws of the State of Alabama (the " Seller") and BARCLAYS CAPITAL REAL ESTATE HOLDINGS INC., a Delaware corporation ("Buyer").  Seller and Buyer are sometimes collectively referred to herein as the "Parties" and individually as a "Party."

W I T N E S S E T H:

WHEREAS, Seller owns all of the issued and outstanding shares of capital stock of EFC Holdings Corporation, a North Carolina corporation (the "Company" and, together with its wholly owned Subsidiaries, the "Purchased Companies");

WHEREAS, the Purchased Companies are engaged in the business of wholesale mortgage lending of non-prime residential mortgage loans (the "Business");

WHEREAS, Seller desires to sell to Buyer, and Buyer desires to purchase for cash from Seller, all of the shares (the "Shares") of common stock, par value $1.00 per share, of the Company ("Common Stock") that are issued and outstanding on the Closing Date (as defined in Article II) upon the terms and subject to the conditions set forth herein;

WHEREAS, as a condition and inducement to Buyer entering into this Agreement, concurrently with the execution and delivery of this Agreement, the Buyer is entering into new agreements with certain key employees of the Company set forth in Annex A (the "Employee Agreements"); and

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants, agreements, undertakings and obligations set forth herein, and intending to be legally bound hereby, the Parties hereto agree as follows:

ARTICLE I

SALE AND PURCHASE OF SHARES

SECTION 1.1  Sale and Purchase of Shares.  Upon the terms and subject to the conditions set forth in this Agreement and on the basis of the representations, warranties, covenants, agreements, undertakings and obligations contained herein, at the Closing, Seller hereby agrees to sell to Buyer, and Buyer hereby agrees to purchase from Seller, the Shares, free and clear of any and all Liens, for the consideration specified in this Article I.

SECTION 1.2  Purchase Price; Payoff Amount.  The purchase price ("Purchase Price") for the Shares shall be equal to $225,000,000.  The initial payoff amount (the "Initial Payoff Amount") shall equal the sum of (a) an amount equal to (x) the Total Assets as set forth on the Estimated Balance Sheet, less (y) the Assumed Liabilities as set forth on the Estimated Balance Sheet, less (z) the Equity, subject to adjustment following the Closing in accordance with Schedule 1.4, *provided*, that in the event that such amount is in excess of $500,000,000, such amount shall equal $500,000,000 and (b) the amount of Pay-Off Liabilities, subject to adjustment following the Closing in accordance with Schedule 1.4. Seller shall deliver to Buyer no later than five Business Days prior to the Closing the Estimated Balance Sheet and a calculation of the Initial Payoff Amount. An example of the Estimated Balance Sheet as of December 31, 2006 is set forth on Schedule 1.2 hereto. The Estimated Balance Sheet and the Final

Balance Sheet shall reflect an expense accrual for payments due under the Stay Bonus Agreements and any other severance related expenses incurred in connection with the Closing of the transactions contemplated hereby and shall reflect all amounts in respect of Taxes that are due from or to Seller or its Related Persons to or from the Purchased Companies.

SECTION 1.3    Payment of Purchase Price and Initial Payoff Amount.  Buyer agrees to pay to Seller the Purchase Price and the Initial Payoff Amount at the Closing by wire transfer or delivery of immediately available funds to an account of Seller designated to Buyer by Seller at least two Business Days prior to the Closing.

SECTION 1.4    Post Closing Payoff Amount Adjustment.  Upon the earlier to occur of (i) the Parties' agreement (or deemed agreement pursuant to Section (b) of Schedule 1.4) with respect to the calculation of the Final Payoff Amount and, if applicable, the amount of any required adjustment to the Initial Payoff Amount and (ii) the delivery of any report of the Settlement Auditor as provided in Sections (c) and (d) of Schedule 1.4, the Initial Payoff Amount shall be increased or decreased by the amount, if any, by which the Final Payoff Amount and the Initial Payoff Amount differ: (x) if the Initial Payoff Amount is greater than the Final Payoff Amount, Seller shall pay, within five Business Days after the earlier to occur of the events described in clauses (i) and (ii) above, the amount of such difference to Buyer, plus simple interest on the amount of such difference from the Closing Date to the date of payment at an annual interest rate equal to three percent per annum, by wire transfer of immediately available funds to such account or accounts of Buyer as Buyer specifies in writing to Seller in the manner specified herein for the delivery of notices; or (y) if the Final Payoff Amount is greater than the Initial Payoff Amount, Buyer shall pay, within five Business Days after the earlier to occur of the events described in clauses (i) and (ii) above, the amount of such difference to Seller, plus simple interest on the amount of such difference from the Closing Date to the date of payment at an annual interest rate equal to three percent per annum, by wire transfer of immediately available funds to such account of Seller as Seller specifies in writing to Buyer in the manner specified herein for the delivery of notices.  Schedule 1.4 sets forth certain defined terms used in this Section 1.4, as well as certain agreements and procedures relating to the manner in which any adjustment to the Initial Payoff Amount is to be determined.

ARTICLE II
THE CLOSING

The closing (the "Closing") of the sale and purchase of the Shares (the "Stock Purchase") shall take place at the offices of Alston & Bird LLP, 90 Park Avenue, New York, New York on the date that is the last day of the first calendar month in which each of the conditions set forth in Article VII have been satisfied or waived (other than conditions that by their nature are to be satisfied at the Closing, but subject to satisfaction or waiver of such conditions) or at such other place, time or date as the Parties hereto may agree (the date of the Closing being herein referred to as the "Closing Date") and shall be effective at 9:00 a.m. (New York City time) on the Closing Date or at such other time or date as the Parties hereto may agree (the "Effective Time").

ARTICLE III

REPRESENTATIONS AND WARRANTIES
REGARDING THE PURCHASED COMPANIES

Concurrently with the execution and delivery of this Agreement, Seller is delivering to Buyer a disclosure memorandum (the "Disclosure Memorandum") that sets forth all of the items the

-2-

disclosure of which is necessary or appropriate either in response to an express disclosure requirement contained in a provision hereof or as an exception to one or more representations or warranties contained in Article III or to one or more of the covenants of Seller contained in this Agreement; *provided*, that the mere inclusion of an item in the Disclosure Memorandum as an exception to a representation or warranty shall not be deemed an admission by Seller that such item represents a material exception or event, state of facts, circumstance, development, change or effect or that such item is reasonably likely to have or result in a Material Adverse Effect on the Company; *provided, further,* that any disclosures made with respect to a section or subsection of this Agreement shall be deemed to qualify such sections or subsections specifically referenced or cross-referenced, as well as other sections or subsections to the extent such disclosure is readily apparent as constituting disclosure in respect of such other sections or subsections.

Seller hereby represents and warrants to Buyer as follows:

SECTION 3.1   Organization and Good Standing.

(a)     Each of the Purchased Companies is duly organized, validly existing and in good standing under the laws of the state in which it is incorporated, with full power and authority to conduct its business as it is now being conducted, to own or use its properties and assets, and to perform all of its respective material obligations under all Applicable Contracts.  Each of the Purchased Companies is duly qualified or licensed to do business as a foreign corporation and is in good standing as a foreign corporation in each jurisdiction in which either the ownership or use of the properties owned or used by it, or the nature of the activities conducted by it, requires such licensing, qualification or good standing, except for such jurisdictions in which the failure to be qualified  or in good standing is not reasonably likely to have or result in a Material Adverse Effect on the Company.

(b)     Each of the Purchased Companies has made available or delivered to Buyer the Purchased Companies' Organizational Documents and the Purchased Companies' Organizational Documents so delivered are in full force and effect.

SECTION 3.2   Capitalization.

(a)     The authorized capital stock of the Company consists solely of 1,000 shares of Common Stock, of which (i) on the date of execution of this Agreement, 1,000 shares of Common Stock are issued and outstanding, and (ii) on the Closing Date, not more than 1,000 shares of Common Stock will be issued and outstanding, and no shares of any other capital stock of the Company or any instruments convertible into any capital stock of the Company are or will be issued and outstanding.  All of the issued and outstanding shares of capital stock of the Company have been duly authorized and are validly issued, fully paid and, except as expressly provided otherwise under applicable Law, nonassessable, and have been issued in compliance with all federal and state securities laws.

(b)     There are no shares of capital stock or other securities of the Company (i) reserved for issuance, (ii) held as treasury shares or (iii) subject to preemptive rights or any outstanding subscriptions or other agreements or other instruments outstanding or in effect giving any Person the right to acquire any shares of capital stock or other securities of the Company.  The Company does not have outstanding any bonds, debentures, notes or other obligations the holders of which have (either presently or upon the occurrence of a contingency) the right to vote (or convertible into or exercisable for securities having the right to vote) with the stockholders of the Company on any matter.

NY12528 266865 1

SECTION 3.3    Company Subsidiaries.    Except for the Purchased Companies, the Company does not have any Subsidiaries.  On the date of this Agreement, Seller is the owner, directly or indirectly, of all of the shares of capital stock of each of the Purchased Companies, free and clear of all Liens.  On the Closing Date, Seller shall be the owner, directly or indirectly, of all of the shares of capital stock of each of the Purchased Companies, free and clear of all Liens.

SECTION 3.4    Governmental Filings and Consents.    Except for the Report required to be filed under the HSR Act, with the FTC and the Antitrust Division (collectively, the "HSR Filing"), and except for the Filings and Consents set forth in Section 3.4 of the Disclosure Memorandum that are required as a result of the change in control of the Purchased Companies resulting from the consummation of the transactions contemplated hereby, no Filings are required to be made by Seller or the Purchased Companies with, nor are any Consents required to be obtained by Seller or the Purchased Companies from, any Governmental Entity, in connection with the execution or delivery by Seller of this Agreement, the performance by Seller of its obligations hereunder or the consummation by Seller of the transactions contemplated hereby.

SECTION 3.5    No Violations.    Assuming the making of the HSR Filing and the other Filings set forth in Section 3.4 and Section 3.5 of the Disclosure Memorandum and the obtaining of the Consents set forth in Section 3.4 and Section 3.5 of the Disclosure Memorandum, the execution and delivery by Seller of this Agreement and the performance and consummation by Seller of the transactions contemplated hereby will not, with respect to any of the Purchased Companies, directly or indirectly (with or without the giving of notice or the lapse of time or both):

(a)    contravene, conflict with, or constitute or result in a breach or violation of, or a default under (i) any provision of the articles of incorporation (as amended) of Seller, (ii) any provision of the Purchased Companies' Organizational Documents or (iii) any resolution (if applicable) adopted by the board of directors (or similar governing body) of Seller or any of the Purchased Companies;

(b)    contravene, conflict with, or constitute or result in a breach or violation of, or a default under, or the cancellation, modification or termination of, or the acceleration of, or the creation of a Lien on any properties or assets owned or used by the Purchased Companies or pursuant to any Applicable Contract, which contravention, conflict, breach, violation, default, cancellation, modification or termination is material; or

(c)    contravene, conflict with, or constitute or result in a breach or violation of any Law or Order to which Seller or any of the Purchased Companies, or any of the assets owned or used by any of the Purchased Companies are subject, which contravention, conflict, breach or violation is material.

SECTION 3.6    Financial Statements; Books and Records.

(a)    Section 3.6(a) of the Disclosure Memorandum contains the Financial Statements (other than the 2006 Audited Financial Statements) of the Purchased Companies on a consolidated basis.

(b)    The Financial Statements and notes present fairly in all material respects the consolidated financial condition and the results of operations and, to the extent included, changes in stockholder's equity and cash flow of the Purchased Companies as of the respective dates of and for the periods referred to in such Financial Statements and have been prepared in accordance with GAAP applied on a consistent basis during the periods presented, subject, in the case of unaudited financial

-4-

statements, to normal recurring year-end adjustments (the effect of which are not, individually or in the aggregate, expected to be material in amount or effect) and the absence of notes (that, if presented, would not differ materially from those included in the Balance Sheet).

(c)    The Financial Statements were compiled from and are in accordance with the books and records of the Purchased Companies. The books and records (including the books of account, minute books, stock record books and other records) of the Purchased Companies have been maintained in accordance with sound business practices and accurately reflect all meetings and other corporate actions held or taken in the past three years of their stockholders and boards of directors (including committees of their boards of directors) and in all material respects all of the transactions and actions therein described. At the Closing, all of those books and records shall be in the possession of the Company.

SECTION 3.7  Absence of Certain Changes and Events.  Since the date of the Interim Balance Sheet, (i) the Purchased Companies have conducted the Business only in, and have not engaged in any transaction other than according to, the Ordinary Course of Business, and (ii) there has not occurred:

(a)    any event, state of facts, circumstance, development, change or effect that, individually or in the aggregate with all other events, states of facts, circumstance, developments, changes and effects, that has, has had or is reasonably likely to have or result in a Material Adverse Effect on the Company;

(b)    any action prior to the date of this Agreement that would result in:

(i)    any amendment, modification, alteration or rescission of the Purchased Companies' Organizational Documents;

(ii)    the declaration, setting aside, or payment of any dividends on or the making of any other distributions in cash (other than dividends made on the capital stock of the Purchased Companies (other than the Company)), in respect of any shares of the capital stock of such Purchased Companies or the issuance, sale, transfer, grant or pledge or authorization of the issuance, sale, transfer, grant or pledge of any capital stock of the Purchased Companies or other securities in respect of, in lieu of or in substitution for shares of the capital stock of the Purchased Companies, or the repurchase or acquisition, directly or indirectly, of any shares of the capital stock of the Purchased Companies, except from former employees, directors and consultants in accordance with agreements providing for the repurchase of shares in connection with any termination of service to the Purchased Companies, or the split, combination or reclassification of any capital stock of the Purchased Companies or the redemption or other acquisition or disposition of any capital stock of the Purchased Companies;

(iii)    the entrance into or amendment of any agreements pursuant to which any other party is granted exclusive marketing or other exclusive rights of any type or scope with respect to any of the products, services or technology of any of the Purchased Companies;

(iv)    other than in the Ordinary Course of Business or as required by applicable Law or Seller or its Related Persons, the making or changing of any material election in respect of Taxes;

NY12528 266865.1

(v)        the entrance into, establishment, adoption or amendment (except as may be required by applicable Law) of any pension, retirement, stock option, stock purchase, savings, profit sharing, deferred compensation, employment, consulting, change in control, retention, severance, bonus, group insurance or other employee benefit, incentive or welfare contract, plan or arrangement, or any trust agreement (or similar arrangement) related thereto, in respect of any director, officer, employee or consultant of any of the Purchased Companies or any Continuing Employee in a manner that would result in any material increase in compensation or benefits to or in respect of any such individuals, take any action to accelerate the vesting or exercisability of compensation or benefits payable to any such individuals,  or forgive any loans to any such individuals;

(vi)        the revaluation of any of the Purchased Companies' assets, including writing off notes or accounts receivable, other than in the Ordinary Course of Business or as required by GAAP or applicable Law; or

(vii)        the making of any material change to the Purchased Companies' accounting methods, principles, policies, procedures or practices, except as may be required by GAAP; or

(c)        any agreement by Seller or any of the Purchased Companies to do or which would have the effect of any of the things described in the preceding clauses (a) and (b).

SECTION 3.8    Actions; Orders; etc.   There are no Actions or Orders issued, pending or, to the Knowledge of Seller, threatened, against any of the Purchased Companies or any of their assets, at law, in equity or otherwise, in, before, by, or otherwise involving, any Governmental Entity, arbitrator or other Person that (i) question or challenge the validity or legality of, or have the effect of prohibiting, preventing, restraining, restricting, delaying, making illegal or otherwise interfering with, this Agreement, the consummation of the transactions contemplated hereby or any action taken or proposed to be taken by Seller or the Purchased Companies pursuant hereto or in connection with the transactions contemplated hereby or (ii) that has, has had or is reasonably likely to have or result in a Material Adverse Effect on the Company or its Subsidiaries.  Section 3.8 of the Disclosure Memorandum contains a summary of all material Actions to which a Purchased Company is a party as of the date of this Agreement and which names a Purchased Company as a defendant or cross-defendant or for which any Purchased Company has any potential Liability, and such summary is complete and accurate in all material respects as of the date of this Agreement.

SECTION 3.9    Taxes.

(a)        Each of the Purchased Companies has duly filed or caused to be filed all federal, state and local income and other material Tax Returns and reports required to be filed by them on or prior to the date of this Agreement (all such returns and reports are accurate and complete in all material respects) and have duly paid or caused to be paid on their behalf all Taxes that are due and payable as of the date of this Agreement other than Taxes which are being contested in good faith and are adequately reserved against or provided for (in accordance with GAAP) in the Financial Statements and disclosed on Section 3.9(a) of the Disclosure Memorandum. Each of the Purchased Companies has adequately reserved for all Taxes accrued through the date of this Agreement but not yet payable.  Tax refunds reflected on the Final Balance Sheet do not materially exceed the actual amounts of Tax refunds the Purchased Companies are or will be entitled to.

NY12528:266865.1

(b)     Except as provided in Section 3.9(b) of the Disclosure Memorandum, there are no pending audits or examinations with respect to any Tax Returns of the Company and its Subsidiaries and the Company and its Subsidiaries have not received any notification of a potential audit. There are no Liens on any of the assets of the Company or any of its Subsidiaries that arose in connection with any failure (or alleged failure) to pay any Tax other than Liens for Taxes not yet due.

(c)     There are no disputes pending with respect to, or claims or assessments asserted in writing for any amount of Taxes upon any of the Purchased Companies except for such disputes, claims or assessments which are being contested in good faith and are disclosed on Section 3.9(c) of the Disclosure Memorandum. All deficiencies asserted or assessments made as a result of the examination of the Tax Returns and reports referred to in Section 3.9(a) have been paid in full (except those being contested pursuant to the prior sentence). Except as provided in Section 3.9(c) of the Disclosure Memorandum, Seller has provided Buyer correct and complete copies of examination reports and statements of deficiencies assessed against or agreed to by any of the Purchased Companies. Except as provided in Section 3.9(c) of the Disclosure Memorandum, none of the Purchased Companies has given or been requested in writing to give any currently effective waivers extending the statutory period of limitation applicable to any Tax Return for any period.

(d)     Except as provided in Section 3.9(d) of the Disclosure Memorandum, there is no Tax sharing agreement, contract or intercompany account system in existence to which a Purchased Company is a party that would require any payment by the Company after the date of this Agreement. The Company has no Liability for indemnification of third parties with respect to Taxes or any Liability for Taxes as a transferee. No written claim has been made to any of the Purchased Companies by an authority in a jurisdiction where any of the Purchased Companies does not file Tax Returns that any of the Purchased Companies is or may be subject to taxation by that jurisdiction or should have been included in a consolidated return.

(e)     Since January 1, 2002, none of the Purchased Companies has been required to include in income any adjustment pursuant to Section 481 of the Code (or any similar provision of state, local or foreign law) by reason of a voluntary change in accounting method initiated by any of the Purchased Companies, and the IRS (or other Tax authority) has not initiated or proposed any such adjustment or change in accounting method (including any method for determining reserves for bad debts maintained by any of the Purchased Companies). None of the Purchased Companies are required to include any item of income in or exclude any item of deduction from any Tax period beginning on or after the Closing as a result of any "closing agreement" as described in Section 7121 of the Code (or any similar provision of state, local or foreign Tax law).

(f)     None of the Purchased Companies is a party to any Contract, plan or arrangement covering any Person that is reasonably likely to give rise to the payment of any amount (except for any amount that will become payable solely as a result of the transactions contemplated by this Agreement) that would not be deductible by reason of Section 162(m) of the Code.

(g)     Each of the Purchased Companies has withheld or collected and paid or deposited in accordance with Law all material Taxes required to have been withheld or collected and paid or deposited in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder or other third party, and the Purchased Companies' records contain all material information and documents (including properly completed IRS Forms W-9) necessary to comply with, all applicable information reporting and Tax withholding requirements under federal, state, and local Tax Laws, and

such records identify with specificity all material accounts subject to backup withholding under Section 3406 of the Code.

(h)    Since November 30, 1998, and to Seller's Knowledge prior thereto, no Purchased Company has or has had in any foreign country a permanent establishment, as defined in any applicable tax treaty or convention between the United States and such foreign country.

(i)    Since November 30, 1998, and to Seller's Knowledge prior thereto, none of Purchased Companies (x) has been a member of an affiliated, combined, consolidated or unitary Tax group for purposes of filing any Tax Return other than, for filing consolidated U.S. Federal Income Tax Returns, a group the common parent of which is Seller or a Related Person of Seller or (y) has any liability for the Taxes of any Person (other than the Targets or any of their Subsidiaries) under Reg. §1.1502-6 (or any similar provision of state, local, or foreign law), as a transferee or successor, by contract, or otherwise.

(j)    No closing agreements, private letter rulings, technical advance memoranda or similar agreement or rulings have been entered into or issued by any taxing authority with respect to any of the Purchased Companies.

(k)    Except as provided in Section 3.9(k) of the Disclosure Memorandum, Seller has made available to Buyer true and correct copies of the portions of all material Tax Returns filed by each of the Purchased Companies, including, without limitation, all income Tax Returns relating the Purchased Companies for which the statute of limitations remains open as of the date hereof.

(l)    None of the Purchased Companies or any of their current or former Subsidiaries (i) has engaged in any transaction that is the same as, or substantially similar to, a transaction which is a "reportable transaction" for purposes of Treasury Regulations Section 1.6011-4(b) (including any transaction which the IRS has determined to be a "listed transaction" for purposes of Treasury Regulations Section 1.6011-4(b)(2), or would be reportable to a similar extent under any other provision of state, local or foreign Tax law); (ii) has engaged in a transaction of which it made disclosure to any taxing authority to avoid penalties; or (iii) has participated in any "tax amnesty" or similar program offered by any taxing authority to avoid the assessment of penalties or other additions to Tax.

(m)    None of the Purchased Companies nor any of their current or former Subsidiaries has been a "distributing corporation" or a "controlled corporation" in a distribution of stock intended to qualify for Tax-free treatment under Section 355(a) of the Code: (i) at any time during the two-year period prior to the date hereof, (ii) at any time during the period commencing on the date hereof and ending on the Closing Date or (iii) which could otherwise constitute part of a "plan" or "series of related transactions" (within the meaning of Section 355(e) of the Code) in conjunction with and including the transactions contemplated by this Agreement.

(n)    None of the Purchased Companies is a party to any agreement, contract, arrangement, or plan that could result, separately or in the aggregate, in the payment of any "excess parachute payment" within the meaning of Code §280G (or any corresponding provision of state, local, or foreign Tax law).

(o)    The Purchased Companies are as of the date of this Agreement and will be as of the Closing Date members of a consolidated group that includes Seller.

SECTION 3.10 <u>Employee Benefits; ERISA</u>.

(a)      Section 3.10(a) of the Disclosure Memorandum sets forth a complete list of the Benefit Plans in effect as of the date of this Agreement. Each Benefit Plan has been maintained in substantial compliance with ERISA, the Code and other applicable Law and in substantial compliance with the terms of such Benefit Plan. Each Benefit Plan that is an "employee pension benefit plan" within the meaning of Section 3(2) of ERISA and that is intended to be qualified under Section 401(a) of the Code, has received a favorable determination from the Internal Revenue Service (the "IRS"), or is entitled to rely on a favorable opinion letter issued by the IRS to the plan sponsor.  To the Knowledge of Seller, there are no circumstances likely to result in revocation of any such favorable determination letter or inability to rely on such opinion letter, as the case may be, or the loss of the qualification of such Benefit Plan.

