UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X

BARCLAYS CAPITAL REAL ESTATE
HOLDINGS INC.

      Petitioner,

          - against -

REGIONS BANK

      Respondent.

------------------------------------------------------------------- X

:

:

07 Civ. 76__ ( )

:

:

:

:


## PETITIONER'S MEMORANDUM OF LAW
## IN SUPPORT OF ITS APPLICATION TO COMPEL ARBITRATION


CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
(212) 225-2000
Attorneys for Barclays Capital Real Estate Holdings Inc.


Of Counsel:

Evan A. Davis
Mitchell A. Lowenthal
Jason P. Gottlieb
Anna A. Makanju

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES………………………………………………………….    ii

PRELIMINARY STATEMENT…………………………………………………….....    2

STATEMENT OF FACTS…………………………………………………………….    4

    A. Overview of Dispute…………………………………………………………..    4

    B. The Parties………………………………………………………………….    8

    C. Topics of Disagreement…………………………………………………….    8

             1. Repurchase Reserves……………………………………….….    8

             2. Mortgage Loans Valuation………………………………………    10

             3. Deferred Tax Asset Valuation Allowance………………………..    12

             4. Other Issues…………………………………………………....    13

ARGUMENT………………………………………………………………………….    15

POINT I    THE PARTIES' AGREEMENT CONTROLS AND MUST BE
              CONSTRUED IN FAVOR OF THE AGREED DISPUTE RESOLUTION
              PROCEDURE………………………………………….…………………    15

POINT II   THE PARTIES' AGREEMENT MAKES CLEAR THAT GAAP ISSUES
              RELATING TO THE FINAL BALANCE SHEET ARE TO BE RESOLVED
              BY THE SETTLEMENT AUDITOR…………………..……………….…..    17

    A. The SPA Specifically Calls For Reference To A Settlement Auditor…………..    17

    B. New York Law Is Not To The Contrary……………………………………….    18

CONCLUSION……………………………………………………………………….    19

# TABLE OF AUTHORITIES

| Statutes | Page(s) |
|---|---|
| 9 U.S.C. § 2…………………………………………………………………….. | 15 |
| 9 U.S.C. § 4…………………………………………………………………….. | 16 |

Cases

| | |
|---|---|
| *AT&T Techs., Inc. v. Commc'ns Workers of Am.*,<br>475 U.S. 643 (1986)………………………………………………………………. | 15 |
| *CAE Indus. Ltd. v. Aerospace Holdings Co.*,<br>741 F. Supp. 388 (S.D.N.Y. 1989)…………………………………………………….. | 16 |
| *Genesco, Inc. v. Kakiuchi & Co.*,<br>815 F.2d 840 (2d Cir. 1987)……………………………………………………………. | 16 |
| *In re Chung & President Enters.*,<br>943 F.2d 225 (2d Cir. 1991)……………………………………………………………. | 15 |
| *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,<br>473 U.S. 614 (1985)………………………………………………………………. | 15 |
| *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,<br>460 U.S. 1 (1983)………………………………………………………………. | 15 |
| *Oldroyd v. Elmira Sav. Bank, FSB*,<br>134 F.3d 72 (2d Cir. 1998)…………………………………………………………….. | 16 |
| *Talegen Holdings v. Fremont Gen. Corp.*,<br>No. 98 Civ. 0366 (DC), 1998 U.S. Dist. LEXIS 12805 (S.D.N.Y. Aug. 19, 1998)……… | 16 |
| *Westmoreland Coal Co. v. Entech, Inc.*,<br>100 N.Y.2d 352 (2003)………………………………………………………………… | 18 |

Petitioner Barclays Capital Real Estate Holdings Inc. ("Barclays" or "Petitioner") submits this Memorandum of Law in support of its application under the Federal Arbitration Act (the "FAA"), 9 U.S.C. § 4, for an order compelling Regions Bank ("Regions" or "Respondent") to comply with the dispute resolution procedure specified in Schedule 1.4 of a certain Stock Purchase Agreement between Petitioner and Respondent dated January 18, 2007 (the "Agreement" or the "SPA").[1]  The Agreement is attached as Exhibit 1 to the accompanying Declaration of Richard Gordon (the "Gordon Declaration").