(b)      None of the Benefit Plans is subject to Title IV of ERISA or provides post-retirement welfare benefits coverage (other than as required by COBRA or a medical expense reimbursement account plan pursuant to Section 125 of the Code which is at the expense of the participant or the participant's beneficiary), and none of the Purchased Companies has any liability with respect to employee benefit plans maintained by Seller or any of Seller's ERISA Affiliates.  None of the Purchased Companies has an obligation to contribute to or has within the past six years maintained or had an obligation to contribute to a "multiemployer plan" within the meaning of Section 3(37) of ERISA with respect to employees of the Purchased Companies, and no Benefit Plan is a multiemployer plan.  As of the date hereof, there is no material pending or, to the knowledge of Seller threatened, litigation relating to the Benefit Plans. Neither the Seller, the Seller's ERISA Affiliates nor the Purchased Companies have engaged in a transaction with respect to any Benefit Plan that has subjected or could subject the Purchased Companies to a material tax or penalty imposed by either Section 4975 of the Code or Section 502(i) of ERISA.  The Benefit Plans in effect as of the date of this Agreement may be amended or terminated at any time without any Person incurring any liability thereunder, except (i) liabilities for vested accrued benefits, and (ii) typical expenses and notice periods associated with any such amendment or termination.

(c)      Correct and complete copies of the following documents, together with all amendments hereto with respect to each Benefit Plan, have been made available or delivered to Buyer, to the extent applicable:  (i) any plans, all amendments thereto and related trust documents, insurance contracts or other funding arrangements, and amendments thereto; (ii) summary plan descriptions; (iii) the most recent IRS determination letter; and (iv) the most recent IRS Form 5500.  In addition, correct and complete copies of employee handbooks and personnel policies, if any, relating to any Employee have been made available or delivered to Buyer.

(d)      Neither the execution of this Agreement, shareholder or other approval of this Agreement nor the consummation of the transactions contemplated hereby will (i) entitle any Employee or Continuing Employee to either (A) a retention payment or other compensation, or (B) severance pay or any increase in severance pay upon any termination of employment after the date hereof, (ii) accelerate the time of payment or vesting or result in any payment or funding (through a grantor trust or otherwise) of compensation or benefits under, increase the amount payable or result in any other material obligation pursuant to, any of the Benefit Plans, (iii) limit or restrict the right of the Purchased Companies, whether before or after the consummation of the transactions contemplated hereby, to merge, amend or terminate any of the Benefit Plans, or (iv) result in payments under any of the Benefit Plans which would not be deductible under Section 280G of the Code.

(e)    All contributions required to be made under each Benefit Plan have been timely made and all obligations in respect of each Benefit Plan have been properly accrued and reflected in the Financial Statements. There has been no amendment to, announcement by Seller or the Purchased Companies relating to, or change in employee participation or coverage under, any Benefit Plan which would increase materially the expense of maintaining such Benefit Plan above the level of the expense incurred therefor for the most recent fiscal year.

SECTION 3.11  Labor and Employment Matters.

(a)    Section 3.11(a) of the Disclosure Memorandum contains a correct and complete list of all individuals who are, as of the date of this Agreement, officers, employees and consultants of the Purchased Companies (including without limitation individuals who are inactive employees on disability or other leave of absence) (any such individual an "Employee"), and with respect to each Employee, his or her (i) name, (ii) date of hire by the Purchased Companies, (iii) place of employment, (iv) title/position, (v) current salary or hourly wage rate, (vi) current bonus opportunity, and (vii) current status (e.g., full or part time, active or inactive, and, if inactive, whether as a result of a leave of absence or a short-term or long-term disability). Such list shall be updated by Seller prior to and as of approximately 10 days before the Closing Date, and shall be provided to Buyer. All Employees are at-will employees.

(b)    The Purchased Companies have complied in all material respects with employment Laws with respect to the Employees. No Purchased Company is a party to or is bound by any collective bargaining agreement, contract or other labor agreement or understanding with a labor union or labor organization concerning a contract or other labor arrangement. There are no (i) strikes, work stoppages, slowdowns, lockouts or arbitrations or (ii) material grievances or other labor disputes pending or, to the Knowledge of Seller, threatened against or involving any Purchased Company. There are no unfair labor practice charges (within the meaning of the National Labor Relations Act), grievances or complaints pending or, to the Knowledge of Seller, threatened by or on behalf of any Employee.

(c)    Seller and the Purchased Companies have complied in all material respects with the notice and other material requirements under the Worker Adjustment and Retraining Notification Act of 1988, as amended, and other similar Laws of any state or other jurisdiction, without consideration of any actions taken by Buyer or the Purchased Companies following the Effective Time. Seller and the Purchased Companies have performed criminal background checks and drug testing on each of the Continuing Employees at the time of their commencement of employment with Seller or the Purchased Companies, as the case may be, in accordance with Seller's and the Purchased Companies' generally applicable policies and each Continuing Employee has satisfactorily passed such checks and testing as of such date. Seller has provided Buyer with copies of all procedures relating to its performance of criminal background checks and drug testing to the extent applicable to any Continuing Employee.

(d)    Seller and/or the Purchased Companies have collected and retained all Forms I-9 and other required documentation in compliance with the Immigration Reform and Control Act of 1986 in relation to all Employees, and such Forms and other required documentation are complete and updated as of the date of this Agreement. All employee documentation, including Forms I-9, W-4, other tax and/or employment forms or filings, and all other employee information and employee personnel files and records pertaining to the Continuing Employees will either remain with the Purchased Companies or will be transferred to Buyer after the Closing.

SECTION 3.12 <u>Compliance with Laws; Governmental Authorizations; etc.</u>

(a)    Each of the Purchased Companies is, and at all times has been, in compliance in all material respects with each Law that is or was applicable to it or to the conduct or operation of the Business or the ownership or use of any of its assets.

(b)    No event has occurred that (with or without the giving of notice or the lapse of time or both) constitutes, directly or indirectly, a violation by any of the Purchased Companies of, or a failure of any of the Purchased Companies to comply with, in all material respects, any Law.

(c)    None of the Purchased Companies has received, at any time, any notice or communication from any Governmental Entity regarding any actual, alleged, possible, or potential violation of, or failure of any of the Purchased Companies to comply with, in all material respects, any Law.

(d)    Each of the Purchased Companies holds and maintains in full force and effect all material Governmental Authorizations required to conduct the Business in the manner and in all such jurisdictions as it is currently conducted and to permit it to own and use its properties and assets in the manner in which it currently owns and uses such assets.

(e)    Each of the Purchased Companies is, and at all times has been, in compliance in all material respects with all of the terms and requirements of each Governmental Authorization applicable to such Purchased Company.

SECTION 3.13 <u>Title to Property</u>.   The Purchased Companies have good, valid and marketable title to all of their respective properties, interests in properties and assets (real and personal) reflected in the Balance Sheet or acquired after the date of the Balance Sheet (except properties, interests in properties and assets sold or otherwise disposed of since the date of the Balance Sheet in the Ordinary Course of Business and except for any real property that the Purchased Companies have acquired in the Ordinary Course of Business by foreclosure or by deed in lieu thereof), or in the case of leased properties and assets, valid leasehold interests in the leased properties and assets, free and clear of all Liens of any kind or character, except (i) any Liens for current taxes not yet due and payable, (ii) recorded easements, covenants, conditions and other restrictions of record as do not and will not materially detract from or materially interfere with the use of the properties subject thereto or affected thereby, or otherwise materially impair business operations involving such properties, (iii) Liens securing debt which is reflected on the Balance Sheet, and (iv) for any defects in the title or leasehold interest of any properties or assets that do not materially affect the ownership or use of such properties and assets.  There are no defaults (or events that, with notice or lapse of time or both, would constitute defaults) by any of the Purchased Companies with respect to the Liens securing debt which are reflected on the Balance Sheet. With respect to any properties or assets leased by the Purchased Companies, there are no defaults (or events that, with notice or lapse of time or both, would constitute defaults) by the Purchased Companies, or to the Knowledge of Seller, any other party to the leases of such properties or assets.  There are no outstanding options, rights of first refusal or similar rights to purchase the properties and/or assets owned by the Purchased Companies.  All properties used in the operations of the Purchased Companies are reflected in the Balance Sheet to the extent GAAP requires the same to be reflected.  Section 3.13 of the Disclosure Memorandum identifies each parcel of real property owned or leased by the Purchased Companies as of the date of this Agreement.

SECTION 3.14 <u>Contracts; No Default</u>.

(a)   Section 3.14(a) of the Disclosure Memorandum lists each Material Contract to which a Purchased Company is party or is bound as of the date of this Agreement.  For purposes of this Agreement, "Material Contract" means any Contract to which a Purchased Company is party or is bound (excluding, in each case, Contracts with a term of less than 90 days):

(i)   evidencing indebtedness for borrowed money or pursuant to which any of the Purchased Companies has guaranteed (including guarantees by way of acting as surety, co-signer, endorser, co-maker, indemnitor or otherwise) any obligation of any other Person in excess of $1,000,000;

(ii)   prohibiting or limiting, or purporting to prohibit or limit, the ability of any of the Purchased Companies or their Related Persons or any of their employees (A) to engage in any line of business, (B) to compete with, obtain products or services from, or provide services or products to, any Person, (C) to carry on or expand the nature or geographical scope of the Business or any other business or activity anywhere in the world or (D) to disclose any confidential information in the possession of any of the Purchased Companies (and not otherwise generally available to the public);

(iii)   with any director or officer of any of the Purchased Companies (or any of their respective family members) or with any employee, agent, consultant, advisor, leased employee or representative for employment or for consulting or similar services or containing any severance or termination pay obligations;

(iv)   pursuant to which it (A) leases from or to any other Person any tangible personal property or real property or (B) purchases or sells real estate, fixed assets, materials, supplies, equipment or services and which, in the case of clauses (A) and (B), calls for future payments in excess of $100,000 in any year or $500,000 over the term of such agreement and which may not be terminated within 60 days without payment of an early termination fee or penalty or any post-termination restrictions;

(v)   involving Intellectual Property or providing for the provision of data processing, network communication or other technical services to or by the Purchased Companies, that involve aggregate consideration to or by any of the Purchased Companies of at least $100,000 per annum or at least $300,000 over the term of such agreement or which are otherwise material to the business of the Purchased Companies and which may not be terminated within 60 days without payment of an early termination fee or penalty or any post-termination restrictions;

(vi)   which is a partnership agreement, joint venture agreement or other Contract (however named) involving a sharing of profits, losses, costs or Liabilities by any of the Purchased Companies with any other Person;

(vii)   providing for the acquisition or disposition after the date of this Agreement of any portion of the Business or assets of any of the Purchased Companies other than in the Ordinary Course of Business;

NY12528 266865.1

        (viii)     relating to a mortgage, pledge, security agreement, deed of trust or other document granting a Lien over any real or personal asset or property owned by any of the Purchased Companies.

        (ix)     which is a lease for real property;

        (x)     requiring any of the Purchased Companies to use the products or services of the contracting party on an exclusive basis;

        (xi)     requiring any of the Purchased Companies to provide services on a "most favored nation" basis; or

        (xii)     restricting any Person from disclosing any confidential information in its possession which relates to the Purchased Companies (and is not otherwise generally available to the public).

    (b)     With respect to each Material Contract:

        (i)     the Contract is a valid and binding agreement of the relevant Purchased Company (assuming its validity and binding effect with respect to each other party to such Contract) and is in full force and effect;

        (ii)     none of the Purchased Companies is in material breach or violation of, or material default thereunder;

        (iii)     except as expressly permitted by this Agreement, none of the Purchased Companies has repudiated or waived any material provision of any such Contract;

        (iv)     no other party to any such Contract is to the Knowledge of Seller, in material default in any respect, material breach or violation of any such Contract; no event has occurred which would result in a breach of or a default under, require any consent or action by any Person under, or give rise to any penalty or right of termination, cancellation or acceleration of any right or obligation of any Purchased Company or to a loss of any benefit to which a Purchased Company is entitled under any such Contract (in each case, with or without notice or lapse of time); and, to the Knowledge of Seller, no other party to any such Contract has repudiated any material provision thereunder; and

        (v)     the Seller has provided to Buyer complete and correct copies of all such Contracts.

    (c)     Section 3.14(c) of the Disclosure Memorandum lists as of the date of this Agreement each Contract between or among a Purchased Company and any of its Related Persons (other than (i) any such Contracts solely between Purchased Companies and (ii) any such Contracts with employees that are set forth on Section 3.10 of the Disclosure Memorandum).

SECTION 3.15 <u>Environmental Matters</u>.

    (a)     No property currently or formerly owned or operated by any of the Purchased Companies has been contaminated with any Hazardous Material and no Hazardous Materials have been used, stored or otherwise handled in any manner by any of the Purchased Companies on, in, from or

NY12528 266865.1

affecting the Properties except in compliance in all material respects with, and as would not be expected to result in liability under, applicable Environmental Laws.

(b)    None of the Purchased Companies has received any notice of any violations (and there are no existing violations) of, or liability relating to, any Environmental Law including any applicable Law governing the use, storage, treatment, transportation, manufacture, refinement, handling, production or disposal of Hazardous Materials on, in, from or affecting any of the Properties and there are no Actions pending or threatened by any Person with respect to any such violations.

(c)    The Purchased Companies and all Properties are currently being, and have in the past been, operated by any of the Purchased Companies in accordance and in compliance in all material respects with all applicable Environmental Laws.

(d)    The Purchased Companies are not subject to any judgments, claims, consent decrees, liens, orders, remediation liabilities or indemnification obligations arising out of or relating to any Environmental Law.

SECTION 3.16 Insurance. As of the date of this Agreement, the Purchased Companies have in full force and effect the insurance coverage with respect to the Business set forth in Section 3.16 of the Disclosure Memorandum. To the Knowledge of Seller: (i) there is no material claim pending under any of such policies as to which coverage has been questioned, denied or disputed by the underwriters of such policies; (ii) all premiums due and payable under all such policies have been paid and the Purchased Companies are otherwise in compliance in all material respects with the terms of such policies; and (iii) none of the Purchased Companies has received notice of any threatened termination of, or material premium increase with respect to, any of such policies.

SECTION 3.17 Brokers and Finders. Except for Merrill Lynch & Co., whose fees, if any, shall be paid by Seller, no agent, broker, investment banker, intermediary, finder, Person or firm acting on behalf of Seller or the Purchased Companies or which has been retained by or is authorized to act on behalf of Seller or the Purchased Companies is or would be entitled to any broker's or finder's fee or any other commission or similar fee, directly or indirectly, from any of the Parties hereto in connection with the execution of this Agreement or upon consummation of the transactions contemplated hereby.

SECTION 3.18 No Undisclosed Liabilities; No Non-Business Activities. None of the Purchased Companies has (i) any Liabilities except Liabilities which are reflected or reserved against in the Financial Statements or (ii) incurred or paid any Liability since September 30, 2006, except, in the case of both clauses (i) and (ii) above, for such Liabilities incurred or paid (x) in the Ordinary Course of Business and which are not reasonably likely to have or result in, individually or in the aggregate, a Material Adverse Effect on the Company, (y) in connection with the transactions contemplated by this Agreement, or (z) in connection with performance obligations under executory contracts (other than performance obligations arising as a result of a default thereunder by the Purchased Companies). Since January 1, 2002, all material business activities of the Purchased Companies have been conducted solely in connection with the operation of the Business.

SECTION 3.19 Intellectual Property. Schedule 3.19 of the Disclosure Memorandum sets forth all registered Intellectual Property, all material unregistered trademarks, service marks and copyrights, and all material Contracts concerning Intellectual Property used by each of the Purchased Companies in the course of its business (together with all other material unregistered Intellectual Property the "Material IP") as of the date of this Agreement. To the Knowledge of Seller, all of the registered

-14-

Intellectual Property set forth on Schedule 3.19 is valid and enforceable and has not expired. Each of the Purchased Companies owns or has a license to use all of the Intellectual Property used by such Purchased Company in the course of its business free and clear of all Liens, and all of such rights shall survive the consummation of the transactions contemplated by this Agreement unchanged. Each of the Purchased Companies is the owner of or has a license to use any Intellectual Property sold or licensed to a third party by such Purchased Company in connection with such Purchased Company's business operations, and such Purchased Company has the right to convey by sale or license any Intellectual Property so conveyed. None of the Purchased Companies, and to the Knowledge of Seller, no other party is in breach or default under any of its material Contracts concerning Intellectual Property, and all of such material Contracts are valid, enforceable and in full force and effect. Consummation of the transactions contemplated by this Agreement will not place any of the Purchased Companies in breach or default of any material Contract concerning Intellectual Property, or trigger any modification, termination, acceleration or increase in fees thereunder or create any license under or encumbrance on Intellectual Property owned by the Purchased Companies. Consummation of the transactions contemplated by this Agreement will not result in the Intellectual Property of the Buyer becoming subject to any license or encumbrance that is currently applicable to the Intellectual Property of the Purchased Companies. No Actions or Orders have been instituted, or are pending or to the Knowledge of Seller, threatened, which seek to cancel, limit or challenge the validity, enforceability, ownership, use of, or other rights of any of the Purchased Companies with respect to Intellectual Property used, sold or licensed by such Purchased Company in the course of its business, nor has any Person claimed or alleged any rights to such Intellectual Property. To the Knowledge of Seller, the Intellectual Property owned by, and the conduct of the business of, the Purchased Companies does not infringe, misappropriate, or otherwise violate any Intellectual Property of any other Person and no other Person is infringing, misappropriating or otherwise violating any Material IP owned by the Purchased Companies. In addition, no officer, director or employee of any Purchased Company is party to any Contract with any Person other than a Purchased Company which requires such officer, director or employee to assign any interest in any Intellectual Property to any Person other than a Purchased Company. The Purchased Companies take all reasonable actions to protect, preserve and maintain the owned Material IP (including executing assignment of invention agreements and confidentiality agreements with all appropriate employees, consultants and contractors) and the confidentiality of all Trade Secrets that are owned, used or held by the Purchased Companies. The IT Assets perform in all material respects in accordance with their documentation and functional specifications and otherwise as required by the Purchased Companies in connection with their business, and have not materially failed or malfunctioned in the past three (3) years. The Purchased Companies have implemented reasonable backup and disaster recovery technology consistent with reasonable industry practices.

SECTION 3.20 <u>Bank Accounts</u>. Section 3.20 of the Disclosure Memorandum sets forth a complete list of the bank names, locations and account numbers of all bank and safe deposit box accounts of any of the Purchased Companies, including any custodial accounts for securities owned by any of the Purchased Companies.

SECTION 3.21 <u>Related Party Transactions</u>. Section 3.21 of the Disclosure Memorandum sets forth a complete list of all intercompany account balances as of the date of the Interim Balance Sheet between Seller or any of its Related Persons, on the one hand, and any of the Purchased Companies, on the other hand. Since the date of the Interim Balance Sheet, there has not been any incurrence or accrual of any Liability (as a result of allocations or otherwise) by any of the Purchased Companies to Seller or any of its Related Persons or other transaction between any of the Purchased Companies and Seller or any of its Related Persons other than in the Ordinary Course of Business and on an arm's-length basis.

NY12528 266865 1

SECTION 3.22 <u>Mortgage Loans</u>.

(a)    With respect to each mortgage loan originated or owned by a Purchased Company, regardless of whether such mortgage loan was originated by a Purchased Company, or was originated by a mortgage broker and brokered to a Purchased Company, or originated by a third party originator and assigned or sold to a Purchased Company (each a "<u>Mortgage Loan</u>") at and as of the time such Mortgage Loan was (1) originated, in the case of Mortgage Loans originated by a Purchased Company, (2) acquired, in the case of Mortgage Loans brokered, sold or assigned to a Purchased Company, and (3) sold, in the case of Mortgage Loans sold by a Purchased Company:

(i)    Each Purchased Company has, and in the case of a Mortgage Loan originated through a mortgage broker or third party originator, has required that the mortgage broker or third party originator execute a written agreement whereby the mortgage broker or third party originator has represented and warranted that the mortgage broker or third party originator also has, complied in all material respects with all applicable Laws as then currently in effect (including but not limited to usury laws and other Laws restricting interest charges on loans, the Real Estate Settlement Procedures Act, the federal Truth in Lending Act, the Equal Credit Opportunity Act, the Fair Housing Act, the Fair Credit Reporting Act, the Home Mortgage Disclosure Act, the Fair Debt Collection Practices Act, the Federal Trade Commission Act and applicable state laws relating to the foregoing and to unfair or deceptive acts and practices, and state adaptations of the Uniform Commercial Code (the "UCC") and the Uniform Consumer Credit Code and other consumer credit laws and equal credit opportunity, consumer protection, collection and disclosure laws, including with respect to limitations on origination-related fees and charges and prepayment penalties) and Mortgage Loan Requirements applicable to such Mortgage Loan and to the Purchased Company, mortgage broker or third party originator, as applicable.

(ii)    Each Purchased Company has complied with any Law and Mortgage Loan Requirement applicable to the sale of any physical damage, credit life and credit accident and health insurance in all material respects.  No Purchased Company is or has been a party to any reinsurance arrangement, including but not limited to reinsurance of title insurance or mortgage guaranty insurance.

(iii)    If any right of rescission existed for one or more consumers with respect to a Mortgage Loan, the time for the exercise of such right has expired without exercise (unless as of the Closing Date such Mortgage Loan was originated within three days of the Closing Date, in which case the rescission period will expire at the end of such three days).

(iv)    The practices of the Purchased Companies with respect to compensation paid to mortgage brokers, third party originators and other settlement service providers comply and have complied at all times with applicable provisions of the federal Real Estate Settlement Procedures Act and its implementing regulation, Regulation X, RESPA Statement of Policy 1999-1 (Regarding Lender Payments to Mortgage Brokers) issued by the Department of Housing and Urban Development, RESPA Statement of Policy 2001-1 (Clarification regarding Lender Payments to Mortgage Brokers) issued by the Department of Housing and Urban Development, similar state laws and regulations, and state laws related to permissible fees and charges.

NY12528:266865 1

(v)       Each Purchased Company is, and at all relevant times has been, in good standing and in compliance with all applicable requirements (including eligibility requirements) under any agreement with an Investor pursuant to which the Company sells Mortgage Loans.  Section 3.22(a)(v) of the Disclosure Memorandum contains a correct list of all Investors to whom the Purchased Companies have sold Mortgage Loans between January 1, 2005 and the date hereof.  No Investor has notified any Purchased Company of its intent to cease doing business with such Purchased Company or to materially modify the manner in which it presently does business with the Purchased Companies.