In accordance with the Agreement, Petitioner seeks an order (1) compelling Respondent to submit to final and binding resolution before a Settlement Auditor to be chosen by this Court (absent agreement by the Parties) certain disputes relating to the preparation of the Final Balance Sheet and the calculation of the Final Payoff Amount, all in accordance with Schedule 1.4 of the Agreement; (2) enjoining Respondent from commencing any lawsuit on the same subject matter against Petitioner (including its affiliates, members, employees, officers and agents), in any jurisdiction, without a prior determination of the Settlement Auditor that such action would be outside the scope of its jurisdiction; and (3) requiring Respondent to reimburse Petitioner for the cost and expenses (plus statutory prejudgment interest thereon) incurred in bringing this motion, on the ground that the refusal to submit to ADR resolution by the Settlement Auditor all of the disagreements described in the Gordon Declaration is a breach of Respondent's commitments under the Agreement.

---

[1]  Petitioner and Respondent will be collectively referred to as the "Parties."  Capitalized terms that are not defined herein have the same meaning as set forth in the Agreement.

## PRELIMINARY STATEMENT

This is an action to enforce a contractual agreement to have a purchase price adjustment dispute resolved – as the Parties specifically agreed – by "an independent nationally recognized auditing firm." The purchase price adjustment mechanism at issue here provides for an adjustment based on a Final Balance Sheet prepared by the Buyer. The Final Payoff Amount is calculated from this Final Balance Sheet. It is then compared to an Initial Payoff Amount determined prior to the Closing Date based on an Estimated Balance Sheet prepared by Seller. If the Final Balance Sheet results in a Final Payoff Amount less than the Initial Payoff Amount, then Seller pays the difference to Buyer. Petitioner Barclays and Respondent Regions disagree over the Final Payoff Amount and, as a result, the amount which Barclays or Regions must pay the other. Barclays contends that it is owed approximately $68.67 million. Regions contends that it is owed approximately $2.77 million.

The initial amount paid when a company is acquired is often based on interim financials available at the time the acquisition is priced. Because these interim financials may not correspond to the actual value of the company at closing, a purchase price adjustment provision allows the preparation of a post-closing financial statement that would accurately reflect the closing date value of the company. The issue arises whether, if the interim financial statement was not prepared in accordance with GAAP, the post-Closing financial statement prepared in accordance with GAAP is controlling – even if inconsistent with the prior financial statement.

Where the intent of the parties was that consistency controls over GAAP, and the intent of the parties is to capture changes that result from operations and not from accounting adjustments, adjustments to final amounts made to rectify GAAP errors in the interim financial

2

statement are not permitted. The only recourse for the party claiming a GAAP error in the interim financial statement is to sue for breach of the representation and warranty that the relevant initial financial statement was prepared in accordance with GAAP.

Respondent contends that this same approach is required here. What it neglects to acknowledge is that the post-closing adjustment mechanism at issue here works in a very different way from that just described.

First, Barclays and Regions made clear in the SPA that the accounting principles and practices used to calculate the Estimated Balance Sheet and the Initial Payoff Amount would not be used to calculate the Final Balance Sheet and the Final Payoff Amount, if those principles and practices were not consistent with GAAP. In fact, they explicitly agreed that GAAP would control over consistency, stating that "the Final Balance Sheet shall be prepared in accordance with GAAP and, to the extent consistent with GAAP, on the basis of the same accounting principles" that were used in preparing the Estimated Balance Sheet. Gordon Decl. Ex. 1 at Schedule 1.4(a) (emphasis added).

Second, the adjustment process the Parties specified was structured to do more than just capture changes that result from operations. Because of the language just quoted, it would also determine whether the methodology used to capture those changes complies with GAAP.

Third, the Parties structured the process so that an Estimated Balance Sheet would be replaced with a Final Balance Sheet in calculating the Final Payoff Amount. The process turns on the *substitution* of the Final for the Estimated, and not on a side-by-side comparison of the two. Only the Final Balance Sheet would be used to calculate the Final Payoff Amount, and the Parties gave the Settlement Auditor exclusive authority to resolve any disagreement relating

3

to that Final Balance Sheet. The SPA does not call on the Settlement Auditor to undertake any

comparison at all of results under the Estimated Balance Sheet with results under the Final

Balance Sheet. The Settlement Auditor determines Final Balance Sheet results only.