(b)       Each Mortgage Loan is, and each Pipeline Loan, upon the closing of such Pipeline Loan, will be, eligible for sale to at least one Investor that regularly purchases Mortgage Loans from the Purchased Companies on a non-recourse basis (other than repurchase obligations for breaches of representations and warranties).  Each Mortgage Loan and Pipeline Loan was processed, underwritten, approved, originated, closed, funded, insured, serviced (including interim serviced) by or on behalf of a Purchased Company, or sold, as applicable, and the loan documents and loan files maintained (or required to be maintained) by the Purchased Companies with respect thereto are being, and at all relevant times were, maintained by such Purchased Company, in compliance in all material respects with all applicable Laws and, if applicable, the requirements of the Investor acquiring such Mortgage Loan (or, if there is no such Investor, in accordance with the Company's underwriting standards then in effect), the requirements of each Insurer of such Mortgage Loan (if any) in effect and applicable at the time such insurance was obtained, and any other applicable Mortgage Loan Requirements.  No Investor or Insurer has (A) given written notice or a written report that any Purchased Company has violated or has not complied on a recurring basis with the applicable underwriting standards with respect to Mortgage Loans sold by such Purchased Company to an Investor or (B) imposed restrictions on the activities (including commitment authority or volume restrictions) of a Purchased Company.

(c)       All indebtedness reflected as assets on the books and records of the Company were, as of the date of the Financial Statements and will be as of the Closing Date, in all respects legal, valid and binding obligations of the respective obligors named therein and the indebtedness is not subject to any defenses which have been or may be asserted, except for defenses arising from applicable bankruptcy, insolvency, moratorium or other similar laws relating to creditors' rights generally and general principles of equity.

(d)       Each Mortgage Loan outstanding and each commitment to extend credit has been solicited, originated and administered in accordance with the Company's underwriting standards and any applicable Mortgage Loan Requirements, and is or was administered by the Company in all material respects in accordance with the relevant loan documents.

(e)       To the Knowledge of Seller, all brokers and other third parties who originate or have originated Mortgage Loans, at the time of such originations, have or had (i) all Governmental Authorizations from all jurisdictions requiring such Governmental Authorizations for such origination activities and (ii) materially complied with and were not in material violation of any applicable Laws or Mortgage Loan Requirements and were not at the time of such origination subject to any pending or threatened investigation by any Governmental Entity.

(f)       No Purchased Company is obligated directly or indirectly by its loan correspondents or brokers to extend credit to any borrower or potential borrower, except with regard to Pipeline Loans.

-17-

(g)     The Purchased Companies are the sole legal, beneficial and equitable owners of the Mortgage Loans reflected as held for sale or held for investment on the Company's consolidated balance sheet as of December 31, 2006 or required to be reflected as held for sale or held for investment on the Company's Final Balance Sheet. Subject to each Purchased Company's obligations to deliver Mortgage Loans to Investors pursuant to a delivery commitment with the Investor, each Purchased Company has full right and authority, subject to no interest or participation of, or agreement with, any Person, to transfer and sell the Mortgage Loans reflected as held for sale or held for investment on the Company's consolidated balance sheet as of December 31, 2006 (or required to be reflected as held for sale or held for investment on the Company's Final Balance Sheet) to an Investor free and clear of any encumbrance or right of others, equity, lien, pledge, charge, mortgage, claim, participation interest or security interest of any nature.

(h)     There do not exist any circumstances or conditions with respect to any Mortgage Loan reflected as held for sale or held for investment on the Company's consolidated balance sheet as of December 31, 2006 (or required to be reflected as held for sale or held for investment on the Company's Final Balance Sheet), or with respect to the related Mortgaged Property, Mortgagor or such Mortgagor's credit standing that could reasonably be expected to cause private institutional investors to regard the Mortgage Loan as an unacceptable investment, to cause such Mortgage Loan to become delinquent, or to materially and adversely affect the value or marketability of such Mortgage Loan.

(i)     Set forth in Section 3.22(i) of the Disclosure Memorandum is a true and complete list of all commitments for the future purchase or delivery of Mortgage Loans existing as of the date of this Agreement (each a "Commitment"). Each Commitment is a valid and binding obligation of the parties thereto enforceable in accordance with its terms and is in full force and effect. Each Commitment shall not, by virtue of the execution and delivery of this Agreement, result in a default (or give rise to any right of termination, cancellation or acceleration not otherwise available) under any of the terms, conditions or provisions of such Commitment or require waivers or consents of the parties thereto. There is not, under any of the Commitments, any existing material default, or other event which, with or without due notice or lapse of time or both, would constitute a material default on the part of a Purchased Company or could reasonably be anticipated to result in any Commitment being terminated by any other party thereto.

(j)     No Mortgage Loan at the time of its origination or sale (a) was subject to Section 226.32 of Regulation Z or any similar state or local law (relating to high interest rate credit/lending transactions), (b) included any single premium credit life or accident and health insurance or disability insurance, or (c) contained any term or condition, or involved any loan origination practice, that has been defined as "predatory," "covered," or "threshold" (or any other similar term) under applicable federal, state or local law, or which has been expressly categorized as an "unfair" or "deceptive" term, condition, or practice in any applicable federal, state or local law dealing with "predatory" or "high cost" (or other similar) mortgage lending.

(k)     No misrepresentation or fraud has occurred with respect to any Mortgage Loan.

(l)     Set forth in Section 3.22(l) of the Disclosure Memorandum is a list, as of the date hereof, of all licenses, approvals and other Governmental Authorizations issued or granted by federal, state or local governmental or quasi-governmental bodies, or any agency thereof, including expiration dates thereof if applicable, which the Purchased Companies possess, and which are necessary to permit the Purchased Companies to conduct their respective mortgage origination businesses as they are now being conducted. Each such license, approval or authorization is in good standing and there is no

-18-

proceeding pending or, to the Knowledge of Seller or any Purchased Company, threatened, to revoke or limit any such license, approval or authorization or to impose any penalty or other disciplinary sanction in connection with any such license, approval or authorization.

(m)     No written demand has been made to a Purchased Company to repurchase a Mortgage Loan that remains outstanding.

(n)     During the period of time during which a Purchased Company provided servicing with respect to a Mortgage Loan, all monies received with respect to such Mortgage Loan were properly accounted for and applied in all material respects.

(o)     Each Purchased Company has timely filed all material reports required by any Investor or Insurer.

SECTION 3.23 <u>Sufficiency of Assets</u>.  The assets that will be owned by the Purchased Companies as of the Effective Time will constitute all, or substantially all, of the assets used in or held for use in the Business and will be sufficient for Buyer to conduct the Business as of the Closing Date without interruption and in the Ordinary Course of Business.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES OF SELLER

SECTION 4.1 <u>Representations and Warranties of Seller</u>.  Seller hereby represents and warrants to Buyer as follows:

(a)     On the date of execution of this Agreement, Seller is the sole record and beneficial owner and holder of 1,000 shares of Common Stock, free and clear of all Liens.  On the Closing Date, Seller shall be the sole record and beneficial owner and holder of 1,000 shares of Common Stock, free and clear of all Liens.  Upon consummation of the transactions contemplated hereby, Buyer will acquire all right, title and interest in the Shares from Seller free and clear of all Liens.

(b)     Seller has the full legal right, requisite power and authority and has taken all corporate action necessary in order to execute, deliver and perform fully, its obligations under this Agreement and to consummate the transactions contemplated hereby.  The execution and delivery by Seller of this Agreement and the consummation by Seller of the transactions contemplated hereby have been duly authorized and approved and no other corporate proceeding with respect to Seller is necessary to authorize this Agreement or the transactions contemplated hereby.  This Agreement has been duly executed and delivered by Seller and constitutes a valid and binding agreement of Seller, enforceable against Seller in accordance with its terms except to the extent that the enforceability may be limited by applicable bankruptcy, insolvency, reorganization, receivership, conservatorship, moratorium or other similar Laws affecting the enforcement of creditors' rights generally and subject to general principles of equity and except that the availability of the equitable remedy of specific performance or injunctive relief is subject to the discretion of the court before which any proceeding may be brought.

-19-

ARTICLE V

REPRESENTATIONS AND WARRANTIES OF BUYER

Concurrently with or prior to the execution and delivery of this Agreement, Buyer is delivering to Seller a disclosure memorandum (the "Buyer Disclosure Memorandum") that sets forth all of the items the disclosure of which is necessary or appropriate either in response to an express disclosure requirement contained in a provision hereof or as an exception to one or more representations or warranties contained in Article V or to one or more of the covenants of Buyer contained in this Agreement; provided, that the mere inclusion of an item in the Buyer Disclosure Memorandum as an exception to a representation or warranty shall not be deemed an admission by Buyer that such item represents a material exception or event, state of facts, circumstances, developments, change or effect or that such item is reasonably likely to have or result in a Material Adverse Effect on Buyer; provided, further, that any disclosures made with respect to a section or subsection of this Agreement shall be deemed to qualify such sections or subsections specifically referenced or cross-referenced, as well as other sections or subsections to the extent such disclosure is readily apparent as constituting disclosure in respect of such other sections or subsections.

Buyer hereby represents and warrants to Seller as follows:

SECTION 5.1  Organization and Good Standing.  Buyer is a corporation duly organized, validly existing and in good standing under the laws of Delaware, its jurisdiction of incorporation.

SECTION 5.2  Corporate Authority.  Buyer has the full legal right, requisite corporate power and authority and has taken all corporate action necessary in order to execute, deliver and perform fully, its obligations under this Agreement and to consummate the transactions contemplated hereby. The execution and delivery by Buyer of this Agreement and the consummation by Buyer of the transactions contemplated hereby have been duly authorized and approved and no other corporate proceeding with respect to Buyer is necessary to authorize this Agreement or the transactions contemplated hereby. This Agreement has been duly executed and delivered by Buyer and constitutes a valid and binding agreement of Buyer, enforceable against Buyer in accordance with its terms except to the extent that the enforceability may be limited by applicable bankruptcy, insolvency, moratorium or other similar Laws affecting the enforcement of creditors' rights generally and subject to general principles of equity and except that the availability of the equitable remedy of specific performance or injunctive relief is subject to the discretion of the court before which any proceeding may be brought.

SECTION 5.3  Governmental Filings and Consents; No Violations.

(a)      Except for the HSR Filing and the other Filings and Consents set forth in Section 5.3(a) of the Buyer Disclosure Memorandum, no Filings are required to be made by Buyer with, nor are any Consents required to be obtained by Buyer from, any Governmental Entity, in connection with the execution or delivery by Buyer of this Agreement, the performance by Buyer of its obligations hereunder or the consummation by Buyer of the transactions contemplated hereby.

(b)      Assuming the making of the HSR Filing, the other Filings set forth in Section 5.3(a) of Buyer Disclosure Memorandum and the obtaining of the Consents set forth in Section 5.3(b) of Buyer Disclosure Memorandum, the execution and delivery by Buyer of this Agreement does not, and the performance by Buyer of its obligations hereunder or the performance and

consummation by Buyer of any of the transactions contemplated hereby will not, with respect to Buyer, directly or indirectly (with or without the giving of notice or the lapse of time or both):

        (i)      contravene, conflict with, or constitute or result in a breach or violation of, or a default under (A) any provision of the articles of incorporation or by-laws (or equivalent documents) of Buyer or (B) any resolution adopted by the board of directors of Buyer;

        (ii)     require Buyer to make any Filing with, or obtain any Consent from, any Governmental Entity;

        (iii)    contravene, conflict with, or constitute or result in a breach or violation of any material Law or Order to which Buyer, or any of the assets owned or used by Buyer, is subject, which contravention, conflict, breach or violation is reasonably likely to have or result in a material adverse effect on Buyer's ability to consummate the transactions contemplated by this Agreement; or

        (iv)    contravene, conflict with, or constitute or result in a breach or violation of, or a default under, or the cancellation, modification or termination of, or the acceleration of, or the creation of a Lien on any properties or assets owned or used by Buyer pursuant to any provision of a Contract, under which Buyer is or may become bound or is or may become subject to any obligation or Liability or by which any of Buyer's assets owned or used are or may become bound, which contravention, conflict, breach, violation, default, cancellation, modification or termination is reasonably likely to have or result in a material adverse effect on Buyer's ability to consummate the transactions contemplated by this Agreement.

        (c)     Except as set forth in Section 5.3(c) of Buyer Disclosure Memorandum, there are no Actions or Orders issued, pending or, to the Knowledge of Buyer, threatened against Buyer or any of its assets, at law, in equity or otherwise, in, before, by, or otherwise involving, any Governmental Entity, arbitrator or other Person that question or challenge the validity or legality of, or have the effect of prohibiting, preventing, restraining, restricting, delaying, making illegal or otherwise interfering with, this Agreement, the consummation of the transactions contemplated hereby or any action taken or proposed to be taken by Buyer pursuant hereto or in connection with the transactions contemplated hereby.

        SECTION 5.4   Securities Act.  Buyer is acquiring the Shares for its own account and not with a view to their distribution within the meaning of Section 2(a)(11) of the Securities Act in any manner that would be in violation of the Securities Act. Buyer has not, directly or indirectly, offered the Shares to anyone or solicited any offer to buy the Shares from anyone, so as to bring such offer and sale of the Shares by Buyer within the registration requirements of the Securities Act. Buyer will not sell, convey, transfer or offer for sale any of the Shares except upon compliance with the Securities Act and any applicable state securities laws or pursuant to any exemption there from.

        SECTION 5.5   Brokers and Finders.  Except for UBS Securities LLC, whose fees, if any, shall be paid by or on behalf of Buyer, no agent, broker, investment banker, intermediary, finder, Person or firm acting on behalf of Buyer or which has been retained by or is authorized to act on behalf of Buyer is or would be entitled to any broker's or finder's fee or any other commission or similar fee, directly or indirectly, from any of the Parties hereto in connection with the execution of this Agreement or upon consummation of the transactions contemplated hereby.

        SECTION 5.6   Financing.  Buyer has available, and on the Closing Date will have available, sufficient funds, available lines of credit or other sources of immediately available funds to

-21-

enable it to purchase the Shares on the terms and conditions of this Agreement. Buyer's obligations hereunder are not subject to any conditions regarding Buyer's ability to obtain financing for the consummation of the transactions contemplated hereby.

## ARTICLE VI

### COVENANTS AND ADDITIONAL AGREEMENTS

SECTION 6.1  Conduct of Business.  Between the date of this Agreement and the Closing Date, except as requested or consented to by Buyer in writing (which consent shall not be unreasonably withheld, conditioned or delayed), and except as otherwise expressly contemplated in this Agreement:

(a)  Seller shall cause the Purchased Companies to conduct the Business only in the Ordinary Course of Business (it being understood and agreed that nothing contained herein shall permit the Purchased Companies to enter into or engage (through acquisition, product extension or otherwise), in any material respect, in any material new line of business), and to use its commercially reasonable efforts to preserve intact the current business organization of the Company and use its commercially reasonable efforts to keep available the services of the current advisors, managers, officers, employees, agents, brokers, and sales representatives of the Purchased Companies.

(b)  Without limiting the generality of Section 6.1(a), from the date hereof through the Closing, except as expressly provided in this Agreement or consented to in writing in advance by Buyer (such consent not to be unreasonably withheld), Seller will cause the Purchased Companies not to:

(i)  enter into any Contract with any Related Person, except as required under the present terms of any Contract as set forth in Section 6.1(b) of the Disclosure Memorandum;

(ii)  open, relocate or close any office, except in the Ordinary Course of Business;

(iii)  (A) enter into or amend or renew any employment, retention, change in control, severance or similar plans, policies or agreements with or for the benefit of any Employee or Continuing Employee, unless, with respect to an amendment or renewal, such amendment or renewal is required in order for the Purchased Companies or Seller to be in compliance with applicable Law, or (B) grant any additional compensation, or any salary or wage increases, for any Employee (including incentive or bonus payments) or Continuing Employee, other than regularly scheduled salary or wage increases (including wage increases resulting from an internal transfer upon acceptance of a position that had a posted requisition as of the date hereof) of up to 2% in aggregate amount from those existing on the date hereof, except as required by applicable Law;

(iv)  except as required by applicable Law, (A) implement or adopt any material change in its interest rate and other risk management policies, procedures or practices; (B) fail to follow its existing policies or practices with respect to managing its exposure to interest rate and other risk (including in respect of underwriting policies); (C) make any changes in accounting methods, policies, procedures, principles or practices except to the extent required by changes in GAAP;

-22-

(v)        acquire (including by merger, consolidation, acquisition of stock or assets, license or lease) assets, properties, rights or businesses from any Person, other than the acquisitions of inventory, supplies and immaterial assets in the Ordinary Course of Business;

(vi)       dispose of, transfer, encumber, license, sub-license, abandon, cancel or permit to lapse any rights in, to or for any Material Intellectual Property, except in the Ordinary Course of Business;

(vii)      (A) sell, assign, lease, transfer, license, or otherwise dispose of, or extend or exercise any option to sell, assign, lease, transfer, license, or otherwise dispose of, any material Assets, other than originations in the Ordinary Course of Business or (B) mortgage or pledge any Assets of the Purchased Companies, or create or suffer to exist any Lien (other than a Permitted Lien) thereupon, in each case other than in the Ordinary Course of Business;

(viii)     adopt a plan of complete or partial liquidation, dissolution, merger, consolidation, restructuring, recapitalization or other reorganization;

(ix)       (A) fail to file any Tax Return on the date due therefor, including extensions, (B) file a Tax Return that is not true and complete in all respects, (C) make, change or rescind any Tax election, except for elections or changes or rescissions by or at the direction of Seller or a Related Person in connection with any consolidated Tax Return of Seller or a Related Person; provided, that such elections are not materially adverse to Buyer, (D) change any annual Tax accounting period, change any method of Tax accounting or file for any change in Tax accounting method, (E) file any amended Tax Return, except for amended Tax Returns filed by Seller or a Related Person on a consolidated basis; provided, that such amended Tax returns are not materially adverse to Buyer, (F) enter into any closing agreement, (G) waive or extend the statute of limitations in respect of Taxes, (H) settle any Tax claim or assessment or surrender any right to claim for a Tax refund, (I) settle or finally resolve any Tax contest with respect to any amount of Tax or (J) take any other action if, in any such case, such action is likely to materially increase the Tax liability of the Company or any of the Company Subsidiaries for any Post-Closing Tax Period or to materially decrease any Tax attribute of the Company or any of the Company Subsidiaries existing on the Closing Date;

(x)        pay, discharge, cancel or satisfy (A) intercompany payables or Taxes or (B) any material claims or Liabilities, in each case other than the payment, discharge or satisfaction when due or otherwise in the Ordinary Course of Business;

(xi)       create, incur or assume any indebtedness (including any guarantee of or indemnity in respect of indebtedness) other than indebtedness under the Line of Credit or trade accounts payable in the Ordinary Course of Business;

(xii)      incur, authorize or commit to make any capital expenditure, other than (A) maintenance, repair and upkeep in the Ordinary Course of Business or (B) in accordance with the Company's capital budget;

(xiii)     cancel any debts or waive any claims or rights of substantial value (including the cancellation, compromise, release or assignment of any Indebtedness owed to, or claims held by any Purchased Company), except for cancellations made or waivers granted in the Ordinary Course of Business which, in the aggregate, are not material;

-23-

(xiv)        commence, compromise or settle, or take any material action with respect to, any legal proceedings or investigations or other matters involving Governmental Entities other than the prosecution, defense and settlement of legal proceedings in the Ordinary Course of Business which, in the aggregate, are not material;

(xv)        other than in the Ordinary Course of Business consistent with past practice, amend, supplement, modify, waive, terminate, assign, convey, encumber or otherwise transfer, in whole or in part, its rights or interests under or in any material Contract, or enter into any Contract that would be required to appear on Section 3.14 (a) of the Disclosure Memorandum if such contract had been in effect on the date of this Agreement;

(xvi)        except to the extent required by applicable Law, take any action that could reasonably be expected to result in (A) any representation and warranty of Seller set forth in this Agreement ceasing to be true and correct or (B) any condition to the Closing set forth in Article VII not being satisfied;

(xvii)        take any action that, or fail to take any action the failure of which to be taken, could reasonably be expected to prevent or materially delay the consummation of the transactions contemplated hereby; or

(xviii)        take, offer, propose or authorize any of, or commit or agree to take any of, the foregoing.

SECTION 6.2   Access.   Between the date of this Agreement and the Closing Date, Seller shall, and shall cause the Purchased Companies and each of their respective Representatives to, (i) afford Buyer and its Representatives reasonable access to the Purchased Companies' personnel, premises, properties, Contracts, books and records, and other documents and data during normal business hours of the Purchased Companies, (ii) furnish Buyer and its Representatives with copies of all such Contracts, books and records, and other existing documents and data as Buyer may reasonably request, (iii) furnish Buyer and its Representatives with such additional financial, operating, and other data and information as Buyer may reasonably request and (iv) otherwise cooperate with any further investigation by Buyer and its Representatives of the Purchased Companies pursuant to this Section 6.2; provided, Seller shall not be required to cause the Purchased Companies to provide Buyer and its Representatives access to or disclose information where such access or disclosure would jeopardize the attorney-client or similar privilege, violate a confidentiality agreement existing as of the date of this Agreement with respect to such information or contravene any Law or Order with respect to such information.   All requests for information made pursuant to this Section 6.2 shall be directed to an executive officer of Seller.

SECTION 6.3   Required Approvals.   Each Party hereto hereby agrees to cooperate with each other Party and to promptly, and, subject to the timely receipt of all necessary information and materials from the Seller and the Purchased Companies, in any event on or prior to 15 Business Days after the date hereof, prepare and file all necessary Filings and other documents, to obtain as promptly as practicable all Consents of all third parties and Governmental Entities necessary or advisable to consummate the transactions contemplated hereby and to lift any injunction or other legal bar to the consummation of the transactions contemplated by this Agreement (and, in such case, to proceed with the consummation of the transactions contemplated by this Agreement as expeditiously as possible), including through all possible appeals; provided that Buyer shall not be required to consummate the transactions contemplated hereby if, in the reasonable good faith judgment of Buyer, any conditions or restrictions imposed by any third party or Governmental Entity in connection with any such Consent may

-24-

reasonably be expected to materially impair the ability of Buyer to consummate the transactions contemplated hereby or operate the Business or any other business operated by Buyer or its Related Persons following the Closing in substantially the same manner it has been operated prior to the date of this Agreement (a "Burdensome Condition"). Each Party shall have the right to review in advance, and to the extent practicable each will consult the other on, in each case subject to applicable Laws relating to the exchange of information, all information relating to Buyer, Seller or the Purchased Companies, as the case may be, that is reasonably relevant to such Party in terms of obtaining any Consents of Governmental Entities and which appears in any Filing made with, or other written materials submitted to, any third party or Governmental Entity in connection with the transactions contemplated by this Agreement. In exercising the foregoing right, each of Buyer and Seller shall act reasonably and as promptly as practicable. Buyer and Seller agree that they will keep the other apprised of the status of matters relating to completion of the transactions contemplated by this Agreement, including, subject to applicable Laws relating to the exchange of information, promptly furnishing the other with copies of notice or other communications received by Buyer, Seller or the Company, as the case may be, from any third party or Governmental Entity with respect to the transactions contemplated hereby.