Fourth, the Parties did not leave open any possibility for court resolution of the

GAAP issues. While the Agreement's definition of "Estimated Balance Sheet" says that the

Estimated Balance Sheet is to be prepared in accordance with GAAP, this balance sheet is

further defined to be a "good faith best estimate" based on the accounting policies and

procedures used in preparing the December 31, 2005 Balance Sheet, "to the extent consistent

with GAAP." Although the consistency of the December 31, 2005 Balance Sheet with GAAP is

warranted, the Estimated Balance Sheet definition does not assume the accuracy of that

representation. Under the SPA, the Final Balance Sheet was required to be presented, as of

March 30, 2007, in accordance with GAAP. No representation or warranty was made as to

whether the Estimated Balance Sheet was prepared in accordance with GAAP.

For all these reasons, it is entirely plain that the parties intended any GAAP or

other disagreements that arise in connection with the Final Balance Sheet to be determined by

the Settlement Auditor.

## STATEMENT OF FACTS

Barclays contends that this dispute should be resolved by a Settlement Auditor

under procedures specified in the SPA. Regions contends that some or all of the matters which

Barclays contends are to be resolved by the Settlement Auditor should be resolved by a court.

## A.    Overview of Dispute

The SPA documents Barclays' purchase of EFC from Regions. With the

acquisition of EFC Holdings Corporation ("EFC"), Barclays also became the owner of EFC's

4

wholly-owned subsidiary EquiFirst Corporation ("EquiFirst"), a wholesale subprime mortgage lender. The notional purchase price of EFC was $225,000,000, but Barclays was aware that EquiFirst was operating in a volatile and declining market, and therefore included within the SPA provisions to ensure that the sales price properly reflected EFC's value on the Closing Date. To address this issue, the SPA required Regions to deliver an Estimated Balance Sheet to Barclays shortly before the Closing Date. The Estimated Balance Sheet would be used to determine the Initial Payoff Amount – an amount that would be included in the calculation of the sum Barclays would initially pay Regions. Based upon Regions' Estimated Balance Sheet, the Initial Payoff Amount was $175,795,064. See Gordon Decl. ¶ 4.

Thereafter, as provided in Schedule 1.4 of the SPA, Barclays was required to prepare a Final Balance Sheet, and timely did so. The purpose of the Final Balance Sheet was to determine the Final Payoff Amount. This -- plus $225 million – was the amount Barclays would have to pay for EFC. See Exhibit 1, § 1.3. To the extent the Final Payoff Amount differed from the Initial Payoff Amount, the Parties would make the appropriate adjustment – i.e., either an increase in the payment by Barclays, if the Final Payoff Amount were greater than the Initial Payoff Amount, or a return of payment by Regions, if the Final Payoff Amount were less than the Initial Payoff Amount. In either case, the difference is to be paid with simple interest at the rate of 3% from the Closing Date, which was March 30, 2007. See Gordon Decl. ¶ 5.

The Final Balance Sheet prepared by Barclays demonstrated that the Final Payoff Amount ($107,129,870) was less than the Initial Payoff Amount ($175,795,064), so under the terms of the SPA the Seller, Regions, had to return funds to the Buyer, Barclays. See Gordon Decl. ¶¶ 6, 11.

The underlying dispute concerns disagreements among the Parties about the preparation of that Final Balance Sheet, something the Parties contemplated might happen, and something the Parties explicitly provided in the SPA would be resolved by a "Settlement Auditor." Regions, however, disagrees with the role of the Settlement Auditor and has refused to proceed with the Settlement Auditor selection process, necessitating this Motion to Compel. See Gordon Decl. ¶ 7.

The SPA provides that the Final Balance Sheet "shall be prepared in accordance with GAAP, and, to the extent consistent with GAAP, on the basis of the same accounting principles and practices, and, regardless of whether consistent with GAAP, in the same format and utilizing the same line item classifications, as were used by Seller and the Company (as the case may be) in preparing the Estimated Balance Sheet, the Balance Sheet [defined to be the audited balance sheet at December 31, 2005] and the example Estimated Balance Sheet set forth on Schedule 1.2 hereto." Exhibit 1, Schedule 1.4(a). In other words, the SPA is clear that if an accounting principle or practice used in preparing the Estimated Balance Sheet is not in accordance with GAAP, then the requirement of GAAP, rather than consistency with the Estimated Balance Sheet, controls in the preparation of the Final Balance Sheet. See Gordon Decl. ¶ 8.