SECTION 6.4    Reasonable Best Efforts. Between the date of this Agreement and the Closing Date, the Parties hereto shall use their respective reasonable best efforts to cause the conditions in Sections 7.1 and 7.2 hereof to be satisfied.

SECTION 6.5    Governmental Approvals. Buyer and Seller each agree to prepare and file the Report with the FTC and the Antitrust Division as soon as reasonably practical following the date hereof. Each such Party hereby covenants to request early termination of the waiting period required by the HSR Act if Buyer so requests and to cooperate with the other Party to the extent reasonably necessary to assist in making reasonable supplemental presentations to the FTC or the Antitrust Division, and if requested by the FTC or the Antitrust Division, to promptly amend or furnish additional information thereunder. In addition to and without limitation of the foregoing in this Section 6.5, each of Buyer and Seller undertakes and agrees to (i) file (and Buyer agrees to cause any Person that may be deemed to be the ultimate buyer entity or otherwise to control Buyer to file, if such filing is required by Law) as soon as practicable, and in any event on or prior to ten Business Days after the date hereof, the HSR Filing with the FTC and the Antitrust Division (and shall file as soon as practicable any form or report required by any other Governmental Entity relating to antitrust, competition, trade or other regulatory matters), and (ii) take any act, make any undertaking or receive any clearance or Consent required by any Governmental Entity or applicable Law; *provided*, that the foregoing shall not require Buyer or its Related Persons to take any actions or make any undertakings that reasonably could be expected to result in a Burdensome Condition. Each of Buyer and Seller shall (A) respond as promptly as practicable to any inquiries or requests received from any Governmental Entity for additional information or documentation, and (B) not extend any waiting period under the HSR Act or enter into any Contract with any Governmental Entity not to consummate the transactions contemplated by this Agreement, except with the prior written consent of the other Party hereto (which consent shall not be unreasonably withheld). Buyer shall use reasonable best efforts to take any and all steps necessary to avoid or eliminate each and every impediment under any antitrust or competition Law that may be asserted by the FTC or the Antitrust Division with respect to the transactions contemplated by this Agreement so as to enable the Effective Time to occur as soon as reasonably possible and to avoid any Action related thereto which would otherwise have the effect of preventing or delaying the Effective Time; *provided*, that the foregoing shall not require Buyer or its Related Persons to take any actions or make any undertakings that reasonably could be expected to result in a Burdensome Condition. The steps involved in the preceding sentence shall include defending through litigation on the merits (including appeals) any claim asserted in any court or other Action by the FTC or the Antitrust Division, proposing, negotiating, committing to and

-25-

effecting, by consent decree, hold separate order or otherwise, the sale, divestiture or disposition of such assets or businesses of Buyer or the Company (including their respective Subsidiaries) (including entering into customary ancillary agreements on commercially reasonable terms relating to any such sale, divestiture or disposition of such assets or businesses), or agreeing to such limitations on its or their conduct or actions, as may be required in order obtain all necessary Consents as soon as reasonably possible, to avoid the entry of, or to effect the dissolution of, any injunction, temporary restraining order or other Order in any Action, which would otherwise have the effect of preventing or delaying the Effective Time. At the request of Buyer, Seller shall agree to take any action in the two preceding sentences; provided, that any such action may be conditioned upon the consummation of the transactions contemplated by this Agreement. Each Party shall (x) promptly notify the other Party of any written communication to that Party or its Related Persons from any Governmental Entity with respect to this Agreement; and (y) not agree to participate, or to permit its Representatives to participate, in any substantive meeting or discussion with any Governmental Entity in respect of any filings, investigation or inquiry concerning this Agreement or the transactions contemplated hereby unless it consults with the other Party in advance.

SECTION 6.6  Publicity.  The Parties hereto shall agree with each other as to the form and substance of any press releases or other public announcements related to the transactions contemplated hereby and any filings with any Governmental Entity or with any national securities exchange or interdealer quotation service with respect thereto prior to issuing any press release or other public announcement or making any filing, except nothing in this Section 6.6 shall be deemed to prohibit any Party from making any disclosure or filing as may be required by Law or by obligations pursuant to any listing agreement with or rules of any national securities exchange or interdealer quotation service or to prohibit Seller from making disclosures in connection with other discussions, questions or comments in connection with investor relations matters the principal focus of which is not specifically related to the transactions contemplated hereby provided that such disclosures or comments are not designed to adversely affect the reputation or business of Buyer or its Related Persons.

SECTION 6.7  Confidentiality.

(a)  Notwithstanding anything herein to the contrary, Seller shall, and shall cause its Subsidiaries and Related Persons and each of their respective Representatives to, maintain in confidence and not use to the detriment of Buyer or the Purchased Companies any written, oral or other information relating to the Purchased Companies or to the Business or obtained from Buyer, its Subsidiaries or Related Persons or any of its Representatives in connection with this Agreement or the transactions contemplated hereby, except to the extent (i) any such information is or becomes generally available to the public other than as a result of unauthorized disclosure by Seller, its Subsidiaries, Related Persons or any of their respective Representatives, (ii) any such information is required to be disclosed by a Governmental Entity of competent jurisdiction, *provided* that, to the extent permissible, Seller shall provide Buyer with reasonable prior written notice of such requirement and use commercially reasonable efforts to obtain or to assist Buyer in obtaining confidential treatment or a protective order for such information, (iii) any such information was or becomes available to Seller on a non-confidential basis and from a source (other than a Party to this Agreement or any Representative of such Party other than Buyer or any Representative of Buyer) that is not, to the knowledge of the recipient, bound by a confidentiality agreement, or (iv) that use of such information is necessary or appropriate in making any Filing or obtaining any Consent required for the consummation of the transactions contemplated by this Agreement, *provided* that, to the extent permissible, Seller shall provide Buyer with reasonable prior written notice of such requirement and use commercially reasonable efforts to obtain or to assist Buyer in obtaining confidential treatment or a protective order for such information. Seller shall instruct its

Subsidiaries, Related Persons and Representatives having access to such information of such obligation of confidentiality. Seller shall continue to enforce all confidentiality agreements relating to the Purchased Companies entered into with any Person prior to the date hereof (including in respect of trade secrets) and has not waived any provisions in respect thereto prior to the date of this Agreement. At the Closing, Seller shall assign to Buyer all of its rights (including any non-solicit rights) under any such confidentiality agreements relating to the Purchased Companies other than those rights relating to confidential information specifically related to the Seller and its Related Persons other than the Purchased Companies.

(b)    Notwithstanding anything herein to the contrary, prior to the Closing Date, Buyer shall, and shall cause its Subsidiaries and Related Persons and each of their Representatives to, maintain in confidence and not use to the detriment of Seller or the Purchased Companies any written, oral or other information relating to the Purchased Companies or to the Business or obtained from Seller, the Company, their respective Subsidiaries or Related Persons or any of their respective Representatives in connection with this Agreement or the transactions contemplated hereby, except to the extent (i) any such information is or becomes generally available to the public other than as a result of unauthorized disclosure by Buyer, its Subsidiaries, Related Persons or any of their Representatives, (ii) any such information is required to be disclosed by a Governmental Entity of competent jurisdiction, *provided* that, to the extent permissible, Buyer shall provide Seller with reasonable prior written notice of such requirement and use commercially reasonable efforts to obtain or to assist Buyer in obtaining confidential treatment or a protective order for such information, (iii) any such information was or becomes available to Buyer on a non-confidential basis and from a source (other than Seller or any Representative of Seller) that is not, to the knowledge of the recipient, bound by a confidentiality agreement, or (iv) that use of such information is necessary or appropriate in making any Filing or obtaining any Consent required for the consummation of the transactions contemplated by this Agreement, *provided* that, to the extent permissible, Buyer shall provide Seller with reasonable prior written notice of such requirement and use commercially reasonable efforts to obtain or to assist Buyer in obtaining confidential treatment or a protective order for such information. In addition, if this Agreement is terminated pursuant to Article VIII hereof, for three years after such termination, Buyer and its Subsidiaries and Related Persons shall not use any of the information obtained from Seller, the Company or any of their respective Subsidiaries, Related Persons or Representatives to solicit clients or customers of the Purchased Companies; provided, that this Section 6.7(b) shall not be deemed to prohibit Buyer from engaging in advertising or solicitations directed to the public generally. Buyer shall instruct its Subsidiaries, Related Persons and Representatives having access to such information of the foregoing obligation of confidentiality.

SECTION 6.8    Expenses. Except as otherwise expressly provided herein, whether or not the transactions contemplated hereby are consummated, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby (i) by the Purchased Companies or Seller shall be paid by Seller and (ii) by Buyer shall be paid by Buyer. Without limiting the generality of the foregoing, all legal, accounting and investment banking fees, and other fees to consultants and advisors incurred in connection with this Agreement and the transactions contemplated hereby (i) by the Purchased Companies and Seller shall be paid by Seller and (ii) by Buyer shall be paid by Buyer. Buyer shall pay one-half and Seller shall pay one-half of the HSR Act filing fee. In the event of termination of this Agreement, the obligation of each Party to pay its own expenses will be subject to any rights of such Party arising from a breach of this Agreement by another Party.

SECTION 6.9    Further Assurances. At any time and from time to time after the date hereof, the Parties hereto agree to (a) furnish to each other such further assurances, information, documents, instruments of transfer or assignment, files and books and records, (b) promptly execute, acknowledge, and deliver any such further assurances, documents, instruments of transfer or assignment,

-27-

files and books and records, and (c) subject to the provisions of Sections 6.3 and 6.5, do all such further acts and things, all as may be necessary or desirable to carry out the provisions of this Agreement and make effective the transactions contemplated hereby.

SECTION 6.10 Notifications. Between the date of this Agreement and the Closing Date, each Party agrees to give the other Party notice in writing as promptly as practicable after it becomes aware of any event, state of facts, circumstances, development, change or effect that constitutes, or could be reasonably likely to constitute, a material breach of any representation, warranty, or covenant by such Party.

SECTION 6.11 Non-Solicitation. In consideration of the benefits of this Agreement to Seller and in order to induce Buyer to enter into this Agreement, Seller hereby covenants and agrees that neither Seller nor any of its Subsidiaries or Related Persons shall, without the prior written consent of Buyer, (i) for a period of three years after the Closing Date, directly or indirectly solicit for employment any then current officer or employee of the Purchased Companies (any such person, a "Covered Employee") or otherwise do anything to cause or encourage any officer or employee of the Purchased Companies to terminate or sever his or her employment or other relationship with such Purchased Company or conduct any marketing, media or customer solicitation campaign which specifically targets any Company Customer related to the Business or (ii) for a period of two years after the Closing Date hire any Covered Employee; provided, that this Section 6.11 shall not be deemed to prohibit Seller from (x) engaging in advertising or solicitations directed to the public generally or (y) engaging in mailings or phone solicitations to Company Customers, which mailing or phone solicitations occur systematically as a result of any other relationship any such Company Customer may have with Seller. Seller specifically agrees that this covenant is an integral part of the inducement of Buyer to purchase the Shares and that Buyer (or its successors or assigns) shall be entitled to injunctive relief in addition to all other legal and equitable rights and remedies available to it in connection with any breach by Seller of any provision of this Section 6.11 and that, notwithstanding the foregoing, no right, power or remedy conferred upon or reserved or exercised by Buyer in this Section 6.11 is intended to be exclusive of any other right, power or remedy, each and every one of which (now or hereafter existing at law, in equity, by statute or otherwise) shall be cumulative and concurrent.

SECTION 6.12 Non-Competition.

(a)     During the period beginning on the Closing Date and ending on the third anniversary thereof, Seller shall not, and shall cause its Subsidiaries and Related Persons not to, directly or indirectly, own, manage, support or operate, or participate in the ownership, management, support or operation of, any business engaged in the business of wholesale mortgage lending of non-prime residential mortgage loans anywhere in the United States (any such business, a "Competing Business"); provided, that nothing herein shall prohibit or in any way prevent:

(i)     Seller or any of its Related Persons from acquiring not more than five percent (5%) of the capital stock of an entity with operations in a Competing Business whose stock is publicly traded on a securities exchange or over-the-counter;

(ii)     Seller or any of its Related Persons from financing, lending or making extensions of credit to, or foreclosing on the collateral of, any Competing Business in the ordinary course of Seller's or its Related Persons, as the case may be, business, provided, that Seller or its applicable Related Person uses commercially reasonable efforts to dispose of the Competing Business promptly following any such foreclosure, provided, further, that nothing in

-28-

the foregoing shall permit the Seller or any of its Related Persons to engage in the purchase of any non-prime mortgage loans;

        (iii)      Seller or any of its Related Persons from making any investment (or activity related thereto) in a fiduciary or agency capacity and carried out on behalf of clients or other beneficiaries; or

        (iv)      the ownership of, an affiliation with, or the conduct of any other prohibited activity with respect to, a Person that conducts, either directly or indirectly, a Competing Business (any such Person, together with all of its Related Persons, a "Competing Person") that is the result of (1) the merger, consolidation, share exchange, sale or purchase of assets, scheme of arrangement or similar business combination involving Seller or any of its Related Persons with any Competing Person or (2) the acquisition of any Competing Person by Seller or any of its Related Persons, if, in the case of both (1) or (2), at least 50% of the total consolidated assets and total consolidated revenues (including as revenues net interest income revenues with respect to a lending business) of such Competing Person in the calendar year prior to such ownership or affiliation does not relate to a Competing Business; *provided*, that Seller or its applicable Related Person uses commercially reasonable efforts to dispose of the Competing Business promptly following such transaction.

        (b)      Seller specifically agrees that the covenant contained in this Section 6.12 is an integral part of the inducement of Buyer to purchase the Shares and that Buyer (or its successors or assigns) shall be entitled to injunctive relief in addition to all other legal and equitable rights and remedies available to it in connection with any breach by Seller of any provision of this Section 6.12 and that, notwithstanding the foregoing, no right, power or remedy conferred upon or reserved or exercised by Buyer in this Section 6.12 is intended to be exclusive of any other right, power or remedy, each and every one of which (now or hereafter existing at law, in equity, by statute or otherwise) shall be cumulative and concurrent.

SECTION 6.13 Employees and Employee Benefit Plan Matters.

        (a)      Immediately following the Effective Time and for a period of one year thereafter, (i) Buyer shall provide, or shall cause the Purchased Companies to provide, each Continuing Employee with (A) base salary at the same level provided to such Continuing Employee by the Purchased Companies immediately prior to the Effective Time, and (B) with compensation opportunities which are substantially comparable in the aggregate to the compensation opportunities provided to such Continuing Employee by the Purchased Companies immediately prior to the Effective Time, and (ii) Buyer shall provide or cause the Purchased Companies to provide, generally to the Continuing Employees, employee benefits under the Benefit Plans or under other employee benefit plans which when taken as a whole are substantially similar to the benefits provided to such Continuing Employees under the Benefit Plans immediately prior to the Effective Time.  To the extent recognized under the Benefit Plans as of immediately prior to the Effective Time, service with Seller and its predecessors and Related Persons shall be recognized as service for purposes of participation and vesting (but not for purposes of benefit accrual) under any benefit plan maintained following the Effective Time by the Purchased Companies, Buyer or Buyer's Related Persons for the benefit of the Continuing Employees ("Post-Closing Plans"). For purposes of clarity, this provision shall not be interpreted as requiring Buyer to (i) provide any particular Buyer employee benefit plan as a Post-Closing Plan to or for the benefit of the Continuing Employees or (ii) allow for participation by Continuing Employees in Buyer's defined benefits pension plan or retiree medical benefit plan.

(b)    Buyer shall cause any Post-Closing Plans that are welfare benefit plans that cover the Employees after the Effective Time to (i) waive any waiting period and restrictions and limitations for preexisting conditions or insurability, and (ii) cause any deductible, co-insurance, or maximum out-of-pocket payments made by the Employees under the Benefit Plans prior to the Effective Time to be credited to such Employees under the Post-Closing Plans, so as to reduce the amount of any deductible, co-insurance, or maximum out-of-pocket payments payable by the Employees under the Post-Closing Plans. Buyer also shall cause the Purchased Companies to honor all employment, severance, consulting, and other compensation Contracts disclosed in Section 6.13(b) of the Disclosure Memorandum to Buyer between the Purchased Companies and any current or former director, officer, or employee thereof, and all provisions for vested benefits or other vested amounts earned or accrued through the Effective Time under the Benefit Plans to the extent set forth on Schedule 6.13(b) of the Disclosure Memorandum.

(c)    Seller shall retain all Liabilities with respect to any employee benefit plan maintained by Seller, and any employee benefit plan maintained by any ERISA Affiliate of Seller other than the Purchased Companies and all Liabilities arising under Title IV of ERISA (whether or not in respect of a Benefit Plan maintained by the Purchased Companies). Without limiting the foregoing, (i) Seller shall be responsible for the operation of its equity-based benefit plans and the administration of all equity-based awards to Continuing Employees which have been granted under such plans, including providing for the vesting and acceleration of awards as contemplated by Section 3.7 of the Disclosure Memorandum and (ii) Seller shall cause no "Contingent Payments" to be due and owing pursuant to the Stay Bonus Agreements unless such payments are accrued for on the Final Balance Sheet.

(d)    Notwithstanding the foregoing, nothing contained herein shall (i) be treated as an amendment of any particular Benefit Plan, (ii) give any third party any right to enforce the provisions of this Section 6.13 or (iii) obligate Buyer or the Purchased Companies or any of their Related Persons to (A) maintain any particular Benefit Plan or (B) retain the employment of any particular Employee. Prior to the Effective Time, if requested by Buyer in writing, to the extent permitted by applicable Law and the terms of the plan, Seller and/or the Purchased Companies shall cause the EquiFirst Corporation Retirement Savings and Profit Sharing Plan to be terminated effective as of immediately before the Closing Date.

SECTION 6.14 Related Party Transactions.    Except as otherwise provided in this Agreement or set forth in Section 6.14 of the Disclosure Memorandum, Seller shall take all actions necessary to terminate prior to or concurrent with the Closing all Contracts between any Purchased Company, on the one hand, and Seller or any of its Related Persons, on the other hand, such Contracts being set forth in Section 3.14(c) of the Disclosure Memorandum. From and after the date hereof and subject to Section 6.1(b), except with the prior written consent of Buyer (which consent shall not be unreasonably withheld), Seller and its Related Persons shall conduct all transactions with the Purchased Companies only in the Ordinary Course of Business and on an arm's-length basis. At least 10 Business Days prior to the Closing, Seller shall prepare and deliver to Buyer a statement setting out in reasonable detail the calculation of all accounts between the Purchased Companies, on the one hand, and Seller or any of its Related Persons, on the other hand, such accounts being set forth in Section 3.21 of the Disclosure Memorandum, and, to the extent requested by Buyer, provide Buyer with supporting documentation to verify the underlying intercompany accounts and transactions.

SECTION 6.15 Additional Financial Statements.

(a)    As soon as reasonably practicable after they become available, Seller or the Purchased Companies shall furnish to Buyer any financial statements with respect to any period ending

-30-

subsequent to the date of the Interim Balance Sheet and prior to the Closing Date, which in any event shall include a Monthly Balance Sheet. Any Monthly Balance Sheet shall be delivered no later than the 15th day of the following month and shall present fairly in all material respects the financial condition of the Company as of the date of such Monthly Balance Sheet, shall be prepared in accordance with GAAP and shall be subject to normal recurring year-end adjustments (the effect of which will not, individually or in the aggregate, be material in amount or effect) and the absence of notes (that, if presented, would not differ materially from those included in the Balance Sheet).

(b)     As promptly as practicable after the date hereof, Seller shall cause to be prepared and delivered to Buyer the 2006 Audited Financial Statements.

SECTION 6.16 Retention of Records.

(a)     Buyer shall retain, and cause the Company to retain, all books and records now in the Company's possession relating to the Benefit Plans or accounting or legal matters for the Purchased Companies prior to the Closing for a period of at least six years from the date hereof or such further period as may be required by any applicable Law in effect as of the date of this Agreement or that may be enacted thereafter; provided, that at the end of such six-year or longer period any such document or record may be disposed of by Buyer or the Company, if Buyer or the Company first offers to surrender possession thereof to Seller at Seller's expense. Seller shall have the right during business hours, upon reasonable notice to Buyer or the Company, to inspect and make copies of any such records for any purpose reasonably related to Seller's prior ownership of the Business.

(b)     Except as otherwise provided in this Agreement, Seller may retain for its records and not for use, disclosure, sale or other dissemination to any Person or in any manner, except for any purpose reasonably related to Seller's prior ownership of the Business, (i) one copy of the materials included in the data room organized by Seller in connection with the purchase and sale of the Shares, together with a copy of all documents referred to in such materials, (ii) all internal correspondence and memoranda, valuations, investment banking presentations and bids received from others in connection with the sale of the Shares, and (iii) a copy of all consolidating and consolidated financial information and all other accounting records prepared or used in connection with the preparation of the Financial Statements. Seller shall deliver to Buyer on the Closing Date all other books and records relating to each of the Purchased Companies, and such books and records shall include all investigations, studies, audits, tests, reviews or other analyses conducted by, or relating to, the Purchased Companies.

SECTION 6.17 Certain Tax Covenants.

(a)     Liability for Taxes and Related Matters.

(i)     Except to the extent reflected in the Final Balance Sheet, Seller shall be liable for and shall indemnify (pursuant to Section 9.2) Buyer and the Company for all Taxes (including, any obligation to contribute to the payment of a Tax determined on a consolidated, combined or unitary basis with respect to a group that includes or included the Company and Taxes resulting from the Company ceasing to be a member of any affiliated, combined or consolidated group of which the Company was a member) (x) imposed on any of the Purchased Companies, or for which any of the Purchased Companies may otherwise be liable, for any Pre-Closing Tax Period, (y) imposed on any corporation (other than the Purchased Companies) that was a member of an affiliated, combined or consolidated group of which any of the Purchased Companies was a member prior to the Closing Date, for any taxable year, or (z) attributable to

-31-

any breach of any representation, warranty or covenant by Seller contained in Sections 3.9 or 6.17.

(ii)    Buyer shall be liable for and shall indemnify Seller (pursuant to Section 9.3) for all Taxes of the Purchased Companies (other than Taxes for which Seller is responsible pursuant to Section 6.17(a) (i)) for any Post-Closing Tax Period.  Buyer shall be entitled to any refund of Taxes of the Purchased Companies received in respect of any Post-Closing Tax Period.

(iii)    Whenever it is necessary for purposes of this Section 6.17(a) to determine the Liability for Taxes of the Purchased Companies for a taxable year or period that begins on or before and ends after the Closing Date, the determination shall be made by assuming that the Purchased Companies had a taxable year or period which ended at the close of business on the Closing Date, except that exemptions, allowances or deductions that are calculated on an annual basis (such as the deduction for depreciation) shall be apportioned on a time basis and Taxes (such as real or personal property Taxes) imposed on a periodic basis shall be allocated on a daily basis.