The Final Payoff Amount is defined in Section (e) of Schedule 1.4 to mean "the sum of (a) an amount equal to (x) the Total Assets as set forth on the Final Balance Sheet, less (y) the Assumed Liabilities as set forth on the Final Balance Sheet, less (z) the Equity [defined to mean $150,000,000], *provided*, that in the event that such amount is in excess of $500,000,000, such amount shall equal $500,000,000; and (b) the amount of the Pay-Off Liabilities [referring to

6

an amount owing under a certain line of credit]." These amounts are to be determined in accordance with the rules for determining the Final Balance Sheet. Exhibit 1, Schedule 1.4.

Schedule 1.4 of the SPA sets forth the procedure for the preparation of and the resolution of disputes about the Final Balance Sheet and the calculation of the Final Payoff Amount. It says that within 30 days after the Closing Date, the Buyer will prepare and deliver to Seller the Final Balance Sheet and the calculation of the Final Payoff Amount. Within 30 days of Regions' receipt of the Final Balance Sheet and the calculation of the Final Payoff Amount, Regions must provide Barclays with a written notice stating whether Regions agrees or disagrees with such calculation. If Regions disagrees, it must set forth its calculation of the Final Payoff Amount. If there is such a notice of disagreement, the Parties are to begin negotiations within 10 Business Days. If they are unable to resolve their disagreement within 15 Business Days after such negotiations begin, then "such disagreement shall be submitted to an independent nationally recognized auditing firm selected by the Parties (the 'Settlement Auditor') for resolution consistent with the provisions of this agreement." The Settlement Auditor's "resolution of any such disagreement" shall be reflected in a written report, which shall be delivered promptly to and shall be final and binding on the Parties. See Gordon Decl. ¶ 10.

On April 27, 2007 Barclays delivered to Regions a Final Balance Sheet and calculation of the Final Payoff Amount (a true and correct copy of which is attached as Exhibit 2). The Final Payoff Amount as calculated by Barclays was $107,129,870. On May 25, 2007 Regions delivered to Barclays a notice of disagreement together with its calculation of the Final Payoff Amount (a true and correct copy of which is attached as Exhibit 3). The Final Payoff Amount as calculated by Regions is $178,560,261. The difference between the two is $71,430,391. The Parties have exchanged correspondence and have otherwise negotiated

7

regarding the resolution of their disagreement but have been unable to resolve their disagreement within the time period specified in Schedule 1.4. Regions has stated that it believes that some or all of the matters covered by the notice of disagreement should not be submitted to the Settlement Auditor for resolution, thereby making this Motion to Compel necessary. See Gordon Decl. ¶ 11.

## B.    The Parties

Buyer, Barclays, is a privately held corporation chartered in Delaware and headquartered in New York. See Gordon Decl. ¶ 12.

Seller, Regions, is a bank chartered under the laws of the state of Alabama and headquartered in Birmingham, Alabama. Regions is owned by Regions Financial Corporation. See Gordon Decl. ¶ 13 & Ex. 3.

EquiFirst, a wholly-owned subsidiary of EFC, is a national lender headquartered in Charlotte, N.C., providing wholesale subprime mortgage loans through independent mortgage brokers across the United States. See Gordon Decl. ¶ 14 & Ex. 4.

## C.    Topics of Disagreement

### 1.    Repurchase Reserves

EquiFirst's business model involves the origination of mortgage loans through a nationwide network of independent mortgage brokers and the subsequent bundling and sale of such mortgage loans to external investors. EquiFirst has maintained and is required by GAAP to maintain a reserve in the event that the entity to whom EquiFirst has sold a mortgage loan exercises its right under the transaction documents to require EquiFirst to repurchase the mortgage loan. See Gordon Decl. ¶ 15.

8

To fix the amount of this reserve, EquiFirst must estimate the frequency with which it will be required to repurchase mortgage loans and the severity of the losses it will suffer on those mortgage loans after repurchase. Frequency is expressed as a percentage of mortgage loans sold in a given month. Severity is expressed as a percentage of expected loss on the original amount of mortgage loans sold. See Gordon Decl. ¶ 16.