(iv)    Seller shall be entitled to any refund of Taxes of the Purchased Companies (net of Taxes payable by the Purchased Companies thereon) received in respect of any Pre-Closing Tax Period, except to the extent that such refund is reflected as an asset in the Final Balance Sheet.  Notwithstanding the preceding sentence, if Seller becomes entitled to a refund or credit of Taxes for any Pre-Closing Tax Period, and any portion of such refund or credit is attributable to the carryback of losses, credits or similar items attributable to the Purchased Companies or their Related Persons for a Post-Closing Tax Period, Seller shall promptly pay to Buyer the amount of such refund or credit together with any interest thereon to the extent attributable to such carryback.  In the event that any refund or credit of Taxes for which a payment has been made is subsequently reduced or disallowed, Buyer shall indemnify and hold harmless Seller for any Tax Liability, including interest and penalties, assessed against Seller by reason of the reduction or disallowance.

(v)    Any payment by Buyer to Seller, or by Seller to Buyer, under this Agreement (other than interest payments) shall be treated by the Parties as an adjustment to the Purchase Price paid to or received by such Party, as the case may be.

(vi)    Buyer shall be liable for one-half and Seller shall be liable for the other half of all transfer, documentary, sales, use, stamp, registration and similar taxes arising from the sale of the Shares.

(b)    Tax Returns and Reports.

(i)    Seller shall prepare, or shall be caused to be prepared, and shall file or cause to be filed all Tax Returns that are required to be filed by or with respect to the Purchased Companies for Pre-Closing Tax Periods ending on or before the Closing Date and shall pay all the Taxes shown to be due thereon (after any reduction for previous payments of estimated Taxes and reserves reflected in the Final Balance Sheet). Unless otherwise required by applicable Law, any such Tax Return shall be prepared on a basis consistent with past practice.

-32-

NY12528 266865 1

(ii)    Buyer shall prepare and file or cause to be filed all Tax Returns that are required to be filed by or with respect to the Purchased Companies for taxable years or periods ending after the Closing Date and shall remit any Taxes due in respect of such Tax Returns. With respect to any Tax Return that covers a taxable year or period beginning before and ending after the Closing Date ("Straddle Period"), Buyer shall provide a copy of such Tax Return to Seller at least 30 days prior to the due date (including applicable extensions) for the filing thereof accompanied by a statement calculating in reasonable detail Seller's indemnification obligation, if any, pursuant to Section 6.17(a), and Seller shall have the right to review and comment on such Tax Return to the extent that it relates to the portion of the taxable year or period ending on the Closing Date. If for any reason Seller does not agree with Buyer's calculation of its indemnification obligation, Seller shall notify Buyer of its disagreement within fifteen business days of receiving a copy of the Tax Return and Buyer's calculation, and provide supporting documentation and its own calculation of its indemnification liability. If Buyer and Seller cannot resolve such dispute it shall be submitted to a Settlement Auditor for a final resolution in a manner consistent with the provisions of this Agreement. The Parties shall cooperate with the Settlement Auditor and shall proceed in good faith to cause the Settlement Auditor to resolve such disagreement. The costs and expenses of the Settlement Auditor for disputes under this Section 6.17(b)(ii) shall be borne equally by Buyer and Seller. If Seller agrees with Buyer's calculation of its indemnification obligation, Seller shall pay to Buyer the amount of Seller's indemnification. Seller shall pay Buyer the amount of any Taxes for which Seller is liable pursuant to Section 6.17(a)(i) but which are payable with Tax Returns to be filed by Buyer pursuant to this Section 6.17(b)(ii) promptly after receipt of notice, unless the indemnification amount is disputed, and then promptly after the dispute is resolved.

(iii)    At Seller's request and expense, Buyer shall cause the Purchased Companies to file for any refunds or credits to which Seller is entitled under this Section 6.17 relating to Pre-Closing Periods. In connection therewith, (A) Buyer shall permit Seller to control the prosecution of any such refund claim and, where deemed appropriate by Seller, shall cause the Purchased Companies to authorize by appropriate powers of attorney such persons as Seller shall designate to represent the Purchased Companies with respect to such refund claim and (B) Buyer shall cause the Purchased Companies to forward to Seller any such refund plus any interest received with respect thereto within ten Business Days after such refund and interest are received or reimburse Seller for any such credit within ten Business Days after the relevant Tax Return is filed in which the credit is applied against any of the Purchased Companies' liability for Taxes.

(iv)    Except as required by applicable Law, neither Buyer nor any of its Affiliates shall, without the prior written consent of Seller, make or change any Tax election of or with respect to any of the Companies or amend, refile or otherwise modify (or grant an extension of any applicable statute of limitations for any Tax except with respect to a Tax return for a Straddle Period) any Tax Return of any of the Purchased Companies for a Pre-Closing Tax Period (or portion thereof); provided, that Buyer may make or change any such Tax election or return if such Tax election or change to an election or return or change to a return if there are no resulting adverse economic consequences to Seller. Except as required by applicable Law, neither Seller nor any of its Affiliates shall, without the prior written consent of Buyer, amend or refile any Tax Return of, or including, any of the Purchased Companies for a Pre-Closing Tax Period (or portion thereof); provided, that Seller may amend or refile any such Tax Return if such amending or refiling has no adverse economic consequences to Buyer.

(v)        Nothing in this Section 6.17(b) shall reduce Seller's obligations under Section 6.17(a)(i).

(c)    Contest Provisions.

(i)        Buyer shall promptly (and in any event within 15 Business Days) notify Seller in writing upon receipt by Buyer, any of its Related Persons or the Purchased Companies of notice of any pending or threatened Federal, state, local or foreign audits or assessments relating to Taxes which may materially affect the Tax Liabilities of the Purchased Companies for which Seller would be required to indemnify Buyer pursuant to Section 6.17 or 9.2; provided, that no failure or delay in giving any such notice shall relieve Seller of its obligations under this Agreement, except to the extent that Seller demonstrates that it is materially prejudiced by Buyer's or the Purchased Companies' failure to give, or delay in giving, such notice.  Seller shall have the sole right to represent the Purchased Companies' interests in any audit or administrative or court proceeding relating to taxable periods ending on or before the Closing Date, and to employ counsel of its choice at its expense; provided that Buyer shall be given notice of, and have the right to monitor all proceedings and to review in advance and comment on all submissions made by Seller in connection therewith.   Notwithstanding the foregoing, Seller shall not be entitled to settle, either administratively or after the commencement of litigation, any claim for Taxes which would adversely affect the Liability for Taxes of the Purchased Companies or their Related Persons (including Buyer) for any period after the Closing Date to any extent (including, but not limited to, the imposition of income tax deficiencies, the reduction of asset basis or cost adjustments, the lengthening of any amortization or depreciation periods, the denial of amortization or depreciation deductions, or the reduction of loss or credit carryforwards) without the prior written consent of Buyer.   Such consent shall not be unreasonably withheld and shall not be necessary to the extent that Seller has indemnified Buyer against the effects of any such settlement.

(ii)        Seller shall be entitled to participate at its own expense in the defense of any claim for Taxes for a year or period ending after the Closing Date which may be the subject of indemnification by Seller pursuant to Section 6.17 or 9.2 and, with the written consent of Buyer, and at its sole expense, may assume the entire defense of such claim.

(d)    Cooperation; Tax Records.

(i)    After the Closing Date, each of Seller and Buyer shall:

(A)            assist (and cause their respective Related Persons to assist) the other Party as necessary in preparing any Tax Returns which such other Party is responsible for preparing and filing;

(B)            cooperate fully in preparing for any audits of, or disputes with taxing authorities regarding, any Tax Returns of the Purchased Companies and in administering this Agreement;

(C)            make available to the other Party and to any taxing authority as reasonably requested all books and records, documents, financial, operating and accounting data and other information relating to Taxes of the Purchased Companies;

-34-

(D)                provide timely notice to the other Party in writing of any pending or threatened audits or assessments of the Purchased Companies for taxable periods for which the other Party may have a Liability under Article IX hereof; and

(E)                furnish the other Party with copies of all correspondence received from any taxing authority in connection with any Tax audit or information request with respect to any such taxable period.

(ii)                Each of Seller, Buyer and its Subsidiaries, and the Purchased Companies shall retain or cause to be retained all Tax Returns, schedules, work papers, and all material books and records or other documents relating thereto, until the expiration of the applicable statute of limitations (including any waivers or extensions thereof) for the taxable years to which such Tax Returns and other documents relate or as otherwise required by any record retention agreement with any taxing authority that relates to the Purchased Companies. Prior to transferring, discarding or destroying any such Tax Returns, records or other documents relating to any Pre-Closing Tax Period, Seller shall notify Buyer and, if Buyer so requests, provide Buyer with the opportunity to take possession of such Tax Returns, records or documents solely at Buyer's expense.

(e)        338(h) (10) Election.

(i)                At the request of Buyer, Seller shall make a joint election with Buyer under Section 338(h)(10) of the Code (and any corresponding election under state, local, and foreign tax law) with respect to (x) the purchase and sale of the stock of the Company hereunder and, for the Company's Subsidiaries selected by the Buyer ("338(h)(10) Subsidiaries"), (y) the deemed purchase and sale of the stock of the 338(h)(10) Subsidiaries (collectively, the "Section 338(h)(10) Election"). Seller represents that its sale of the Shares of the Company and the Company's Subsidiaries is eligible for, and Buyer represents that it is qualified to make, such election for US federal income tax purposes. If the election is made, Seller and Buyer shall, 30 days after Buyer provides Seller with written notice of its intent to make the election, exchange completed and executed copies of Internal Revenue Service Form 8023, required schedules thereto, and any similar state and foreign forms. If the election is made, Seller agrees to complete all other necessary forms provided by Buyer to Seller that are needed to effectuate the Section 338(h)(10) Election. If any changes are required in these forms as a result of information which is first available after the Closing Date, the parties will promptly agree on such changes.

(ii)                Allocation of Consideration.  If the Section 338(h)(10) Election is made, the parties to this Agreement agree to allocate the sum of (A) the value of the Purchase Price and (B) the value of Assumed Liabilities (the "Consideration") among the assets of the Company and the 338(h)(10) Subsidiaries deemed to have been acquired pursuant to Section 338(h)(10) of the Code or any state or foreign Law equivalent in accordance with their fair market value. Buyer shall perform or cause to be performed an initial valuation of assets and an allocation of the Consideration for these purposes. Buyer shall provide Seller with drafts of such valuation of assets and allocation of the "aggregated deemed selling price" ("ADSP") (as defined in Treasury Regulations Section 1.338-4) within 60 days after the final determination of the Final Payoff Amount. Seller shall have 30 days to provide Buyer with any written objections to such drafts and provide Seller's computation of the allocation of the ADSP. Buyer and Seller agree to cooperate in good faith to resolve any objections of Seller and to determine a proper allocation of the Consideration. If Buyer and Seller cannot resolve all of Seller's objections within 15 days of

-35-

Buyer's receipt (as determined in accordance with Section 10.5) of Seller's notice of objections, then Buyer and Seller shall submit any unresolved objections to a Settlement Auditor for a final resolution in a manner consistent with the provisions of this Agreement. The Parties shall cooperate with the Settlement Auditor and shall proceed in good faith to cause the Settlement Auditor to resolve such disagreement within 30 days. The costs and expenses of the Settlement Auditor for disputes under this Section 6.17(e)(ii) shall be borne equally by Buyer and Seller. Buyer and Seller shall use the asset values determined from such allocation for purposes of all reports and returns with respect to Taxes, including Internal Revenue Service Forms 8594 or 8883 or any equivalent statement.

(iii)    In the event that the Parties make a Section 338(h)(10) Election, Buyer shall be liable for and shall reimburse Seller for all of Seller's out-of-pocket costs and expenses resulting from the making of the Section 338(h)(10) Election, but excluding any Taxes resulting from the making of the Section 338(h)(10) Election; provided, that Buyer's Liability to Seller pursuant to this Section 6.17(e)(iii) shall be limited to $150,000. For the avoidance of doubt, Seller's out-of-pocket costs and expenses resulting from the making of the Section 338(h)(10) Election only include those costs incurred as a result of the Section 338(h)(10) Election that would not have been incurred but for making the Section 338(h)(10) Election. Within 30 days of the receipt of written notice from Seller setting forth in reasonable detail with supporting documentation any out-of-pocket costs and expenses incurred by Seller resulting from the making of the Section 338(h)(10) Election, Buyer shall pay such costs and expenses to Seller.

(f)    Allocation of Consideration with Respect to Section 6.12. Buyer shall have the right to allocate a reasonable portion of the total consideration transferred by Buyer and its Related Persons to Seller pursuant to this Agreement (not to exceed $27,000,000) to the value of Seller's obligations under Section 6.12. Buyer and Seller shall use this allocation for purposes of all reports and returns with respect to Taxes.

(g)    Survival of Obligations. The obligations of the parties set forth in this Section 6.17 shall be unconditional and absolute (and not subject to any limitation in article IX) and shall remain in effect without limitation as to time.

SECTION 6.18 Indemnification of Directors and Officers of the Purchased Companies.

(a)    Buyer agrees that all rights to indemnification and all limitations on Liability existing in favor of the Covered Parties as provided in the Purchased Companies' Organizational Documents as in effect as of the date of this Agreement with respect to matters occurring prior to or on the Closing Date shall survive the Closing and shall continue in full force and effect, and shall be honored by Buyer and its successors as if they were the indemnifying party thereunder, without any amendment thereto, for a period of six years after the Effective Time; provided, that all rights to indemnification in respect of any claim asserted or made within such period shall continue until the final disposition of such claim; provided, further, that nothing contained in this Section 6.18(a) shall be deemed to preclude the liquidation, consolidation, conversion, merger or similar transaction involving any Purchased Company, in which case all of such rights to indemnification and limitations on Liability shall be deemed to so survive and continue notwithstanding any such liquidation, consolidation, or merger.

(b)    If the Company or any of its successors or assigns shall consolidate with or merge into any other Person and shall not be the continuing or surviving Person of such consolidation or merger or shall transfer all or substantially all of its assets to any Person, then and in each case, proper

-36-

provision shall be made so that the successors and assigns of the Company shall assume the obligations set forth in this Section 6.18.

SECTION 6.19 <u>Certain Litigation</u>. In the case where any of the Purchased Companies is the subject of any Action not contemplated by Article IX, Buyer shall have approval rights with respect to all settlements other than a sole cash settlement.

SECTION 6.20 <u>Release of Employees</u>. Seller agrees that it shall not, and shall cause its Related Persons not to, bring a claim against any Employees who were members of senior management or officers of a Purchased Company for actions or conduct prior to the Closing Date while such Employees were employed by a Purchased Company in connection with this Agreement or the transactions contemplated hereby or any claims brought hereunder; *provided*, that the foregoing shall not preclude Seller or its Related Persons, as applicable, from bringing such claims against such Employees for fraud, manifest dishonesty, gross negligence, violations of Law, or other actions or conduct pursuant to which applicable Law would otherwise make unavailable indemnification to such Employees.

SECTION 6.21 <u>Transition Services</u>.    The Parties understand that the Purchased Companies receive products and services pursuant to agreements or arrangements entered into by Seller or its Related Persons (other than the Purchased Companies) as set forth in Section 3.14(c) of the Disclosure Memorandum. Prior to the Closing Date, the Parties shall in good faith work out arrangements (including the modification of any Contracts or the entering into any new Contracts) to either transition the provision of such products and services to other providers simultaneous with the Closing or to continue the provision of such products and services after the Closing Date through the Seller or its Related Persons on a transitional basis at cost for a reasonable period of time. It is anticipated that the ERS Group services will continue to be provided after Closing on a transitional basis.

SECTION 6.22 <u>Certain Mortgage Loans</u>.

(a)    Seller shall cause the Purchased Companies to cause the Mortgage Loans set forth on Schedule 6.22(a) to be classified as "held for investment" on the Estimated Balance Sheet and Buyer agrees that such Mortgage Loans shall be classified as "held for investment" on the Final Balance Sheet. Seller shall cause the Purchased Companies to use their commercially reasonable efforts to refinance the Mortgagors under such Mortgage Loans as soon as practicable following the date of this Agreement.

(b)    Seller agrees that the principal amount of all Mortgage Loans classified as "available for sale – impaired" on the Estimated Balance Sheet and Final Balance Sheet that are not otherwise committed for future sale or delivery as of the Closing Date (such remaining Mortgage Loans, the "<u>Remaining AFSI Mortgage Loans</u>") shall not exceed $5,000,000. Seller and Buyer agree that the value of the Remaining AFSI Mortgage Loans as reflected on the Estimated Balance Sheet and Final Balance Sheet shall be determined in accordance with GAAP. Such valuation shall take into account an appropriate discount (or reserve) for such Remaining AFSI Mortgage Loans based on the Purchased Companies' Mortgage Loans' sales history and reserve practices related to Mortgage Loans classified as "available for sale – impaired"

(c)    Seller shall sell, in one or more transactions, the Mortgage Loans set forth on Schedule 6.22(c) prior to the Effective Time; *provided*, that if no more than $5,000,000 in principal amount of such Mortgage Loans are remaining as of the Effective Time (as set forth on the Estimated Balance Sheet and Final Balance Sheet), then Seller shall be deemed to have fully satisfied the obligations

set forth in this Section 6.22(c) for purposes of this Agreement (other than pursuant to Section 9.2(c) with respect to such Mortgage Loans that were sold prior to the Effective Time).

SECTION 6.23  Stipulations.  Buyer shall cause the Purchased Companies to use their commercially reasonable efforts at and following the Closing to clear any stipulations from third parties on Mortgage Loans purchased by Seller from the Purchased Companies between the date of this Agreement and the Closing Date.

ARTICLE VII

CONDITIONS TO CLOSING

SECTION 7.1  Conditions to Obligations of Buyer.  The obligation of Buyer to consummate the transactions contemplated hereby and to take the other actions to be taken by Buyer at the Closing is subject to the satisfaction, at or prior to the Closing, of each of the following conditions (any of which may be waived in whole or in part by Buyer):

(a)  Representations and Warranties.  The representations and warranties of Seller contained in this Agreement shall be true and correct at and as of the date of this Agreement and the Closing (in each case without regard to any qualifications therein as to materiality or Material Adverse Effect), as though made at and as of such time (or, if made as of a specific date, at and as of such date), except where the events, states of facts, circumstances, developments, changes or effects causing the failure of such representations and warranties to be so true and correct do not have and would not reasonably be expected to have or result in, individually or in the aggregate, a Material Adverse Effect on the Company.  Notwithstanding the foregoing, the representations and warranties of Seller set forth in Sections 3.1, 3.2, 3.3 and 4.1 shall be true and correct at and as of the date of this Agreement and at and as of the Closing.

(b)  Covenants.  The Seller shall have performed in all material respects all of the obligations hereunder required to be performed by it at or prior to the Closing.

(c)  Certificates.

(i)  Seller shall have delivered to Buyer a certificate, dated as of the Closing Date and signed by an executive officer or officers of Seller, representing that the conditions set forth in Sections 7.1(a) and 7.1(b) have been satisfied; and

(ii)  Seller shall have delivered to Buyer a "good standing" certificate for each of the Purchased Companies and a copy of the articles of incorporation and all amendments thereto (or equivalent charter document) of each of the Purchased Companies, certified by the Secretary of State of the jurisdiction of incorporation of such entity, in each case, dated as of a recent date prior to the Closing Date.

(d)  Secretary's Certificate.  Buyer shall have received copies of the resolutions (if any) of the board of directors (or other similar governing body) of Seller, authorizing the execution, delivery and performance of this Agreement.  Buyer also shall have received a certificate of the secretary or assistant secretary of Seller, dated as of the Closing Date, to the effect that such resolutions were duly adopted and are in full force and effect, that each officer of each of Seller and the Company who executed and delivered this Agreement and any other document delivered in connection with the consummation of

-38-

the transactions contemplated by this Agreement was at the respective times of such execution and delivery duly elected or appointed, qualified and acting as such officer, and that the signature of each such officer appearing on such document is his genuine signature, together with copies of the articles or certificate of incorporation and by-laws (or equivalent documents) of Seller certified by such officers.

(e)    No Action or Order.  No Action or Order shall be issued or entered which (i) prohibits, prevents, restrains or makes illegal or otherwise interferes with the consummation of any of the transactions contemplated hereby or (ii) seeks or imposes substantial damages in connection with the consummation of any of the transactions contemplated hereby.

(f)    Shares.  Buyer shall have received from Seller a certificate or certificates evidencing all of the then issued and outstanding Shares, duly endorsed in the name of Buyer or accompanied by stock powers duly executed in the name of Buyer, in proper form for transfer.

(g)    HSR Act; Consents.  The waiting period required by the HSR Act, and any extensions thereof obtained by request or other action by the FTC and/or the Antitrust Division, shall have expired or been terminated by the FTC and the Antitrust Division and each of the Consents set forth in (i) the Disclosure Memorandum and (ii) the Buyer Disclosure Memorandum or otherwise required for consummation of the transactions contemplated by this Agreement shall have been obtained and must be in full force and effect.

(h)    Director Resignations.  Seller shall have caused the Company to deliver the resignation of each director of the Company, effective as of the Effective Time.

(i)    Material Adverse Effect.  As of the Closing Date, there shall not have been any event, state of facts, circumstance, development, change or effect that, individually or in aggregate, has, has had or is reasonably likely to have or result in a Material Adverse Effect on the Company.

(j)    Payoff Letter.  Seller or a Related Person of Seller shall deliver a payoff letter acknowledging satisfaction of the obligations under the Line of Credit pursuant to the payment of the Initial Payoff Amount.

(k)    Financial Statements. Seller shall have delivered to Buyer the 2006 Audited Financial Statements, together with the report thereon of the Company's independent certified public accountants.

(l)    Tax Matters. Seller shall have delivered to Buyer an affidavit from Seller, in a form reasonably satisfactory to Buyer, stating under penalties of perjury Seller's U.S. taxpayer identification number and that Seller is not a foreign person within the meaning of Section 1445(b)(2) of the Code.

SECTION 7.2  Conditions to Obligations of Seller.  The obligation of Seller to consummate the transactions contemplated hereby and to take the other actions to be taken by Seller at the Closing is subject to the satisfaction, at or prior to the Closing, of each of the following conditions (any of which may be waived in whole or in part by Seller):

(a)    Representations and Warranties.  The representations and warranties of Buyer contained in this Agreement shall be true and correct at and as of the date of this Agreement and at and as of the Closing (in each case without regard to any qualifications therein as to materiality or Material

Adverse Effect), as though made at and as of such time (or, if made as of a specific date, at and as of such date), except where the events, states of facts, circumstances, developments, changes or effects causing the failure of such representations and warranties to be so true and correct do not have and would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on Buyer's ability to consummate the transactions contemplated by this Agreement. Notwithstanding the foregoing, the representations and warranties set forth in Section 5.2, will be true and correct at and as of the Closing.

(b)  Covenants.  Buyer shall have performed in all material respects all of its obligations hereunder required to be performed by it at or prior to the Closing.

(c)  Officer's Certificate.  Buyer shall have delivered to Seller a certificate, dated as of the Closing Date and signed by an executive officer or officers of Buyer, representing that the conditions referred to in Sections 7.2(a) and 7.2(b) have been satisfied.