In preparing the Final Balance Sheet, Barclays used frequency and severity figures that were higher than those Regions believed should have been used. In setting its frequency and severity levels for the Repurchase Reserve, Barclays used information that was available as of the Closing Date as well as information that became available between the Closing Date and April 27, when the Final Balance Sheet was delivered in accordance with the SPA. Because this information concerned only time periods prior to the Closing Date and reflected conditions existing on the Closing Date, Barclays is of the view that GAAP required this information be taken into account in preparing the Final Balance Sheet. Regions is of the view that the information considered by Barclays in preparing the Final Balance Sheet included information that was not considered pursuant to the Company's past accounting practices. Regions contends that GAAP does not require adjustments to the Final Balance Sheet as a result of the information that became available through the date the Final Balance Sheet was delivered. Barclays responds that much of the information on actual repurchase frequencies and severities was available when the Estimated Balance Sheet was prepared, and that in any event GAAP prevails over consistency with past practice (assuming, without conceding, that past practices differed from the practices employed in preparing the Final Balance Sheet). Even though Regions prepared the Estimated Balance Sheet, it now contends that the methodology used in calculating the Repurchase Reserve in the Estimated Balance Sheet (the same methodology used

by Barclays in creating the Final Balance Sheet) represented a departure from the Company's past accounting practice and should not have been employed.  See Gordon Decl. ¶ 17.

The amount in controversy as a result of this disagreement is approximately $82.6 million.[2]  Regions contends that this topic of disagreement must be judicially resolved as set forth in Article IX of the SPA because it involves, according to Regions, an assertion by Barclays of a breach by Regions of its agreements and representations.  Barclays believes that under the terms of Schedule 1.4, this topic of disagreement, like all the other items of disagreement described herein, should be resolved by the Settlement Auditor because, among other things, the Settlement Auditor is specifically instructed by the SPA to apply GAAP in the event of an inconsistency between the accounting policies and practices previously used and GAAP.  See Gordon Decl. ¶ 18.

## 2.    Mortgage Loans Valuation

This topic deals with the valuation of mortgage loans (and notes backed by those loans) that are "available for sale" but "impaired" (known as "AFSI Mortgage Loans").  AFSI Mortgage Loans are mortgage loans on which the Company estimates upon sale it may realize an amount less than the principal amounts otherwise due from the underlying borrowers according to the contractual terms governing the mortgage loan due to some type of defect or delinquency.  See Gordon Decl. ¶ 19.

As part of the Acquisition, in accordance with the SPA, the Parties agreed that Regions would sell most of these loans before the Closing Date.  Thus, under the SPA, Regions

---

[2]    The amounts at issue with respect to particular topics of disagreement are stated before account is taken of the tax benefit realized from the adjustments. The aggregate tax benefit adjustment for all items of disagreement is set forth at Paragraph 37 of the Gordon Declaration.

was to sell or commit for sale such AFSI Mortgage Loans until it held under $5 million of uncommitted loans.  See Gordon Decl. ¶ 20; SPA § 6.22(b).

Regions entered into executory agreements for the sale of the majority of the AFSI Mortgage Loans to third parties.  Under these executory agreements, the purchasers had the right to exclude certain AFSI Mortgage Loans from the transaction if these mortgage loans did not successfully pass the purchasers' due diligence reviews.  This is common in the industry; the exercise of this right is generally referred to as a "Loan Kick."  See Gordon Decl. ¶ 21.

As of the Closing Date, Regions had entered into agreements for the sale of approximately $23 million worth of AFSI Mortgage Loans to third parties that those third parties subsequently rejected.  See Gordon Decl. ¶ 22.

The accounting issue in dispute is how, in accordance with GAAP requirements, to establish the carrying value of those Loan Kicks as of the Closing Date.  See Gordon Decl. ¶ 23.

On the Final Balance Sheet, Barclays accounted for the Loan Kicks using GAAP, which requires management to consider all available information prior to the issuance of financial statements in order to establish market values to be recorded, asset impairments or loss contingencies.  Because the $23 million of Loan Kicks for AFSI Mortgage Loans committed to be purchased as of the Closing Date had already been rejected by the time the Final Balance Sheet was prepared by Barclays, Barclays estimated the market value of these loans for purposes of preparing the Final Balance Sheet based on the underlying characteristics of the loans and based on its knowledge of the whole loan market for such loans in accordance with GAAP.  See Gordon Decl. ¶ 24.

11

Regions disagrees with this treatment on the Final Balance Sheet, and believes that the Loan Kicks should not be re-valued, instead using the sales prices for the trades in which these loans were originally committed as of March 30, 2007, as their value. See Gordon Decl. ¶ 25.

The amount in controversy on the basis of this topic of disagreement is approximately $11.9 million. See Gordon Decl. ¶ 26.