(d)  Secretary's Certificate.  Seller shall have received copies of the resolutions of the board of directors (or other similar governing body) of Buyer authorizing the execution, delivery and performance of this Agreement.  Seller also shall have received a certificate of the secretary or assistant secretary of Buyer dated as of the Closing Date, to the effect that such resolutions were duly adopted and are in full force and effect, that each officer of Buyer (or Person acting as attorney-in-fact pursuant to a valid power-of-attorney) who executed and delivered this Agreement and any other document delivered in connection with the consummation of the transactions contemplated by this Agreement was at the respective times of such execution and delivery duly elected or appointed, qualified and acting as such officer (or attorney-in-fact), and that the signature of each such officer (or attorney-in-fact) appearing on such document is his genuine signature, together with copies of the articles or certificate of incorporation and by-laws (or equivalent documents) of Buyer certified by such officer (or attorney-in-fact).

(e)  Payment of Purchase Price and Initial Payoff Amount.  Seller shall have received from Buyer payment of the Purchase Price and the Initial Payoff Amount in accordance with Section 1.3.

(f)  HSR Act.  The waiting period required by the HSR Act, and any extensions thereof obtained by request or other action by the FTC and/or the Antitrust Division, shall have expired or been terminated by the FTC and the Antitrust Division.

ARTICLE VIII

TERMINATION

SECTION 8.1  Termination.  Notwithstanding anything in this Agreement to the contrary, this Agreement and the transactions contemplated hereby may, by written notice given at any time prior to the Closing, be terminated:

(a)  by mutual consent of Buyer and Seller;

(b)  by either Buyer or Seller if the Closing has not occurred (other than through the failure of any Party seeking to terminate this Agreement to fully comply with its obligations hereunder) on or before the day that is the 120th day after the date hereof;

NY12528:266865.1

(c)    by either Buyer or Seller (provided that the terminating Party or any of its Related Persons is not then in breach of any representation or warranty contained in this Agreement such that the closing condition set forth in Section 7.1(a) or 7.2(a), as applicable, would not be satisfied or in material breach of any covenant or other agreement contained in this Agreement) in the event of an inaccuracy of any representation or warranty of the other Party contained in this Agreement which cannot be or has not been cured within 30 days after the giving of written notice to the breaching Party of such inaccuracy and which inaccuracy would constitute a failure of the closing condition set forth in Section 7.1(a) or 7.2(a), as applicable, to be satisfied;

(d)    by either Buyer or Seller (provided that the terminating Party or any of its Related Persons is not then in breach of any representation or warranty contained in this Agreement such that the closing condition set forth in Sections 7.1(a) or 7.2(a), as applicable, would not be satisfied or in material breach of any covenant or other agreement contained in this Agreement) in the event of a material breach by the other Party of any covenant or agreement contained in this Agreement which cannot be or has not been cured within 30 days after the giving of written notice to the breaching Party of such breach; or

(e)    by either Buyer or Seller, if any Governmental Entity shall have issued, enacted, entered, promulgated or enforced any Order, or taken any other action restraining, enjoining or otherwise prohibiting the consummation of any of the transactions contemplated by this Agreement by final nonappealable action of such Governmental Entity; provided, that the right to terminate this Agreement pursuant to this Section 8.1(e) shall not be available to any Party that has (or whose Related Persons have) failed to fully comply with its obligations hereunder in any manner that shall have proximately contributed to the occurrence of such Order.

SECTION 8.2    Effect of Termination.  In the event of the termination of this Agreement pursuant to Section 8.1, this Agreement shall become null and void and have no effect, and none of Buyer, Seller, or any of their respective Related Persons, shall have any Liability of any nature whatsoever hereunder or in conjunction with the transactions contemplated hereby, except that (i) the provisions of Section 6.7 (Confidentiality), Section 6.8 (Expenses), this Section 8.2, Section 10.6 (Governing Law), and Section 10.7 (Consent to Jurisdiction; Waiver of Jury Trial) of this Agreement shall survive any such termination; and (ii) a termination of this Agreement shall not relieve the breaching Party from Liability for a willful breach of a representation, warranty, covenant, or agreement of such Party contained in this Agreement.

ARTICLE IX

INDEMNIFICATION; REMEDIES

SECTION 9.1    Survival.  All representations and warranties made or undertaken by the Parties in this Agreement are material, have been relied upon by the other Party, shall survive the Closing Date, shall not merge in the performance of any obligation by any Party and shall terminate and expire on the date which is two years from the Closing Date; provided, that the representations and warranties (A) of Seller set forth in (x) Sections 3.1, 3.2, 3.3, 3.17 and 4.1 shall survive the Closing indefinitely, (y) Section 3.22 shall survive the Closing for three years from the Closing Date, and (z) Sections 3.9 and 3.10 shall survive the Closing until the expiration of the applicable statute of limitations with respect to the particular matter that is the subject matter thereof, and (B) of Buyer set forth in Section 5.2 shall survive the Closing indefinitely.  All covenants and other agreements of the Parties to this Agreement are material, have been relied upon by the other Party, shall not merge in the performance of any obligation

-41-

by any Party, and shall survive the Closing Date until the date that is six months from the date on which such covenant or agreement is to be performed completely hereunder; *provided*, that no initial notice of a claim for indemnification pursuant to Section 9.2(b) or 9.3(b) with respect to a particular breach of a particular covenant or agreement may be made more than two years after the date upon which the non-breaching Party acquires actual Knowledge of such breach. Notwithstanding the foregoing, in the event that notice of any claim for indemnification under Section 9.2 or 9.3 hereof shall have been given pursuant to Section 9.6 or Section 9.7 within the applicable survival period, the representations, warranties, covenants and agreements that are the subject of such indemnification claim shall survive with respect to such indemnification claim until the date such claim is finally resolved.

SECTION 9.2    Indemnification and Reimbursement by Seller.  Subject to the limitations contained in Sections 9.4 and 9.8, from and after the Closing, Seller agrees to indemnify Buyer and the Purchased Companies and their respective successors, assigns, stockholders, employees, Related Persons and Representatives against, and to hold Buyer and the Purchased Companies and their respective successors, assigns, stockholders, employees, Related Persons and Representatives harmless from, any and all Damages asserted against, imposed upon or incurred by any of the foregoing Persons resulting from, arising out of or based upon the following:

(a)    any inaccuracy in any representation or warranty made by Seller pursuant to this Agreement (whether when initially made or as of the Closing Date) (except for Section 3.7(a), in each case without regard to any qualifications contained therein as to Knowledge, materiality or Material Adverse Effect);

(b)    any breach of any covenant or agreement made or to be performed by Seller pursuant to this Agreement;

(c)    repurchase demands from Investors made prior to the 180th day following the Closing Date in respect of Mortgage Loans originated and sold by the Purchased Companies prior to the Closing Date (as to which the Buyer has used commercially reasonable efforts to mitigate any losses); or

(d)    any Taxes payable by the Purchased Companies or Buyer, and the amount of any deductions that may not be taken by the Purchased Companies or Buyer, due to the applicability of Section 280G of the Code to any employee, director or shareholder of the Purchased Companies as a result of payments made pursuant to agreements or arrangements with such Persons entered into by the Purchased Companies or Seller prior to the Effective Time; *provided,* that Seller shall not indemnify Buyer for such Taxes to the extent they become due (or for deductions that may not be taken) as a result of transactions consummated by Buyer or the Purchased Companies after the Effective Time or as a result of any modification or amendment to any agreement or arrangement with any employee, director or shareholder of the Purchased Companies by Buyer or the Purchased Companies after the Effective Time.

SECTION 9.3   Indemnification and Reimbursement by Buyer.  Subject to the limitations contained in Sections 9.4 and 9.8, from and after the Closing, Buyer agrees to indemnify Seller and its successors, assigns, stockholders, employees, affiliates, Related Persons and Representatives against, and to hold Seller and its successors, assigns, stockholders, employees, Related Persons and Representatives harmless from, any and all Damages asserted against, imposed upon or incurred by any of the foregoing Persons resulting from, arising out of or based upon the following:

(a)     any inaccuracy in any representation or warranty made by Buyer pursuant to this Agreement (in each case without regard to any qualifications contained therein as to Knowledge, materiality or Material Adverse Effect); or

(b)     any breach of any covenant or agreement made or to be performed by Buyer pursuant this Agreement.

SECTION 9.4   Limitations on Indemnification.

(a)     The Indemnifying Party shall have no Liability with respect to the matters described in Sections 9.2(a) or 9.3(a) until the total of all Damages with respect thereto exceeds the Threshold Amount and then only for the amount by which such Damages exceed the Threshold Amount. The Liability of Seller with respect to the matters described in Section 9.2(a) shall be limited in the aggregate to the Maximum Amount.  The Liability of Buyer with respect to the matters described in Section 9.3(a) shall be limited in the aggregate to the Maximum Amount.  Notwithstanding the foregoing, (i) any Damages incurred as a result of any matter for which indemnification is required under this Article IX will be first satisfied by applying any reserves reflected in the calculation of the Final Payoff Amount for such resulting Liability before such Damages are applied to the Threshold Amount, and (ii) no claim for Damages may be made for indemnification or aggregated with any other claim for indemnification if the amount of such claim does not exceed $10,000.

(b)     The limitations set forth in this Section 9.4 shall not apply to any Damages occasioned by the willful misconduct, fraud, or bad faith of any Indemnifying Party, and the Indemnifying Party shall be liable for all Damages with respect thereto.  No Person otherwise entitled to indemnification under this Agreement shall be indemnified pursuant to this Agreement to the extent that such Person's Damages are increased or extended by the willful misconduct, fraud, or bad faith of such Person.

(c)     The limitations in this Section 9.4 shall not apply to any Damages by reason of, resulting from, arising out of, based upon or otherwise in respect of (i) any inaccuracy of a representation or warranty made by Seller in Section 3.1, 3.2, 3.3, 3.17 or 4.1, (ii) any inaccuracy of a representation or warranty made by Buyer in Section 5.2 or (iii) any claim under Section 6.17.

(d)     No Person shall be entitled to collect punitive damages, special damages or consequential damages by operation of this Article IX or any other provision of this Agreement, except insofar as such punitive, special or consequential damages are owed to a third party and otherwise constitute Damages hereunder.

(e)     The Indemnifying Party's liability with respect to Buyer under Section 9.2(c) shall be limited to an amount equal to 50% of the amount by which the Damages under Section 9.2(c) exceed the Repurchase Reserve Threshold but in no event may the Damages for which the Indemnifying Party is liable under Section 9.2(c) exceed $10,000,000.   If the Buyer seeks Damages under

-43-

Section 9.2(c), Buyer will in good faith supply to Seller a detailed accounting of repurchase demands in respect of the relevant Mortgage Loans as soon as practicable after the 180th day after the Closing Date. Any dispute Seller has with respect to the amount of any Damages with respect to Section 9.2(c) shall be settled in the manner set forth in Schedule 1.4, including the time periods set forth therein applied to the delivery of such accounting. "Repurchase Reserve Threshold" shall mean an amount equal to 120% of the reserve for losses due to repurchase obligations identified on the Final Balance Sheet.

SECTION 9.5   Subrogation Rights.   In the event that the Indemnifying Party shall be obligated to indemnify the Indemnitee pursuant to this Article IX, the Indemnifying Party shall, upon payment of such indemnity in full, be subrogated to all rights of the Indemnitee with respect to the Damages to which such indemnification relates; provided, that the Indemnifying Party shall only be subrogated to the extent of any amount paid by it pursuant to this Article IX in connection with such Damages.

SECTION 9.6   Notice and Payment of Claims.

(a)   Notice.   The Person entitled to indemnification pursuant to this Article IX (the "Indemnitee") shall notify in writing (a "Claims Notice") the Party liable for indemnification pursuant to this Article IX (the "Indemnifying Party") promptly after becoming aware of, and shall provide to the Indemnitee as soon as practicable thereafter all information and documentation reasonably necessary to support and verify, any Damages that the Indemnitee shall have determined to have given or may give rise to a claim for indemnification hereunder, and the Indemnifying Party shall be given access to all books and records in the possession or under the control of the Indemnitee which the Indemnifying Party reasonably determines to be related to such claim. The Claims Notice shall describe the Damages in reasonable detail, and shall indicate the amount (reasonably estimated, if necessary) of the Damages that have been incurred by the Indemnitee. Notwithstanding the foregoing, the failure to so notify the Indemnifying Party shall not relieve the Indemnifying Party of any Liability that it may have to any Indemnitee, except to the extent that the Indemnifying Party demonstrates that it is materially prejudiced by the Indemnitee's failure to give such notice and shall not relieve the Indemnifying Party from any other obligation or Liability that it may have to any Indemnitee otherwise than under Article IX.

(b)   Payment.   In the event an action for indemnification under this Article IX shall have been finally determined, the amount of indemnification payable pursuant to such final determination shall be paid to the Indemnitee within 20 Business Days in immediately available funds in U.S. dollars. An action, and the Liability for and amount of Damages therefor, shall be deemed to be "finally determined" for purposes of this Article IX when the parties to such action have so determined by mutual agreement or, if disputed, when a final non-appealable Order shall have been entered.

(c)   Interest.   Any amounts not paid when due pursuant to this Article IX shall bear interest from the date thereof until the date paid at a rate equal to three percent per annum.

SECTION 9.7   Procedure for Indemnification - Third Party Claims.

(a)   Upon receipt by an Indemnitee of a Third Party Claim against it, such Indemnitee shall, if a claim is to be made against an Indemnifying Party under this Article IX, give a Claims Notice to the Indemnifying Party of the commencement of such Third Party Claim as soon as practicable, but the failure to so notify the Indemnifying Party shall not relieve the Indemnifying Party of any Liability that it may have to any Indemnitee, except to the extent that the Indemnifying Party demonstrates that the defense of such Third Party Claim is materially prejudiced by the Indemnitee's failure to give such notice

-44-

and shall not relieve the Indemnifying Party from any other obligation or Liability that it may have to any Indemnitee otherwise than under Article IX.

(b)     (i) If a Third Party Claim is brought against an Indemnitee and it gives proper notice to the Indemnifying Party of the commencement of such Third Party Claim, the Indemnifying Party will be entitled, except as set forth below, to participate in such Third Party Claim (unless (A) the Indemnifying Party is also a party to such Third Party Claim and the Indemnitee determines in good faith that joint representation would be inappropriate, or (B) the Indemnifying Party fails to provide reasonable assurance to the Indemnitee of its financial capacity to defend such Third Party Claim and provide indemnification with respect to such Third Party Claim) and, except as set forth below, to the extent that it elects to assume the defense of such Third Party Claim with counsel reasonably satisfactory to the Indemnitee and provides notice to the Indemnitee of its election to assume the defense of such Third Party Claim, the Indemnifying Party shall not, as long as it legitimately conducts such defense, be liable to the Indemnitee under this Article IX for any fees of other counsel or any other expenses with respect to the defense of such Third Party Claim, in each case subsequently incurred by the Indemnitee in connection with the defense of such Third Party Claim, other than reasonable costs of investigation and monitoring.

(ii)     If the Indemnifying Party assumes the defense of a Third Party Claim, (A) it shall be conclusively established for purposes of this Agreement that the claims made in such Third Party Claim are within the scope of and subject to indemnification; (B) no compromise, discharge or settlement of, or admission of Liability in connection with, such claims may be effected by the Indemnifying Party without the Indemnitee's written consent (which shall not be unreasonably withheld, conditioned or delayed) unless (i) there is no finding or admission of any violation of Law or any violation of the rights of any Person and no effect on any other claims that may be made against the Indemnitee, (ii) the sole relief provided is monetary damages that are paid in full by the Indemnifying Party and (iii) the compromise or settlement includes, as an unconditional term thereof, the giving by the claimant or the plaintiff to the Indemnitee of a release, in form and substance reasonably satisfactory to Indemnitee, from all Liability in respect of such Third Party Claim; (C) the Indemnifying Party shall have no Liability with respect to any compromise or settlement of such claims effected without its written consent (which shall not be unreasonably withheld, conditioned or delayed); and (D) the Indemnitee shall cooperate in all reasonable respects with the Indemnifying Party in connection with such defense, and shall have the right to participate, at the Indemnitee's expense, except as set forth below, in such defense, with counsel selected by it.     If proper notice is given to an Indemnifying Party of the commencement of any Third Party Claim and the Indemnifying Party does not, within 20 Business Days after the Indemnitee's notice is given, give notice to the Indemnitee of its election to assume the defense of such Third Party Claim, the Indemnifying Party shall be bound by any determination made in such Third Party Claim and any compromise or settlement effected by the Indemnitee, and the Indemnifying Party shall be responsible for the reasonable fees and expenses of counsel employed by the Indemnitee, which shall be promptly reimbursed for any such fees and expenses, as and when incurred.

(c)     Notwithstanding the foregoing, if an Indemnitee determines in good faith that there is a reasonable probability that a Third Party Claim (i) may adversely affect it, the Business or its Related Persons other than solely as a result of monetary damages for which it could be entitled to indemnification under this Agreement, (ii) may have a material and adverse effect upon the conduct or reputation of the Business after the Closing Date (which shall include any purported class action claim against the Buyer and/or its Related Persons and any claim based on an investigation, inquiry, or other proceeding by a Governmental Authority), or (iii) relates to Taxes and involves matters that are not

-45-

indemnified hereunder, the Indemnitee may, by notice to the Indemnifying Party, assume the exclusive right to defend, compromise or settle such Third Party Claim at the Indemnifying Party's expense; *provided*, no compromise, discharge or settlement of, or admission of Liability in connection with, such claims may be effected by the Indemnitee without the Indemnifying Party's written consent (which shall not be unreasonably withheld, conditioned or delayed).

        (d)      The Indemnifying Party hereby consents to the non-exclusive jurisdiction of any court in which a Third Party Claim is brought against the Indemnitee for purposes of any claim that the Indemnitee may have under this Agreement with respect to such Third Party Claim or the matters alleged therein, and agrees that process may be served on the Indemnifying Party with respect to such a claim anywhere in the world.

        (e)      Each of Seller and Buyer shall, and Seller or Buyer (as the case may be) shall cause the Company to, cooperate fully with the others as to all Third Party Claims, shall make available to the others as reasonably requested all information, records and documents relating to all Third Party Claims and shall preserve all such information, records and documents until the termination of any Third Party Claim. To the extent reasonably practicable, each of Seller and Buyer, and Seller or Buyer (as the case may be) shall cause the Company to make available to the others, as reasonably requested, its personnel, agents, and other Representatives who are responsible for preparing or maintaining information, records, or other documents or who may have particular knowledge with respect to any Third Party Claim.

        SECTION 9.8  <u>Tax Effect and Insurance</u>. The Liability of the Indemnifying Party with respect to any Damages shall be reduced by the Tax benefit actually realized and any insurance proceeds received by the Indemnitee as a result of any Damages upon which such Claims Notice is based, and shall include any Tax detriment actually suffered by the Indemnitee as a result of such Damages and any payment under this Article IX.

        SECTION 9.9  <u>Indemnification Exclusive Remedy</u>. After the Closing Date, except for remedies based upon willful misconduct, fraud, bad faith or equitable principles, the remedies provided in this Article IX constitute the sole and exclusive remedies for recovery against a Party for damages or any other claims arising under this Agreement, including claims based upon the inaccuracy of any representation or warranty contained in this Agreement or based upon the failure to perform any covenant, agreement or undertaking contained in this Agreement.

ARTICLE X

MISCELLANEOUS

SECTION 10.1  <u>Definitions</u>.

        (a)      The following terms, when used in this Agreement, shall have the meanings set forth below:

        "<u>Actions</u>" shall mean civil, criminal, administrative, investigative or informal actions, audits, demands, suits, claims, arbitrations, hearings, litigations, disputes, investigations or other proceedings of any kind or nature.

        "<u>Agency</u>" shall mean FHA, HUD, or a state agency, as applicable.

-46-

"Agreement" shall have the meaning set forth in the preamble to this Agreement.

"Antitrust Division" shall mean the Antitrust Division of the Department of Justice.

"Applicable Contract" shall mean any Contract under which any of the Purchased Companies are or may become bound or are or may become subject to any obligation or Liability or by which any of the Purchased Companies' assets owned or used are or may become bound.

"Assumed Liabilities" shall mean, as of immediately prior to the Closing, the liabilities of the Company and its Subsidiaries on a consolidated basis determined in accordance with GAAP and, to the extent consistent with GAAP, on the basis of the same accounting principles and practices used by the Company in preparing the Balance Sheet (including utilizing the same line item classifications) including the Pay-Off Liabilities.

"Balance Sheet" shall mean an audited consolidated balance sheet of the Company as of December 31, 2005 (including the notes thereto).

"Benefit Plans" shall mean each profit-sharing, pension, severance, thrift, savings, incentive, change of control, employment, severance, retention, retirement, bonus, deferred compensation, group life and health insurance or other employee benefit plan, agreement, arrangement or commitment and any stock option, stock purchase, stock appreciation right, stock based incentive plan, which is maintained, contributed to or required to be contributed to by Seller, the Purchased Companies or any ERISA Affiliate of Seller or the Purchased Companies, or pursuant to which any of such entities are a party, on behalf of, for the benefit of or with, in each case, any current or former employee, director or consultant of the Purchased Companies or any Continuing Employees, or with respect to which the Purchased Companies could have Liability with respect to any current employee, director or consultant of the Purchased Companies or any Continuing Employees.  For purposes of this definition, a plan, arrangement or agreement shall not be a "Benefit Plan" merely because it covers one or more former employees, former directors or former consultants of the Purchased Companies unless such coverage relates to such persons' service with the Purchased Companies.

"Business" shall have the meaning set forth in the recitals to this Agreement.

"Business Day" shall mean any day, other than a Saturday or a Sunday, that is neither a legal holiday nor a day on which banking institutions are generally authorized or required by law or regulation to close in The City of New York, New York or London.

"Buyer" shall have the meaning set forth in the preamble to this Agreement.

"Buyer Disclosure Memorandum" shall mean a disclosure memorandum delivered by Buyer to Seller at or prior to the execution of this Agreement.

"Claims Notice" shall have the meaning set forth in Section 9.6(a) of this Agreement.

"Closing" shall have the meaning set forth in Article II of this Agreement.

"Closing Date" shall have the meaning set forth in Article II of this Agreement.

"Code" means the Internal Revenue Code of 1986, as amended.

-47-

"Company" shall have the meaning set forth in the recitals to this Agreement.

"Common Stock" shall have the meaning set forth in the recitals to this Agreement.

"Consents" shall mean any consents, registrations, approvals, declarations, permits, expiration of any applicable waiting periods or authorizations.

"Continuing Employees" shall mean officers and employees of the Purchased Companies set forth on Section 3.11(a) of the Disclosure Memorandum (as updated as required by Section 3.11(a) of this Agreement), who at or after the Effective Time become employees of Buyer.

"Contract" shall mean any agreement, license, lease, understanding, contract, loan, note, mortgage, indenture, promise, undertaking or other commitment or obligation (whether written or oral and express or implied).

"Covered Parties" shall mean the directors, officers, and employees of the Purchased Companies.

"Damages" shall mean any losses, Liabilities, claims, expenses (including costs of investigation and defense and reasonable attorneys' and accountants' fees and expenses), or damages of any kind or nature whatsoever, whether or not involving a Third Party Claim.

"Designated LIBOR Page" shall mean the display designated as Page 3750.