### 3.    Deferred Tax Asset Valuation Allowance

In 2006 and the first quarter of 2007, EquiFirst had estimated taxable losses. Because during this time period EquiFirst was owned by Regions, these taxable losses are to be included in Regions' 2006 and 2007 U.S. consolidated income tax returns. Thus, these taxable losses should be available to Regions to offset taxable income from other members of the Regions Bank group (in effect reducing Regions' overall tax bill). See Gordon Decl. ¶ 27.

However, Regions and EquiFirst did not file state tax returns on a consolidated basis in all U.S. states. For those states in which EquiFirst files its own state tax return (over two dozen states), its tax losses are unavailable to offset other income from the Regions group. EquiFirst should be able, however, to use those tax losses (as well as any future tax deductions related to temporary book-tax differences), subject to individual state tax laws, to offset future income that EquiFirst may generate in those states. See Gordon Decl. ¶ 28.

This future offset is normally treated as a deferred tax asset on the balance sheet. See Gordon Decl. ¶ 29.

Under GAAP, deferred tax assets must be reduced by a certain amount (called a "valuation allowance") if it is more likely than not that some portion or all of the deferred tax assets will not be realized. See Gordon Decl. ¶ 30.

12

Barclays contends that under this standard EquiFirst may not be able to realize the full benefit of this tax asset and as a result placed a valuation allowance against the deferred tax asset in preparing the Final Balance Sheet. See Gordon Decl. ¶ 31.

Thus, Barclays prepared the Final Balance Sheet on the basis that under GAAP it was necessary to establish a valuation allowance – that is, it was necessary to account for a decrease in EquiFirst's deferred tax assets, a net decrease of its overall assets, and thus, a recognized expense. In Barclays' view it was necessary to maintain a valuation allowance in order to properly account for taxes under GAAP. See Gordon Decl. ¶ 32.

The Parties disagree on the need to maintain such a valuation allowance. See Gordon Decl. ¶ 33.

The amount in controversy as result of this disagreement is approximately $7.5 million. See Gordon Decl. ¶ 34.

**4.    Other Issues**

Regions disputes the treatment of several other items on the Final Balance Sheet. These items involve relatively smaller dollar amounts than the three major items detailed above, but in each case, the issue appears to be whether or not the accounting on the Final Balance Sheet is as required by GAAP. In brief, these items are as follows:

- **"Held For Investment" Valuation Adjustment** (approximately $2.7 million). Certain loans that were previously categorized by Regions as either available for sale (AFS) or available for sale impaired (AFSI) contained certain deficiencies that made them difficult to sell under traditional terms of sale, so these loans were subsequently categorized as held for investment (HFI) by Regions. These loans are exclusive of those mortgage loans referred to in paragraphs 19-26 above. The issue is how these loans should have been accounted for when moved from AFS to HFI status; in particular, whether to value the loans using then-current market values or then-current carrying values. Barclays contends that GAAP requires these loans should have been transferred at current market values, not at carrying values.

13

- **Vacation Time Accrual and Year-end Bonus Accrual Adjustments** (approximately $1.8 million). When the Final Balance Sheet was prepared, Barclays had actual, detailed information about accrued vacation times for EquiFirst employees through the Closing Date, and used that information as required by GAAP. Similar to the Vacation Time Accrual, when the Final Balance Sheet was prepared, Barclays was able to estimate an appropriate year-end bonus pool to accrue.

- **Premium Recapture Reserves** (approximately $1.0 million). When EquiFirst sells loans at a premium to face value, an initial loan sale premium is recorded as revenue. However, if the loan is paid in full within 12 months (or in some cases within 90 days, dependent on the terms of the underlying mortgage loan purchase agreement), that loan sale premium is reimbursable to the purchaser. Barclays recorded a reserve for such repayments in the Final Balance Sheet. The issue is whether that reserve, in that amount, was required under GAAP.

- **"Real Estate Owned" ("REO") Valuation Adjustment** (approximately $0.7 million). When the Final Balance Sheet was prepared the actual properties held at March 30, 2007 were known and updated information regarding brokers' opinion of the values as of the real estate that EquiFirst owned was available. As required by GAAP, Barclays used that information to prepare the Final Balance Sheet. In preparing the Final Balance Sheet, Barclays also estimated the liability for the costs to sell such REO consistent with the methodology employed by Regions in preparing the December 31, 2006 audited financial statements and the Estimated Balance Sheet.

- **Accounts Payable** (approximately $0.6 million). In calculating the Accounts Payable balance in the Final Balance Sheet, Barclays accrued for all invoices related to expenses incurred prior to the Closing Date, as required by GAAP, including invoices that were not yet received on March 30, but were received prior to the delivery of the Final Balance Sheet.