"Disclosure Memorandum" shall have the meaning set forth in Article III of this Agreement.

"Effective Time" shall have the meaning set forth in Article II of this Agreement.

"Employee" shall have the meaning set forth in Section 3.11 of this Agreement.

"Environmental Law" shall mean all Laws, including common law standards of conduct, regulating, relating to or imposing Liability or standards of conduct concerning protection of human health or the environment.

"Equity" shall mean $150,000,000.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" shall mean any entity which is considered one employer with Seller or the Purchased Companies under Section 4001 of ERISA of Section 414 of the Code of Section 302 of ERISA (whether or not waived).

"Estimated Balance Sheet" shall mean an estimated consolidated balance sheet of the Company and its Subsidiaries setting forth Seller's good faith best estimate of the assets, liabilities and stockholders' equity of the Company and its Subsidiaries on a consolidated basis as of immediately prior to the Closing, prepared in accordance with GAAP and, to the extent consistent with GAAP, on the basis of the same accounting principles and practices used by the Company in preparing the Balance Sheet and the example set forth on Exhibit 1.2 hereto (including utilizing the same line item classifications)

-48-

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended.

"Filings" shall mean notices, reports, submissions or other filings.

"finally determined" shall have the meaning set forth in Section 9.6(b) of this Agreement.

"Final Balance Sheet" shall mean the consolidated balance sheet of the Company and its Subsidiaries as of immediately prior to the Effective Time prepared by the Buyer.

"Financial Statements" shall mean (x) the following items contained in Section 3.6(a) of the Disclosure Memorandum: (i) an audited consolidated balance sheet of the Company as of December 31, 2004, and the related audited consolidated statements of income, changes in stockholder's equity and cash flow for that fiscal year then ended, together with the report thereon of Ernst & Young LLP, independent certified public accountants, (ii) a Balance Sheet, and the related audited consolidated statements of income, changes in stockholder's equity and cash flow for the fiscal year ended December 31, 2005, together with the report thereon of Ernst & Young LLP, independent certified public accountants, and (iii) an Interim Balance Sheet and the related consolidated unaudited statements of income for the nine months ended September 30, 2006, including with respect to clauses (i) and (ii) above, the notes thereto; and (y) the audited balance sheet of the Company as of December 31, 2006 and the related audited consolidated statements of income, changes in stockholder's equity and cash flow for that fiscal year then ended, together with the report thereon by the Company's independent certified public accountants, including the notes thereto (the "2006 Audited Financial Statements").

"FTC" shall mean the Federal Trade Commission.

"GAAP" shall mean the generally accepted accounting principles in the United States.

"Governmental Authorization" shall mean any approval, franchise, certificate of authority, order, consent, judgment, decree, license, permit, waiver or other authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Entity or pursuant to any Law.

"Governmental Entity" shall mean any foreign, federal, state, local, municipal, county or other governmental, quasi-governmental, administrative or regulatory authority, body, agency, court, tribunal, commission or other similar entity (including any branch, department or official thereof).

"Hazardous Materials" shall mean any hazardous materials, hazardous wastes, hazardous constituents, hazardous or toxic substances or petroleum products (including gasoline, crude oil or any fraction thereof), defined as such in or otherwise regulated under any Environmental Law, including, without limitation, asbestos, polychlorinated biphenyls and urea formaldehyde insulation; *provided,* that "Hazardous Materials" shall not include material in small quantities used in connection with office activities, cleaning, maintenance and other similar activities.

"HSR Act" shall mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"HSR Filing" shall have the meaning set forth in Section 3.4 of this Agreement.

"Indemnifying Party" shall have the meaning set forth in Section 9.6(a) of this Agreement.

"Indemnitee" shall have the meaning set forth in Section 9.6(a) of this Agreement.

"Insurer" shall mean (i) an entity or person who insures or guarantees all or any portion of the risk of loss upon borrower default on any of the Mortgage Loans, including, without limitation, the FHA, the VA, and any private mortgage insurer; and (ii) providers of life, hazard, disability, title, or other insurance with respect to any of the Mortgage Loans or the Mortgaged Property.

"Intellectual Property" shall mean copyrights and works of authorship in any media , patents, inventions (whether patentable or not), trademarks, service marks, logos, domain names service names, trade names, trade dress, all registrations and applications therefor, technology rights and licenses, computer software (including any source or object codes therefor or documentation relating thereto), trade secrets, know how and other confidential or proprietary information and all other intellectual property rights.

"Interim Balance Sheet" shall mean an unaudited consolidated balance sheet of the Company as of September 30, 2006.

"Investor" shall mean FNMA, FHLMC, GNMA or any public or private investor who owns or has an agreement with a Purchased Company to acquire any of the Mortgage Loans or holds beneficial title to any of the Mortgage Loans.

"IRS" shall mean the Internal Revenue Service.

"IT Assets" shall mean any of the Purchased Companies computers, computer software, firm ware, middleware, servers, workstations, routers, hubs, switches, data communication lines and all other information technology equipment, and all associated documentation.

"Knowledge" as used with respect to a Person (including references to such Person being aware of a particular matter) shall mean the personal knowledge of the chairman, president, chief financial officer, chief accounting officer, chief operating officer, tax officer, general counsel or any director of such Person, in each case, after reasonable investigation, and shall be deemed to include any information that appears in the books and records of such Person.  In addition, in the case of the Seller, "Knowledge" shall also mean the personal knowledge of Jeffrey Tennyson, Robin Allcock, Richard Gordon, John Smith, Shawn Butterworth, Christopher Tucci, Dana Acker, David Smith, Robert Goethe and D. Bryan Jordan.

"Law" shall mean any federal, state or local law, rule, administrative ruling, order, ordinance, code, regulation or statute, including, without limitation, any Environmental Law, ERISA, the Exchange Act and the Securities Act.

"Liability" shall mean any direct or indirect, primary or secondary, liability, indebtedness, obligation, penalty, cost or expense (including costs of investigation, collection and defense), claim, deficiency, guaranty or endorsement of or by any Person (other than endorsements of notes, bills, checks, and drafts presented for collection or deposit in the Ordinary Course of Business) of any type, whether accrued, absolute or contingent, liquidated or unliquidated, matured or unmatured, or otherwise.

"LIBOR" shall mean: (i) with respect to a period, on a LIBOR interest determination date, the offered rate per annum for U.S. dollar deposits with a term comparable to such period that

appears on the Designated LIBOR Page on Bridge Telerate, Inc. (or such other page as may replace such page on such service, or on another service designated by the British Bankers' Association for the purpose of displaying the rates at which U.S. dollar deposits are offered by leading banks in the London interbank deposit market), (ii) with respect to a LIBOR interest determination date on which fewer than two offered rates appear, or no rate appears, as the case may be, on the Designated LIBOR Page, the rate calculated as the arithmetic mean of at least two quotations obtained after requesting the principal London offices of each of four major reference banks in the London interbank market to provide its offered quotations for U.S. dollar deposits for the similar period of maturity to prime banks in the London interbank market at approximately 11:00 a.m., London time, on the applicable LIBOR interest determination date and in a principal amount that is representative for a single transaction in U.S. dollars in that market at that time, (iii) if fewer than two quotations referred to in clause (ii) are so provided, the rate on the applicable interest determination date calculated as the arithmetic mean of the rates quoted at approximately 11:00 a.m., in a principal financial center on the applicable LIBOR interest determination date by three major banks, in such principal financial center for loans in U.S. dollars to leading European banks, having the similar maturity and in a principal amount that is representative for a single transaction in U.S. dollars in that market at that time, or (iv) if the banks so selected are not quoting as mentioned in clause (iii), LIBOR in effect on the applicable LIBOR interest determination date at approximately 11:00 a.m. London time, on the date of determination.

"Liens" shall mean any charges, claims, community property interests, conditions, security interests, hypothecations, conditional sale or other title retention agreements, covenants, encumbrances, equitable interests, exceptions, liens, options, pledges, reservations, rights of first refusal, security interests, statutory liens, variances, warrants, or restrictions of any kind, including, without limitation, any restrictions on use, voting, transfer, alienation, receipt of income, or exercise of any other attribute of ownership.

"Line of Credit" shall mean that certain line of credit to the Company from Seller, pursuant to that certain promissory note dated May 22, 2006, by and between the Company and Seller and any successor or supplemental line of credit thereto.

"Material Adverse Effect" shall mean, with respect to a Person, any event, state of facts, circumstances, developments, change or effect that, individually or in the aggregate with all other events, states of facts, circumstances, developments, changes and effects, is materially adverse to (A) the financial condition, business, assets, liabilities, management, operations or results of operations of such Person and its Subsidiaries taken as a whole or (B) the ability of the Person and its Subsidiaries taken as a whole to consummate the transactions contemplated by this Agreement; provided, that "Material Adverse Effect" shall not be deemed to include the impact of (a) changes in GAAP or regulatory accounting principles generally applicable to depository institutions or mortgage banking or finance companies; (b) actions and omissions of a Party (or any of its Subsidiaries) taken with the prior informed written consent of the other Party; (c) the transactions contemplated by this Agreement and any related agreements and any other actions expressly contemplated by this Agreement; (d) general economic or market conditions of the industry of wholesale mortgage lending of non-prime residential mortgage loans in general; (e) a declaration of a banking moratorium or any suspension of payments in respect of banks in the United States; (f) any material limitation (whether or not mandatory) by any Governmental Entity on the extension of credit by banks or other financial institutions; or (g) a commencement or escalation of a war or armed hostilities or other national or international calamity directly or indirectly involving the United States and any terrorist attack or terrorist attacks against the United States or its citizens either domestically or internationally during any such war or armed hostilities, or in the case of any event

-51-

described in (d) through (g) above which is existing at the date of this Agreement, an acceleration or worsening thereof.

"Material Interest" shall mean a direct or indirect beneficial ownership (as defined in Rule 13d-3 of the Exchange Act) of voting securities or other voting interests representing at least five percent of the outstanding voting power or equity securities or other equity interests representing at least five percent of the outstanding equity interests.

"Maximum Amount" shall mean $70,000,000.

"Monthly Balance Sheet" shall mean a balance sheet of the Company as of the end of each month subsequent to the date of the Interim Balance Sheet and prior to the Closing Date prepared in a manner consistent with, and in a format comparable to, the Interim Balance Sheet.

"Mortgage" shall mean any mortgage, deed of trust, security deed or other instrument creating a lien on real property with respect to a Mortgage Loan.

"Mortgage Loan" shall have the meaning set forth in Section 3.22(a) of this Agreement.

"Mortgage Loan Requirements" shall mean the terms of (i) the Mortgage and Note related to each Mortgage Loan, and (ii) all requirements of or responsibilities and obligations to any applicable Agency with respect to the processing, underwriting, credit approval, origination, closing, funding, insuring, servicing (and interim servicing) by or on behalf of a Purchased Company, purchase, or sale, as applicable, of the Mortgage Loans.

"Mortgagor" shall mean the obligor(s) on a Note.

"Note" shall mean a written promise to pay a sum of money at a stated interest rate, which rate may be fixed or adjustable during the term of the obligation, executed by a Mortgagor and secured by a Mortgage.

"Order" shall mean any award, decision, injunction, judgment, decree, settlement, order, process, ruling, subpoena or verdict (whether temporary, preliminary or permanent) entered, issued, made or rendered by any court, administrative agency, arbitrator, Governmental Entity or other tribunal of competent jurisdiction.

"Ordinary Course of Business" shall mean the ordinary and usual course of business of the Purchased Companies, consistent with the Purchased Companies' past practice.

"Parties" shall have the meaning set forth in the preamble to this Agreement.

"Party" shall have the meaning set forth in the recitals to this Agreement.

"Pay-Off Liabilities" shall mean, as of immediately prior to the Closing, the sum of (a) the principal amount outstanding and (b) the amount of interest accrued and unpaid, which is owing by the Company and its Subsidiaries to Seller and/or its affiliates under the Line of Credit.

"Person" shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, Governmental Entity, joint venture, estate, trust, association, organization or other entity of any kind or nature.

-52-

"Pipeline Loans" shall mean all applications for mortgage loans that have been committed to, registered with or taken by a Purchased Company and approved for closing by a Purchased Company that as of the Closing Date have not yet been closed.

"Post-Closing Tax Period" shall mean any taxable year or period that begins after the Closing Date and, with respect to any taxable year or period beginning before and ending after the Closing Date, the portion of such taxable year or period beginning after the Closing Date.

"Pre-Closing Tax Period" shall mean any taxable year or period that ends on or before the Closing Date and, with respect to any taxable year or period beginning before and ending after the Closing Date, the portion of such taxable year or period ending on and including the Closing Date.

"Properties" shall mean any real property presently or formerly owned or operated by any of the Purchased Companies.

"Purchased Companies" shall have the meaning set forth in the recitals to this Agreement.

"Purchase Price" shall have the meaning set forth in Section 1.2 of this Agreement.

"Purchased Companies' Organizational Documents" shall mean a true and complete copy of the Purchased Companies' articles of incorporation (or equivalent charter document) and by-laws, each as amended to the date of the Agreement.

"Related Person" shall mean, with respect to any Person, (i) any Person which, directly or indirectly, controls, is controlled by, or is under common control with, such Person, (ii) each Person that serves as a director, officer, partner, executor, or trustee of such Person (or in any other similar capacity), (iii) any Person with respect to which such Person serves as a general partner or trustee (or in any other similar capacity), (iv) any Person that has a Material Interest in such Person, and (v) any Person in which such Person holds a Material Interest.

"Report" shall mean the notification and report form filed pursuant to the HSR Act.

"Representatives" shall mean the legal counsel, accountants, and financial advisors of Buyer or Seller (as appropriate) or each of their respective Related Persons, as the case may be.

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Seller" shall have the meaning set forth in the preamble to this Agreement.

"Shares" shall have the meaning set forth in the recitals to this Agreement.

"Stay Bonus Agreements" shall mean those certain Stay Bonus Agreements listed on Section 3.10(a) of the Disclosure Memorandum.

"Stock Purchase" shall have the meaning set forth in Article II of this Agreement.

"Subsidiary" shall mean with respect to any Person, any corporation or other entity of which such Person, directly or indirectly, owns securities or other interests representing 25% of the equity or voting power of such corporation or other entity.

-53-

"Tax" shall mean any Federal, state, local or foreign income, gross receipts, license, severance, occupation, capital gains, premium, duties, profits, disability, withholding, payroll, employment, excise, sales, use, value-added, franchise, property or other tax, charge, levy or like assessment, including any interest, penalties, additions, assessments or deferred liability with respect thereto, and any interest in respect of such penalties, additions, assessments or deferred liability.

"Tax Return" shall mean any return, report, notice, form, declaration, claim for refund, estimate, election, or information statement or other document relating to any Tax, including any schedule or attachment thereto, and any amendment thereof.

"Third Party Claim" shall mean written notice of the commencement of any Action by a third party.

"Threshold Amount" shall mean $3,000,000.

"Total Assets" shall mean, as of immediately prior to the Closing, the assets of the Company and its Subsidiaries on a consolidated basis determined in accordance with GAAP and, to the extent consistent with GAAP, on the basis of the same accounting principles and practices used by the Company in preparing the Balance Sheet (including utilizing the same line item classifications).

"UCC" shall have the meaning set forth in Section 3.22(a)(i) of this Agreement.

(b)     Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)     Calculation of Time Period.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(ii)     Dollars.  Any reference in this Agreement to $ shall mean U.S. dollars.

(iii)     Exhibits/Schedules.  The Exhibits and Schedules to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iv)     Gender and Number.  Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(v)     Headings.  The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.  All references in this Agreement to any "Article" or "Section" are to the corresponding Article or Section of this Agreement unless otherwise specified.

(vi)    <u>Herein</u>. The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(vii)    <u>Including</u>. The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific items immediately following it.

(c)    The Parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

SECTION 10.2 <u>Assignments; Successors; No Third Party Rights</u>. No Party may assign any of its rights, or delegate any of its responsibilities, under this Agreement (excluding by merger or other operation of law) without the prior written consent of the other Party hereto (which may not be unreasonably withheld or delayed), and any purported assignment or delegation without such consent shall be void. Subject to the foregoing, this Agreement and all of the provisions hereof shall apply to, be binding upon, and inure to the benefit of the Parties hereto and their successors and permitted assigns and the Parties indemnified pursuant to Article IX. Nothing in this Agreement, express or implied, is intended to confer upon any Person other than the Parties hereto any rights or remedies of any nature whatsoever under or by reason of this Agreement or any provision of this Agreement. Except as explicitly provided for herein, this Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the Parties to this Agreement and their successors and permitted assigns.

SECTION 10.3 <u>Entire Agreement</u>.    This Agreement, including the Disclosure Memorandum and the Buyer Disclosure Memorandum and the other agreements and written understandings referred to herein or otherwise entered into by the Parties hereto as contemplated herein (including the Confidentiality Agreement between the Parties) constitute the entire agreement and understanding and supersede all other prior covenants, agreements, undertakings, obligations, promises, arrangements, communications, representations and warranties, whether oral or written, by any Party hereto or by any director, officer, employee, agent, Related Person or Representative of any Party hereto.

SECTION 10.4 <u>Amendment or Modification</u>.    This Agreement may be amended or modified only by written instrument signed by all of the Parties hereto.

SECTION 10.5 <u>Notices</u>. All notices, requests, instructions, claims, demands, consents and other communications required or permitted to be given hereunder shall be in writing and shall be deemed to have been duly given on the date delivered by hand or by courier service such as Federal Express, or by other messenger (or, if delivery is refused, upon presentment) or upon electronic confirmation of a facsimile transmission, or upon delivery by registered or certified mail (return receipt requested), postage prepaid, to the Parties at the following addresses:

(a)    If to Buyer:

Barclays Capital
200 Park Avenue
New York, NY 10166

NY12528.266865.1

Facsimile: (212) 412-7353
Attention: Richard Smith, Director

With a Copy to:

Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
Facsimile: (212) 558-3588
Attention: Mark J. Menting
Attention: Brian E. Hamilton

(b)      If to Seller:

Regions Financial Corporation
417 North 20th Street
Birmingham, Alabama 35203
Facsimile: (205) 326-7751
Attention: R. Alan Deer

With a Copy to:

Alston & Bird LLP
The Atlantic Building
950 F Street, NW
Washington, DC 20004-1404
Facsimile: (202) 756-3333
Attention: Michael P. Reed

or to such other persons or addresses as the person to whom notice is given may have previously furnished to the other in writing in the manner set forth above (*provided*, that notice of any change of address shall be effective only upon receipt thereof).

SECTION 10.6 Governing Law.  **THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE AND WITHOUT GIVING EFFECT TO ANY CHOICE OF LAW OR CONFLICT OF LAW PROVISION OR RULE (WHETHER OF THE STATE OF NEW YORK OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF NEW YORK.**

SECTION 10.7 Consent To Jurisdiction; Waiver Of Jury Trial.

(a)      THE PARTIES HERETO HEREBY IRREVOCABLY SUBMIT TO THE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN THE STATE OF NEW YORK SOLELY IN RESPECT OF THE INTERPRETATION AND ENFORCEMENT OF THE PROVISIONS OF THIS AGREEMENT AND OF THE DOCUMENTS REFERRED TO IN THIS AGREEMENT, AND IN RESPECT OF THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY, AND

-56-

HEREBY WAIVE, AND AGREE NOT TO ASSERT, AS A DEFENSE IN ANY ACTION FOR THE INTERPRETATION OR ENFORCEMENT HEREOF OR OF ANY SUCH DOCUMENT, THAT IT IS NOT SUBJECT THERETO OR THAT SUCH ACTION MAY NOT BE BROUGHT OR IS NOT MAINTAINABLE IN SAID COURTS OR THAT THE VENUE THEREOF MAY NOT BE APPROPRIATE OR THAT THIS AGREEMENT OR ANY SUCH DOCUMENT MAY NOT BE ENFORCED IN OR BY SUCH COURTS, AND THE PARTIES HERETO IRREVOCABLY AGREE THAT ALL CLAIMS WITH RESPECT TO SUCH ACTION OR PROCEEDING SHALL BE HEARD AND DETERMINED IN SUCH A NEW YORK STATE OR FEDERAL COURT. THE PARTIES HEREBY CONSENT TO AND GRANT ANY SUCH COURT JURISDICTION OVER THE PERSON OF SUCH PARTIES AND OVER THE SUBJECT MATTER OF SUCH DISPUTE AND AGREE THAT MAILING OF PROCESS OR OTHER PAPERS IN CONNECTION WITH ANY SUCH ACTION OR PROCEEDING IN THE MANNER PROVIDED IN SECTION 10.5 OR IN SUCH OTHER MANNER AS MAY BE PERMITTED BY LAW, SHALL BE VALID AND SUFFICIENT SERVICE THEREOF.

(b)    EACH PARTY HERETO HEREBY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY DOCUMENT REFERRED TO IN THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (i) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (ii) EACH SUCH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (iii) EACH SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (iv) EACH SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.7.

SECTION 10.8 Severability. In case any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect in any jurisdiction, such provision or provisions shall be ineffective only to the extent of such invalidity, illegality or unenforceability in such jurisdiction, without invalidating the remainder of such provision or provisions or the remaining provisions of this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision or provisions in such jurisdiction had never been contained herein, unless such a construction would be unreasonable.

SECTION 10.9 Waiver of Conditions.

(a)    To the extent permitted by applicable Law: (i) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Party; (ii) no waiver that may be given by a Party will be applicable except in the specific instance for which it is given; and (iii) no notice to or demand on one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the documents referred to in this Agreement.

(b)    The rights and remedies of the Parties hereto are cumulative and not alternative. Except where a specific period for action or inaction is provided herein, neither the failure nor any delay on the part of any Party in exercising any right, power or privilege under this Agreement or the documents referred to in this Agreement shall operate as a waiver thereof, nor shall any waiver on the part of any Party of any such right, power or privilege, nor any single or partial exercise of any such right, power or privilege, preclude any other or further exercise thereof or the exercise of any other such right, power or privilege.  The failure of a Party to exercise any right conferred herein within the time required shall cause such right to terminate with respect to the transaction or circumstances giving rise to such right, but not to any such right arising as a result of any other transactions or circumstances.

SECTION 10.10    Descriptive Headings; Construction.  The descriptive headings herein are inserted for convenience of reference only and are not intended to be part of, or to affect the meaning, construction or interpretation of, this Agreement.  Unless otherwise expressly provided, the word "including" does not limit the preceding words or terms.

SECTION 10.11    Counterparts.  For the convenience of the Parties hereto, this Agreement may be executed in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

SECTION 10.12    Disclosure Memorandum and Buyer Disclosure Memorandum. In the event of an inconsistency between the statements in the body of this Agreement and those in such Disclosure Memorandum or Buyer Disclosure Memorandum (other than an exception expressly set forth in the Disclosure Memorandum or Buyer Disclosure Memorandum with respect to a specifically identified section or subsection), the statements in the body of this Agreement will control.

SECTION 10.13    Time is of the Essence.  Time shall be deemed to be of the essence in this Agreement.

[Remainder of Page Intentionally Blank]

NY12528 266865 1

      IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their officers duly authorized as of the date first written above.