- **RAKIS Fixed Asset Write-off** (approximately $0.3 million). RAKIS is a software program that EquiFirst attempted to implement to produce and process loan documents. It never worked; it proved incompatible despite efforts to integrate it into EquiFirst's systems and therefore the software had no ongoing benefit. As a result and as required by GAAP, Barclays wrote off the cost of the software (treating the item as an "impaired fixed asset") in preparing the Final Balance Sheet.

See Gordon Decl. ¶ 35.

The amount in controversy as a result of these other miscellaneous disagreements is approximately $7.1 million. See Gordon Decl. ¶ 36.

The total amount of all disagreements is approximately $109.1 million or $71.4 million net of the tax benefit to be realized from the adjustments.

## ARGUMENT

## POINT I

## THE PARTIES' AGREEMENT CONTROLS AND MUST BE CONSTRUED IN FAVOR OF THE AGREED DISPUTE RESOLUTION PROCEDURE

It is well settled that "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983); see also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 627 (1985) (courts are required "liberally to construe the scope of arbitration agreements covered by [the FAA]"). As a result, where an arbitration agreement exists, there is a presumption of arbitrability and the parties must be ordered to arbitrate "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." AT&T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 650 (1986) (emphasis added).

This Court has jurisdiction to issue such an order to compel under the Federal Arbitration Act ("FAA") if: (1) there is a written arbitration agreement; (2) diversity provides an independent basis for federal jurisdiction; and (3) the underlying transaction involves interstate commerce. See 9 U.S.C. § 2; see also In re Chung & President Enters., 943 F.2d 225, 229 (2d Cir. 1991). Where these criteria have been satisfied, federal arbitration law should be applied in reviewing the petition. In re Chung, 943 F.2d at 229.

15

These three criteria are easily met. There is indeed a written arbitration agreement: SPA § 1.4 and SPA Schedule 1.4.[3] Diversity is satisfied: Barclays is a Delaware corporation that is headquartered here, and Regions is a bank chartered under Alabama law and headquartered there. See SPA at 1 (preamble); Gordon Decl. ¶¶ 12-13. The underlying transaction, the sale of EFC, involves interstate commerce. Thus, the FAA applies.

The Court is not free to substitute its judgment for that of the Parties as to the wisdom of the dispute resolution procedure they crafted. The FAA reflects the "strong federal policy favoring arbitration," Oldroyd v. Elmira Sav. Bank, FSB, 134 F.3d 72, 76 (2d Cir. 1998), mandating that, when faced with a petition to compel arbitration due to the alleged failure, neglect or refusal of a party to proceed to arbitration, district courts "shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement," 9 U.S.C. § 4. The FAA "provisions are mandatory: '[b]y its terms, the Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed.'" Genesco, Inc. v. Kakiuchi & Co., 815 F.2d 840, 844 (2d Cir. 1987) (quoting Dean Witter Reynolds Inc. v. Byrd, 470 U.S. 213, 218 (1985)).

---

[3]    It is well settled that dispute resolution provisions such as the one here, which requires a purchase price adjustment dispute to be resolved by a settlement auditor, constitute enforceable arbitration agreements. See, e.g., Talegen Holdings v. Fremont Gen. Corp., No. 98 Civ. 0366 (DC), 1998 U.S. Dist. LEXIS 12805 (S.D.N.Y. Aug. 19, 1998); CAE Indus. Ltd. v. Aerospace Holdings Co., 741 F. Supp. 388, 392 (S.D.N.Y. 1989).

## POINT II

## THE PARTIES' AGREEMENT MAKES CLEAR THAT GAAP ISSUES RELATING TO THE FINAL BALANCE SHEET ARE TO BE RESOLVED BY THE SETTLEMENT AUDITOR

In this case there is actually no need to resort to the "strong federal policy favoring arbitration." The Agreement itself makes it crystal clear that all disagreements relating to the Final Balance Sheet are to be resolved by the Settlement Auditor.