**REGIONS BANK**

By: _____

    Name: D. Bryan Jordan
    Title:   Senior Executive Vice President and
            Chief Financial Officer


**BARCLAYS CAPITAL REAL ESTATE
HOLDINGS INC.**


By: _____

    Name:
    Title:

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their officers duly authorized as of the date first written above.

**REGIONS BANK**

By: _____

    Name:  D. Bryan Jordan
    Title:   Senior Executive Vice President and
             Chief Financial Officer

**BARCLAYS CAPITAL REAL ESTATE
HOLDINGS INC.**

By: *Michael Wade*

    Name:  Michael Wade*
    Title:   Attorney-in-Fact and
             Managing Director of
             Barclays Capital Inc.

* Pursuant to power of attorney
  dated January 16, 2007.

Schedule 1.2

**EFC Holdings and Subsidiaries**
**Balance Sheet As of December 31, 2006**

|  | Consolidated |
|---|---|
| Cash | 11,219,145 |
| Other Receivables: DNC Loans | 3,221,746 |
| Intercompany Receivable/Payable RBK | - |
| Intercompany Receivable/Payable | (0) |
| Mortgage Notes AFS | 1,716,261,485 |
| Mortgage Notes HFI | 9,355,895 |
| Loan Interest Receivables | 3,933,826 |
| Loan Rec.-Cap Purchase Premium | - |
| Loans Rec.-Capitalized Costs | 23,912,504 |
| Other Assets | 16,428,758 |
| Deferred Tax Asset | 16,950,961 |
| Total Current Assets | 1,801,284,320 |
|  |  |
| Investment in EquiFirst Corp | - |
| Investment in Money America | - |
| Investment in EMC | - |
| Investment in EMC of Minnesota | - |
| Total Other Assets | - |
|  |  |
| Fixed Assets | 30,760,701 |
| Accum. Dep. Fixed Assets | (19,466,850) |
| Total Fixed Assets | 11,293,851 |
|  |  |
| TOTAL ASSETS | 1,812,578,171 |
|  |  |
| Accounts Payable | 2,675,787 |
| Interest Not Yet Earned | 18,286 |
| Accrued Wages | 10,911,102 |
| Withholdings Payable | 985 |
| Accd. 401(k) Expense | 122,433 |
| Repurchase Liability | 23,537,383 |
| Other Liabilities | 8,317,094 |
| Interest Payable | 9,159,582 |
| Income Taxes Payable | (389,179) |
| Deferred Revenue | 9,303,755 |
| Deferred Tax Liability | 7,878,927 |

- 1 -

| | |
|---|---:|
| Regions Line of Credit | 1,599,504,000 |
| TOTAL LIABILITIES | 1,671,040,155 |
| | |
| Common Stock | 4,397 |
| Additional Paid in Capital | 7,611,075 |
| Retained Earnings-Prior | 153,298,801 |
| Retained Earnings-Current | (19,376,258) |
| TOTAL EQUITY | 141,538,016 |
| | |
| TOTAL LIABILITIES AND EQUITY | 1,812,578,171 |

Schedule 1.4

POST-CLOSING PAYOFF AMOUNT ADJUSTMENTS:

Section (a).  Within 30 days after the Closing Date, Buyer shall prepare and deliver to Seller the Final Balance Sheet and a calculation of the Final Payoff Amount.  The Final Balance Sheet shall be prepared in accordance with GAAP and, to the extent consistent with GAAP, on the basis of the same accounting principles and practices, and, regardless of whether consistent with GAAP, in the same format and utilizing the same line item classifications, as were used by Seller and the Company (as the case may be) in preparing the Estimated Balance Sheet, the Balance Sheet and the example Estimated Balance Sheet set forth on Schedule 1.2 hereto.

Section (b).  Within 30 days after Seller's receipt of the Final Balance Sheet (together with the calculation of the Final Payoff Amount) from Buyer, Seller shall provide Buyer with written notice indicating whether Seller agrees or disagrees with such calculation, and, if Seller disagrees with such calculation, setting forth Seller's calculation of the Final Payoff Amount.  If Seller agrees with such calculation, or if Seller fails to deliver to Buyer such written notice within such 30-day period, the Final Balance Sheet and the calculation of the Final Payoff Amount shall be deemed final.  Buyer shall, and shall cause the Company, and the Company's and Buyer's officers and employees to, afford to Seller and its officers, employees and agents reasonable access at reasonable times to the officers, employees, properties, books and records of the Company and shall furnish to Seller all financial and other data and information relating to the Company as Seller may reasonably request in connection with Seller's review of the Final Balance Sheet and calculation of the Final Payoff Amount.

Section (c).  Within 10 Business Days after Buyer's timely receipt of any notice of disagreement with the Final Balance Sheet or the calculation of the Final Payoff Amount, Buyer and Seller shall begin negotiations to resolve such disagreement.  The Parties shall negotiate at all times in good faith.  If such Parties are unable to resolve such disagreement within 15 Business Days after such negotiations begin, such disagreement shall be submitted to an independent nationally recognized auditing firm selected by the Parties (the "Settlement Auditor") for resolution in a manner consistent with the provisions of this Agreement.  The Parties shall cooperate with the Settlement Auditor and shall proceed in good faith to cause the Settlement Auditor to resolve such disagreement within 60 days after such disagreement is submitted to the Settlement Auditor.  The fees and expenses of the Settlement Auditor (i) shall be paid by Seller if Buyer's calculation of the Final Payoff Amount is closer to the Settlement Auditor's calculation of the Final Payoff Amount than Seller's calculation of the Final Payoff Amount, (ii) shall be paid by Buyer if Seller's calculation of the Final Payoff Amount is closer to the Settlement Auditor's calculation of the Final Payoff Amount than Buyer's calculation of the Final Payoff Amount and (iii) shall be paid one-half by Seller and one-half by Buyer if neither Seller's calculation of the Final Payoff Amount nor Buyer's calculation of the Final Payoff Amount is closer to the Settlement Auditor's calculation of the Final Payoff Amount than the other.

Section (d).  The Settlement Auditor, in its sole discretion, shall determine (i) the nature and extent of the participation by Buyer and Seller in connection with the resolution of any disagreement submitted to the Settlement Auditor, (ii) the nature and extent of information that Buyer and Seller may submit to the Settlement Auditor for consideration in connection with such resolution and (iii) the personnel of the Settlement Auditor who shall review such information and resolve such disagreement.  The Settlement Auditor's resolution of any such disagreement shall be reflected in a written report which shall be delivered promptly to, and shall be final and binding upon, the Parties and the Initial Payoff Amount shall be adjusted accordingly to reflect any such resolution.

-1-

Section (e).  For purposes of this Schedule 1.4 and the Agreement, the following term shall have the following meaning:

"Final Payoff Amount" shall mean the sum of:

(a)      an amount equal to (x) the Total Assets as set forth on the Final Balance Sheet, less (y) the Assumed Liabilities as set forth on the Final Balance Sheet, less (z) the Equity, *provided*, that in the event that such amount is in excess of $500,000,000, such amount shall equal $500,000,000; and

(b)      the amount of Pay-Off Liabilities.

## ANNEX A

Jeffrey G. Tennyson
Robin A. Allcock
Dana C. Acker
Shawn G. Butterworth
Richard J. Gordon
David J. Smith
John T. Smith
Christopher J. Tucci

NY12528.266865.1

Exhibit 2

**EFC Holdings and Subsidiaries**
**Balance Sheet As of March 30, 2007**

| | EFC Holdings | EquiFirst | EquiFirst MN | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Cash | 82,630,603 | 3,875,514 | - | - | 86,506,118 |
| Other Receivables: DNC Loans | - | 8,456,944 | - | - | 8,456,944 |
| Intercompany Receivable/Payable RBK | - | (740,809) | - | - | (740,809) |
| Intercompany Receivable/Payable | (81,790,514) | 81,894,001 | (103,487) | - | 0 |
| Mortgage Notes AFS | - | 212,282,254 | 2,995,285 | - | 215,277,539 |
| Mortgage Notes HFI | - | 13,407,011 | - | - | 13,407,011 |
| Loan Interest Receivables | - | 1,432,348 | - | - | 1,432,348 |
| Loan Rec.-Cap Purchase Premium | - | - | - | - | - |
| Capitalized Origination Costs | - | 3,283,521 | - | - | 3,283,521 |
| Other Assets | - | 14,926,434 | - | - | 14,926,434 |
| Deferred Tax Asset | - | 91,161,064 | - | - | 91,161,064 |
| **Total Current Assets** | 840,089 | 429,978,282 | 2,891,798 | - | 433,710,169 |
| | | | | | |
| Investment in EquiFirst Corp | (68,399,214) | - | - | 68,399,214 | - |
| Investment in EMC of Minnesota | (6,056) | - | - | 6,056 | - |
| **Total Other Assets** | (68,405,270) | - | - | 68,405,270 | - |
| | | | | | |
| Fixed Assets | - | 30,792,046 | - | - | 30,792,046 |
| Accum. Dep. Fixed Assets | - | (20,239,501) | - | - | (20,239,501) |
| **Total Fixed Assets** | - | 10,552,545 | - | - | 10,552,545 |
| | | | | | |
| **TOTAL ASSETS** | (67,565,181) | 440,530,828 | 2,891,798 | 68,405,270 | 444,262,715 |
| | | | | | |
| | | | | | |
| Accounts Payable | 18,180 | 3,807,266 | - | - | 3,825,445 |
| Interest Not Yet Earned | - | 3,891 | - | - | 3,891 |
| Accrued Wages | - | 10,946,790 | - | - | 10,946,790 |
| Withholdings Payable | - | 814 | - | - | 814 |
| Accd. 401(k) Expense | - | 79,201 | - | - | 79,201 |
| Repurchase Liability | - | 146,769,299 | - | - | 146,769,299 |
| Other Liabilities | - | 15,097,302 | - | - | 15,097,302 |
| Interest Payable | - | 9,648,230 | - | - | 9,648,230 |
| Income Taxes Payable | - | (1,167,401) | (95,553) | - | (1,262,954) |
| Deferred Origination Income | - | 1,481,084 | - | - | 1,481,084 |
| Deferred Tax Liability | - | 10,191,973 | 2,993,407 | - | 10,191,973 |
| Lines of Credit | - | 312,071,593 | - | - | 315,065,000 |
| **TOTAL LIABILITIES** | 18,180 | 508,930,042 | 2,897,854 | - | 511,846,075 |
| | | | | | |
| Common Stock | 1,000 | 1,000 | 25,000 | (26,000) | 1,000 |
| Additional Paid in Capital | 9,489,560 | 50,448,944 | 2,500 | (50,451,444) | 9,489,560 |
| Retained Earnings-Prior | 129,716,643 | 87,717,876 | 189,974 | (87,907,849) | 129,716,644 |
| Retained Earnings-Current | (206,790,563) | (206,567,034) | (223,530) | 206,790,563 | (206,790,564) |
| **TOTAL EQUITY** | (67,583,360) | (68,399,214) | (6,056) | 68,405,270 | (67,583,360) |
| | | | | | |
| **TOTAL LIABILITIES AND EQUITY** | (67,565,181) | 440,530,828 | 2,891,798 | 68,405,270 | 444,262,715 |

**EFC Holdings and Subsidiaries**
**Final Payoff Amount**

| | |
|---|---:|
| **Purchase Price** | 225,000,000.00 |
| | |
| Initial Payoff Amount | |
|    Total Assets | 444,262,715 |
|    Assumed Liabilities | (511,846,075) |
|    Equity | (150,000,000) |
|       subtotal - adjustment for change in Equity | (217,583,360) |
| Pay-Off Liabilities[1] | 324,713,230 |
|    **Total Final Payoff Amount** | 107,129,870 |
| | |
| 1 Pay-Off Liabilities | |
|    Principal Amount Outstanding | 315,065,000 |
|    Amount of accrued and unpaid interest | 9,648,230 |
|    **Total LOC principal and interest** | 324,713,230 |
| | |
|    Initial Payoff Amount | 175,795,064 |
|    Final Payoff Amount | 107,129,870 |
|       Adjustment due Barclays | 68,665,194 |
| | |
|    Taxes Payable due to Regions | 740,809 |

Exhibit 3

# ALSTON&BIRD LLP

One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309-3424

404-881-7000
Fax: 404-881-4777
www.alston.com

Christopher C. Frieden                    Direct Dial: 404-881-7457          E-mail: chris.frieden@alston.com

May 25, 2007

*VIA FACSIMILE, EMAIL and OVERNIGHT DELIVERY*

Barclays Capital
200 Park Avenue
New York, New York 10166
Facsimile: (212) 412-7353
Attn:   Richard Smith, Director

Sullivan & Cromwell LLP
125 Broad Street
New York, New York 10004
Facsimile: (212) 558-3588
Attn:   Mark J. Menting
        Brian E. Hamilton

> Re:   Seller Disagreement with Buyer Prepared Final Balance Sheet and Final Payoff
> Amount Calculation Pursuant to Section 1.4 and Schedule 1.4 of the Stock Purchase Agreement,
> dated as of January 18, 2007, by and between Regions Bank and Barclays Capital Real Estate
> Holdings Inc. (the "Stock Purchase Agreement")

Gentlemen:

On behalf of Regions Bank ("Seller"), this letter shall constitute notice under Section 1.4
and Schedule 1.4(b) of the Stock Purchase Agreement of Seller's disagreement with the Final
Balance Sheet and calculation of the Final Payoff Amount as prepared by Barclays Capital Real
Estate Holdings Inc. ("Buyer") and delivered by Sullivan & Cromwell LLP on behalf of Buyer in
a letter dated April 27, 2007. Attached please find the Final Balance Sheet prepared by Seller
together with Seller's calculation of the Final Payoff Amount.

Sincerely,

Christopher C. Frieden

cc:   Ed Fay, Regions Bank
      Christopher Tucci, EquiFirst

Bank of America Plaza          90 Park Avenue          3201 Beechleaf Court, Suite 600          The Atlantic Building
101 South Tryon Street, Suite 4000   New York, NY 10016          Raleigh, NC 27604-1062          950 F Street, NW
Charlotte, NC 28280-4000        212-210-9400            919-862-2200          Washington, DC 20004-1404
704-444-1000            Fax: 212-210-9444          Fax: 919-862-2260          202-756-3300
Fax: 704-444-1111                                                  Fax: 202-756-3333

**EFC Holdings and Subsidiaries**
**Final Payoff Amount**

|  | Barclays | Regions | Disputed Amount |
|---|---|---|---|
| Purchase Price | 225,000,000 | 225,000,000 | - |
|  |  |  |  |
| Initial Payoff Amount |  |  |  |
| Total Assets | 444,262,715 | 422,191,856 | (22,070,859) |
| Assumed Liabilities | (511,846,075) | (418,344,825) | 93,501,250 |
| Equity | (150,000,000) | (150,000,000) | - |
| subtotal - adjustment of change in Equity | (217,583,360) | (146,152,969) | 71,430,391 |
| Pay-Off Liabilities[1] | 324,713,230 | 324,713,230 | - |
| Total Final Payoff Amount | 107,129,869 | 178,560,261 | 71,430,391 |

| 1 Pay-Off Liabilities |  |  |  |
|---|---|---|---|
| Principal amount outstanding | 315,065,000 | 315,065,000 | - |
| Amount of accrued and unpaid interest | 9,648,230 | 9,648,230 | - |
| Total LOC principal and interest | 324,713,230 | 324,713,230 | - |

|  | Barclays | Regions | Disputed Amount |
|---|---|---|---|
| Initial Payoff Amount | 175,795,064 | 175,795,064 | - |
| Final Payoff Amount | 107,129,869 | 178,560,261 | 71,430,391 |
| Adjustment due Barclays / (Regions) | 68,665,195 | (2,765,197) | (71,430,391) |
|  |  |  |  |
| Taxes Payable due to Regions | 740,809 | 740,809 | - |

# EFC Holdings
# Balance Sheet
# March 30, 2007

| | Estimate<br>March 30, 2007 | EquiFirst *<br>March 30, 2007 | Regions<br>Response |
|---|---|---|---|
| Cash | 69,680,968 | 86,506,118 | 86,506,118 |
| Other Receivables: DNC Loans | 4,500,000 | 8,456,944 | 8,456,944 |
| Intercompany Receivable/Payable RBK | - | (740,809) | (740,809) |
| Intercompany Receivable/Payable | - | 0 | 0 |
| Mortgage Notes AFS | 240,380,812 | 215,277,539 | 227,186,999 |
| Mortgage Notes HFI | 16,177,621 | 13,407,011 | 16,153,243 |
| Loan Interest Receivables | 5,800,000 | 1,432,348 | 1,432,348 |
| Loan Rec.-Cap Purchase Premium | - | - | |
| Loans Rec.-Capitalized Costs | 543,007 | 3,283,521 | 3,283,521 |
| Other Assets | 13,619,131 | 14,926,434 | 15,596,505 |
| Deferred Tax Asset | 50,154,559 | 91,161,064 | 53,454,993 |
| Total Current Assets | 400,856,099 | 433,710,169 | 411,329,861 |
| | | | |
| Investment in EquiFirst Corp | - | - | |
| Investment in Money America | | - | |
| Investment in EMC | | - | |
| Investment in EMC of Minnesota | - | - | |
| Total Other Assets | - | - | |
| | | | |
| Fixed Assets | 31,101,496 | 30,792,046 | 31,101,496 |
| Accum. Dep. Fixed Assets | (20,289,883) | (20,239,501) | (20,239,501) |
| Total Fixed Assets | 10,811,613 | 10,552,545 | 10,861,995 |
| | | | |
| TOTAL ASSETS | 411,667,712 | 444,262,715 | 422,191,856 |
| | | | |
| | | | |
| Accounts Payable | 4,225,000 | 3,825,445 | 3,237,733 |
| Interest Not Yet Earned | 25,000 | 3,891 | 3,891 |
| Accrued Wages | 8,971,711 | 10,946,790 | 9,140,560 |
| Withholdings Payable | - | 814 | 814 |
| Accd. 401(k) Expense | 55,000 | 79,201 | 79,201 |
| Repurchase Liability | 69,777,129 | 146,769,299 | 63,155,998 |
| Other Liabilities | 3,815,790 | 15,097,302 | 14,099,786 |
| Interest Payable | 9,648,230 | 9,648,230 | 9,648,230 |
| Income Taxes Payable | (3,282,947) | (1,262,954) | (242,965) |
| Deferred Revenue | 239,436 | 1,481,084 | 1,481,084 |
| Deferred Tax Liability | 2,046,530 | 10,191,973 | 2,675,493 |
| Regions Line of Credit | 315,065,000 | 315,065,000 | 315,065,000 |
| TOTAL LIABILITIES | 410,585,878 | 511,846,075 | 418,344,825 |
| | | | |
| Common Stock | 1,000 | 1,000 | 1,000 |
| Additional Paid in Capital | 9,460,546 | 9,489,560 | 9,489,560 |
| Retained Earnings-Prior | 129,716,643 | 129,716,644 | 129,716,644 |
| Retained Earnings-Current | (138,096,355) | (206,790,564) | (135,360,172) |
| TOTAL EQUITY | 1,081,834 | (67,583,360) | 3,847,031 |
| | | | |
| TOTAL LIABILITIES AND EQUITY | 411,667,712 | 444,262,715 | 422,191,856 |

\* This is the balance sheet that was sent to Regions by Barclays on 4/27.

Exhibit 4




Non-Conforming Results™

Ne

| Home | Inside The Box | Programs with Results | Broker Toolbox | In Print & In Person | Careers |

**Inside the Box**

How We Got Here

Message From the CEO

Customer Point of View

To Our Valued Mortgage Brokers

## How We Got Here

Beginning in 1990 when the non-conforming lending industry was in its infancy, the company was forged with the ethics, professional practices and service standards more akin to relationship banking than non-conforming lending. EquiFirst has always striven to provide "Non-Conforming Results" in non-conforming lending.



Today, EquiFirst is a premier national lender headquartered in Charlotte, N.C., providing wholesale non-conforming loans. We are the standard-bearer for personalized, in-person service recognized within the industry. We couple our excellent service with a wide range of non-conforming serve our brokers' needs.

With centralized operation centers in Charlotte and Phoenix providing loan processing and services, we have more than 470 underwriter-trained account executives across the U.S. | exceptional service.

Brokers are clearly drawn to our non-conforming approach. EquiFirst has experienced dou sometimes triple-digit growth each year we've been in business. Over 1,300 associates jo last year to write more than $10 billion in loans.

It's not too late for you to experience Non-Conforming Results for yourself. Contact EquiFi



**Employee Login** | **Sitemap** | **Privacy Policy**

**Copyright © 2007 EquiFirst Corporation.**

Equal Housing Opportunity. Terms and Licensing.

PROPOSED ORDER

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X

BARCLAYS CAPITAL REAL ESTATE                    :
HOLDINGS INC.
                                                :
        Petitioner,                             :        ____ Civ. _____ (      )
                                                :
                - against -                     :
                                                :        **[PROPOSED] ORDER**
                                                :        **DIRECTING PARTIES TO**
                                                :        **PROCEED TO**
REGIONS BANK                                    :        **ARBITRATION**
                                                :
        Respondent.                             :
                                                :
------------------------------------------------------------------ X

        Petitioner Barclays Capital Real Estate Holdings Inc., having filed a petition

pursuant to 9 U.S.C. § 4 for an order directing that arbitration proceed in the manner provided for

in Schedule 1.4 of the January 18, 2007 Stock Purchase Agreement between Petitioner and

Respondent Regions Bank, and the petition having come on for hearing, and the Court upon due

deliberation having found that neither the making of the Stock Purchase Agreement of January

18, 2007 between Petitioner and Respondent for arbitration nor the failure of Respondent,

Regions Bank to comply is in issue;

        IT IS ORDERED that Petitioner Barclays Capital Real Estate Holdings Inc. and

Respondent Regions Bank proceed forthwith to present to_____, as

Settlement Auditor under the terms of said Stock Purchase Agreement, all of their disagreements

concerning the Final Balance Sheet and the calculation of the Final Payoff Amount, as those

terms are used in said Stock Purchase Agreement; that Regions is enjoined from commencing

any lawsuit on the same subject matter against Barclays (including its affiliates, members,

employees, officers and agents) in any jurisdiction without a report of such Settlement Auditor

having been issued; and that the costs and expenses of bringing this motion are awarded to

Petitioner together with the statutory pre-judgment simple interest awarded on damages for

breach of contract at the rate of nine (9) percent (there being no pre-judgment interest rate

specified in the SPA).

Dated: _____ ___, 2007
      New York, New York

                                   _____
                                   United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BARCLAYS CAPITAL REAL ESTATE

HOLDINGS INC.,

       Petitioner,

   -against-

REGIONS BANK,

       Respondent.

_____ Civ. _____ (  )

## PETITION TO COMPEL ARBITRATION

CLEARY GOTTLIEB STEEN & HAMILTON LLP
ATTORNEYS FOR PETITIONER

ONE LIBERTY PLAZA
BOROUGH OF MANHATTAN
NEW YORK, N.Y. 10006
(212) 225-2000

COPY RECEIVED

THIS _____ DAY OF _____ 20_____