### A.    The SPA Specifically Calls For Reference To A Settlement Auditor

As contemplated by the SPA, Barclays prepared the Final Balance Sheet – the consolidated balance sheet of EFC and its subsidiaries (including EquiFirst) as of March 30, 2007. See SPA at 49 (§ 10.1(a), definition of "Final Balance Sheet"), Schedule 1.4(a). In preparing the Final Balance Sheet, Barclays used the same accounting principles and practices as EquiFirst had used in the December 31, 2005 Balance Sheet and the Estimated Balance Sheet historically, but only to the extent that those principles and practices were consistent with GAAP. That is exactly what Schedule 1.4 directed Barclays to do.

Barclays now has a disagreement with Regions because Regions contends that a different set of accounting policies and procedures is consistent with GAAP and past practice and therefore had to be used in preparing the Final Balance Sheet under the terms of the Agreement.

The agreement could not be clearer as to who shall resolve such a disagreement: "such disagreement *shall be submitted* to an independent nationally recognized auditing firm selected by the Parties (the 'Settlement Auditor') for resolution in a manner consistent with the terms of this Agreement." SPA Schedule 1.4(c) (emphasis added). The Parties agreed that it is for the Settlement Auditor, not a court, to determine the nature and extent of the participation of

17

the Parties in the resolution process and of the information that the Parties will submit in

connection with the resolution of their disagreement.  The determination of the Settlement

Auditor will follow within 60 days.  It will be written, delivered promptly to the Parties, and final

and binding upon them.  See SPA Schedule 1.4(d).  These time limits are to be followed because

the SPA specifies that time is of the essence.  See Ex. 1 at ¶ 10.13.

        The question of who decides this dispute is not a minor or technical point.  The

GAAP issues identified herein are vital to calculating the amount of the Final Payoff Amount in

dispute between the Parties.  As set forth in the Gordon Declaration, they involve, among other

things, what recognition GAAP requires of information that becomes available after the "as of"

date of a financial statement but before it is actually issued.  This Court can take judicial notice

that in the context of the acquisition of a subprime mortgage origination business during a

volatile time for such businesses, such subsequent information could be highly material to an

accurate determination of the state of financial affairs as of the Closing Date.

**B.**    **New York Law Is Not To The Contrary**

        Regions has told Barclays that it believes a New York Court of Appeals case

justifies its position that the GAAP issues in dispute here are to be resolved by a court.  In

Westmoreland Coal Co. v. Entech, Inc., 100 N.Y.2d 352 (2003), another case involving a post-

closing purchase price adjustment, the seller objected to certain figures in the post-closing

financial statements prepared by the buyer.  The buyer in Westmoreland argued that the

allegedly GAAP-objectionable items were merely carryovers from the seller's interim financial

statement used to establish the baseline for adjustment, which the seller represented was prepared

in accordance with GAAP.  Id. at 359.  The Court held that these GAAP issues should be

resolved by a court in an action for breach of representation and warranty.

The decision in <u>Westmoreland</u> rests on that Court's conclusion that the parties intended consistency to prevail over GAAP compliance; that the intent was to compare two financial statements on an "apples to apples" basis with the goal of determining changes that resulted from operations, and not from accounting methodology corrections.

For the reasons already explained, that same intent cannot be found here. The instructions as to how to prepare the Final Balance Sheet are exactly to the contrary – prior practice controls only "to the extent consistent with GAAP." The purchase price adjustment exercise called for in the Agreement is not the side-by-side comparison of two balance sheets but the substitution of a Final Balance Sheet for an Estimated Balance Sheet. No recourse for a court resolution of GAAP issues was left open though a warranty as to GAAP compliance of the Estimate Balance Sheet. There is no such warranty. For all these reasons the rationale of the <u>Westmoreland</u> decision is not applicable here.

## CONCLUSION

For the reasons set forth above, Barclays respectfully requests that this Court submit the disputes outlined herein to alternative dispute resolution by a "Settlement Auditor" as described in the relevant sections of the SPA, enjoin Regions from commencing any lawsuit on the same subject matter against Barclays (including its affiliates, members, employees, officers and agents) in any jurisdiction without a prior determination of the Settlement Auditor that such action would be outside the scope of its jurisdiction, and award Petitioner appropriate costs and expenses.

Dated: August **28**, 2007
      New York, New York

                      Respectfully submitted,

                      CLEARY GOTTLIEB STEEN & HAMILTON LLP

By:_____

                        Evan A. Davis
                        Mitchell A. Lowenthal
                        Jason P. Gottlieb
                        Anna A. Makanju

                      One Liberty Plaza
                      New York, New York 10006
                      (212) 225-2000

                      Attorneys for Petitioner Barclays Capital Real
                        Estate Holdings Inc.